**IN THE UNITED STATES DISTRICT COURT
FOR THE DISCTRICT OF MARYLAND
Southern Division**

CARMEN GIBSON                        :
            Plaintiff          :

v.                                   :  **Civil Action No.:  L-02-CV-3827**

ENCORE MARKETING                     :
INTERNATIONAL, INC.                  :
            Defendant          :

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT'S
MOTION FOR SUMMARY JUDGMENT**

COMES NOW, the Defendant, Encore Marketing International, Inc., (hereinafter "Encore"), and pursuant to Fed. R. Civ. P. 56, submits this Memorandum of Law in Support of Defendant's Motion for Summary Judgment and moves this Honorable Court to grant its Motion for Summary Judgment in its entirety and enter judgment for the Defendant as a matter of law, and in furtherance thereof states as follows:

## I.    INTRODUCTION

This case is a dispute involving employment compensation between Plaintiff Carmen Gibson, a former Encore employee and Defendant Encore, as Plaintiff's former employer. The Plaintiff was employed in various job positions while with Encore from October 1995 through May 2001.  Plaintiff's positions included, Customer Service Representative, Senior Customer Service Representative, Quality Specialist, Telemarketing Specialist, Telemarketing Manager, and Campaign Manager.  Plaintiff's claims in this case are based on positions held from November 1999 – May 2001, including Telemarketing Process Specialist, Telemarketing Account Manager, and Campaign Manager.

Plaintiff brought this action in November 2002, alleging claims under both the Maryland Wage and Hour Law ("MWHL") and the Federal Fair Labor Standards Act ("FLSA") for "unpaid overtime wages." (Compl. at ¶3, 4)  Defendant Encore answered the Complaint in December 2002, generally denying all of the allegations contained in the Complaint.  Since that time, the parties have completed discovery, except for the deposition of Encore employee David Gallimore which is scheduled for Tuesday, July 1, 2003.  In accordance with the Court's Scheduling Order, Defendant files the instant summary judgment motion, which, if granted, would dispose of all issues in this case.

## II.    STATEMENT OF MATERIAL FACTS TO WHICH THERE IS NO GENUINE DISPUTE

While certain facts may be in dispute, as Plaintiff will surely argue, those facts in dispute are not material to the issue of whether or not Plaintiff was an exempt employee under the FLSA and the MWHL.

Indeed, for purposes of this motion, Defendant will rely nearly exclusively on the Plaintiff's own deposition testimony, the averments in her complaint and answers to interrogatories and the documents she created and produced to the Defendant or documents with which she expressly agrees.  This is because, even under Plaintiff's version of the facts, the Defendant is still entitled to summary judgment as a matter of law.

Plaintiff began employment with Encore in October 1995 as a Customer Service Representative.  She was promoted several times including in December 1996 to Senior Representative, a promotion to Monitoring Specialist, and in July of 1998 a promotion to the telemarketing department as Tape Processing Coordinator.  Each transition was a promotion and each promotion came with a raise.  *See* Deposition of Carmen Gibson attached hereto as Exhibit 1 at 13(22) – 14(1-4).  In December 1998, Plaintiff was again promoted, this time to

2

Telemarketing Process Specialist.  At this point, the Plaintiff became a salaried employee.
Then, in June 2000, Plaintiff was promoted to Teleservices Manager, and received a pay raise
to approximately $38,000.00.  Finally, in March 2001, Plaintiff was promoted to Campaign
Manager with a pay raise to approximately $48,000.00.  At the time of Plaintiff's termination
on May 31, 2001, her annual salary was $48,000. *See* Plaintiff's Answers to Interrogatories at
¶14-15, attached hereto as Exhibit 2.

    As stated above, generally, the Plaintiff's job title throughout employment with
Encore changed as she gained more responsibility and received compensation increases.
Exhibit 1 at 22(5-11).   Plaintiff became a salaried, exempt employee when she promoted to
Telemarketing Process Specialist in December 1998.  Plaintiff's claims in this suit only
request damages for the period November 1999 through May 31, 2001.  (Compl. at ¶ 10; 14.)

    As a Telemarketing Process Specialist, Plaintiff stated that part of her job was
"listening to customer service rep's telephone calls to make sure that they're providing
customer service, quality customer service, to make sure they're not being rude to the
customers, that they're being professional to the customers and they're following the
company's policies."  Exhibit 1 at 12(21-22); 13(1-5).  Her duties included, but were not
limited to: script[1] revisions including implementing clients' suggested/desired language,
monitoring representatives calls and providing feedback, processing paperwork, and preparing
reports.  Exhibit 1 at 15(5-22).

    As a Telemarketing Manager, Plaintiff's responsibilities increased from her prior
position.  Exhibit 1 at 21(8-22).  She was now responsible for duties including, but not limited
to: reviewing reports from outside vendors, disseminating information to vendors, monitoring

---

[1] Script is the sheet detailing what a customer representative is supposed to say when making telephone calls.
Exhibit 1 at 17 (1-11).

customer service representatives, working with the information technology department to startup new programs, working with the accounting department, day-to-day contact with vendors, reviewing vendors' performance results daily, and attending meetings. *Id.*  In addition to the added responsibility, Plaintiff also received a pay raise when promoted to the position of Telemarketing Manager.  Exhibit 1 at 22(5-14).

In March 2001, Plaintiff was again promoted, this time to Campaign Manager. Her annual salary rose to approximately $48,000.  Exhibit 1 at 22(16-21).  As Campaign Manager, Plaintiff's duties, generally, included the same as those performed as a Teleservices Manager. Exhibit 1 at 28 (8-13).

Throughout the relevant time period herein (the time period for which overtime compensation is demanded in the Complaint), the Plaintiff engaged in call monitoring.  The Plaintiff listened to live telephone calls made by vendors and observed and evaluated vendor performance.  Plaintiff explains what this entailed:

```
PAGE 17
12    Q      Okay. And you said that you were also, as a
13    telemarketing specialist, monitoring calls? Would
14    this be the same that we spoke about when you were a
15    service customer representative? Senior customer –
16    A.     No. It's similar but different. In the
17    telemarketing department we did not make calls
18    internally. We hired companies to perform
19    telemarketing calls for us. So I would listen into
20    the companies that were making the calls for us.
21    Q.     And you would listen to live conversations?
22    A.     Yes.

PAGE 18
1     Q.     And what was the purpose of that?
2     A.     Just to make sure that those representatives
3     were adhering to Encore's policies and following all
4     procedures and they were selling the product
5     professionally.
```

```
10    Q.     Would you comment upon the professionalism
11    of the representative you listened to?
12    A.     Yes. We had a standard form that we use to
13    Monitor and we would rate them on a scale of one to
14    five.
15    Q.     For such things as – can you give me an
16    Example besides professionalism?
17    A.     Their tone, listening skills, grammar,
18    Enunciation, pronunciation, common courtesy, polite.
```

Exhibit 1 at 17(12)-18(5); (10-18).  After monitoring sessions, the Plaintiff reported her

observations, suggestions and evaluations to clients and to other Encore personnel, including

her supervisor.  Exhibit 1 at 18(6-9); 23(11-16).

During the positions of Telemarketing Specialist and Campaign Manager, the Plaintiff

went on business trips to vendor sites on behalf of Encore and/or one of Encore's clients.

Exhibit 1 at 50(4-22).  These trips were not day trips, but required spending at least one night

out of town. Exhibit 1 at 49(15-20).  These trips were sometimes taken without a supervisor.

Exhibit 1 at 53(19-21).  During these trips, taken "maybe once every three months, maybe

twice a month" (Exhibit 1 at 50(14-15)), the Plaintiff had an automatic expense account of

$100 for any purchases made at her discretion.  Exhibit 1 at 54(10-19); 56(3-6).

The Plaintiff was compensated on a bi-weekly basis throughout her employment with

Encore.  Exhibit 1 at 45(16-18); Exhibit 2 at ¶15.  Additionally, the Plaintiff received fringe

benefits, including medical and dental insurance as a consequence of her employment with

Encore.  Exhibit 2 at ¶15.  Plaintiff's work hours *prior* to becoming a Telemarketing Process

Specialist were tracked through Plaintiff's use of the telephone.  When she arrived at work in

the morning she would log onto her phone, and when she left in the evening she would log

off.  Exhibit 1 at 60(21)-61(17).  This was the most efficient way to keep track of the

Plaintiff's hours since her job revolved around phone usage at that time.  After this time, once

Plaintiff reached a salaried level, her hours were no longer formerly and automatically tracked by herself or by Encore[2].  Exhibit 1 at 63(13-19).

### III.    STANDARD OF REVIEW

Summary judgment is to be rendered "if the pleadings, depositions, answers to interrogatories, and admissions, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  The party seeking summary judgment "bears the initial responsibility of informing the district court of the basis for its motion," and of establishing, based on relevant portions of the record, that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  *See also Catawba Indian Tribe of South Carolina v. South Carolina*, 978 F.2d 1334, 1339 (4th Cir. 1992); Fed. R. Civ. P. 56(c).  "[W]here the non-moving party will bear the burden of proof at trial on a dispositive issue, a summary judgment motion may properly be made in reliance solely on the 'pleadings, depositions, answers to interrogatories and admissions on file.'"  *Celotex, supra*, 477 U.S. at 324.  The moving party may also use affidavits in support of its motion.

Once this initial showing under Rule 56(c) is made, the burden of production, but not persuasion, shifts to the non-moving party.  In this regard, the non-moving party "may not rest upon the mere allegations or denials of its pleading; rather the non-moving party must, by citing its own affidavits or referring to "'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'"  *Id.*  When "the moving party has carried its burden under Rule 56(c), its opponent must do

---

[2] In part because an exempt salaried employee is paid a set salary regardless of the quantity or quality of their work.  Formally tracking Plaintiff's hours was no longer necessary to determine compensation.

more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986) (footnote omitted). Rule 56(e) states that "when a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response ... must set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P 56(e); *Pine Ridge Coal Co. v. Local 8377, UMW*, 187 F.3d 415, 421 (4th Cir. 1999).

Summary judgment is appropriate if, upon consideration of the record as a whole, a reasonable trier of fact could not find for the non-movant. *See Allstate Fin. Corp. v. Financorp. Inc.,* 934 F.2d 55, 58 (4th Cir. 1991). But, where a faithful examination of the record establishes the absence of a genuine issue of material fact, it is "the affirmative obligation of the trial judge to prevent 'factually unsupported claims and defenses' from proceeding to trial." *Felty v. Graves-Humphreys Co.,* 818 F.2d 1126, 1128 (4th Cir. 1987).

It is evident from the Plaintiff's own description of her qualifications and job duties that she is an administrative employee exempt from the overtime provisions of the FLSA and the MWHL. The exhibits attached hereto are sufficient to adjudge that, as a matter of law, the Plaintiff is an exempt employee. The determination of whether an employee is an exempt administrative employee is a question of law and is appropriate for summary judgment. *Shockley v. City of Newport News*, 907 F.2d 18, 26 (4th Cir. 1993). Therefore, the Defendant respectfully requests that this Court make its determination on Motion for Summary Judgment and enter judgment for Defendant Encore as a matter of law.

## IV.    ARGUMENT

**1.    Plaintiff is an Exempt Administrative employee Under both FLSA and MWHL.**

Count I of Plaintiff's Complaint alleges a violation of the FLSA, specifically 29 U.S.C. § 207(a)(1). (Compl. at ¶8.)  Count II of Plaintiff's Complaint alleges violations of Maryland Wage and Hour Law, and specifically Maryland *Labor and Employment* Code Ann. §§ 3-415; 3-420.  (Compl. at ¶13.)  The substance of both counts is the same, as is Defendant's defense thereto.  The Plaintiff was exempt from the overtime provisions of the FLSA because she was an "administrative" employee, an express exception to the requirements of 29 U.S.C. § 207(a)(1).  FLSA section 207(a)(1) states in relevant part:

> No employer shall employ any of his employees … for a workweek longer than forty hours unless such employee receives compensation for his employment in excess of the hours above specified at a rate not less than one and one-half time the regular rate at which he is employed.

29 C.F.R. § 541.2 provides the test for determining an employee's status as an "administrative employee."  Because the Plaintiff here earned at least $250 per week, the "short test" of 29 C.F.R. § 541.2 is triggered.  The short test exempts employees from the overtime pay provisions of the FLSA if they are "employed in a bona fide … administrative … capacity."  29 C.F.R. § 541.2.  That test covers any employee who (i) is compensated on a salary or fee basis at a rate of not less than $ 250 per week; (ii) whose primary duty consists of the performance of office or nonmanual work directly related to management policies or general business operations of his employer or his employer's customers; and (iii) whose work requires the exercise of discretion and independent judgment.  *Id.*

**A.**     **Plaintiff's Primary Duty was Nonmanual Work Directly Related**
           **To Management Policies And General Business Operations.**

Plaintiff's job requirements consisted mainly of nonmanual work directly related to Encore's management policies and general business operations.

As a Telemarketing Process Specialist, Plaintiff stated that her job consisted mainly of "listening to customer service rep's telephone calls to make sure that they're providing customer service, quality customer service, to make sure they're not being rude to the customers, that they're being professional to the customers and they're following the company's policies."  Exhibit 1 at 12(21-22); 13(1-5).  Her duties also included, but were not limited to: script revisions including implementing the clients suggested/desired language, monitoring representatives calls and providing feedback, processing paperwork, and preparing reports.  Exhibit 1 at 15(5-22).

Additionally, the job description, attached hereto as Exhibit 3, includes functions that consist solely of office work that is nonmanual in nature.  **Plaintiff agreed** that although she did not prepare the description, she "generally agree[s] with the items that are listed there as being the telemarketing specialist responsibilities or job duties[.]" Exhibit 1 at 72(1-11).

The job description that Plaintiff agreed with includes items such as, generating monthly reports for each vendor and presenting those reports at quarterly meetings, handling client and customer complaints, being responsible for quality control, developing inbound, outbound and other scripts, contacting product managers for product updates, making revision to scripts, tracking vendor performance, making recommendations regarding monitoring, ensuring quality manuals for all new vendors, making site recommendations regarding the quality of vendors, training vendors and make recommendations regarding campaigns. *See generally* Exhibit 3.

These job duties cannot be performed by a machine, they inherently require independent judgment, thought and discretion.  Although the Plaintiff was required to attend meetings and give reports, that does not mean that she did not engage in independent judgment, discretion and thought when responding to client and customer complaints or when evaluating vendor sites.  Plaintiff was responsible for implementing suggestions regarding vendor training.  That requires the use of judgment.  Plaintiff contends and will surely emphasize in opposition hereto, that she reported any suggestions back to upper level management at employee meetings.  However, she had the opportunity to hear the suggestions when they were made, to take in and process the suggestions, and to form an opinion of whether suggestions were good or bad prior to her even stepping foot into a meeting.  The way the suggestion was presented to a superior or co-worker was up to the Plaintiff.

The job description for Telemarketing Account Manager, attached hereto as Exhibit 4, was produced by Plaintiff's Counsel and identified by Plaintiff as "the job description for the Telemarketing Account Manager." Plaintiff further stated that "[y]es. I agree with it."  Exhibit 1 at 73(1-13).  The job description states that Plaintiff was responsible for revenue generation / financial implications, vendor management including decision making regarding placement of programs, strong communication, follow-through, and negotiating skills, responsible for managing day to day functions of telemarketing report analyst, providing regular support, direction, coaching and feedback, and cross functional team, involvement with Sales and Client Services to maintain a thorough understanding of strategies and decision making for individual clients. *See generally* Exhibit 4.

Again, these job duties placed Plaintiff in a crucial role in that her performance of these duties directly related to **management policies** and the **general business operations** of

Encore.  Plaintiff was responsible for the revenue being generated for the programs that she oversaw.  This included being the point person for the vendors that she decided would handle the programs.  *See* Exhibit 4 at Vendor Management (Decision making regarding placement of programs.)  The success of programs offered by Encore to their clients kept Encore in business.  If the programs failed so did Encore's business.  This was a crucial role to the company and simply because Plaintiff reported "success" of the programs and gave status updates at meetings attended by personnel such as "the President of the company, the Vice-President of the company, or Accounting Department or Client Services Department[,]" (Exhibit 1 at 27(10-14)), does not de-emphasize or negate the importance of Plaintiff's position or the fact that while performing her duties she was required to make judgment calls and use her independent discretion.

As this Court has stated before, exempt employee's decisions "need not be immune from review, revision, or reversal. The types of decisions that qualify may be in the form of **recommendations to superiors and subject to review and approval**." *Sticker v. Easter Off Road Equip., Inc.,* 935 F. Supp. 650 (D. Md. 1996).  (emphasis supplied.)

### B.    Plaintiff Customarily and Regularly Exercised Discretion and Independent Judgment While Assisting a Bona Fide Executive Employee

Under the FLSA, the administrative duties test is satisfied if the Plaintiff spent over 50% of her time at Encore (1) doing "office or non-manual work directly related to management policies or general business operations of" Encore, and if (2) this work included "work requiring the exercise of discretion and independent judgment."  29 C.F.R. § 541.2.  *See also, West v. Anne Arundel County, Md.,* 137 F.3d 752, 764 (4th Cir. 1998).  The regulations instruct that "the exercise of discretion and independent judgment involves the comparison and the evaluation of possible courses of conduct and acting or making a decision

after the various possibilities have been considered." 29 C.F.R. § 541.207(a). The fact that decisions made by an employee are subject to the review of her superiors is not a bar to the application of the administrative exemption. *See* 29 C.F.R. § 541.207(e)(1). *See also*, *West*, 137 F.3d at 764. Additionally, an exempt administrative employee need not actually participate in either the formulation of policy or the broad operation of the business. Rather, employees whose work is directly related to management policies or to general business operations includes an employee whose work affects policy or whose responsibility it is to execute or carry it out. 29 C.F.R. § 541.205(c). *See also, Stricker v. Eastern Off Road Equipment, Inc*., 935 F. Supp. 650, 656 (D. Md. 1996). Job duties directly related to management policies or general business operations include "advising the management, planning, negotiating, representing the company, purchasing, promoting sales, and business research and control." 29 C.F.R. § 541.205(b). *See also, Stricker*, 935 F.Supp. at 657. Based upon her own description, Plaintiff's job duties encompassed the above-referenced criteria.

Plaintiff represented the company and the clients on business trips to vendor sites. The trips included locations such as Pittsburgh, Canada, North Carolina, etc. . . . Exhibit 1 at 50(4-8). During these trips, the Plaintiff was the eyes and ears of Encore and/or one of Encore's clients. Plaintiff would frequently travel to vendor's sites with the clients and/or co-workers to inspect and evaluate the sites and the personnel. *See generally* Exhibit 1 at pp. 50-51. Plaintiff stated that when the clients would accompany her, she would essentially represent Encore by accompanying the clients through a tour of the vendor sites highlighting "how they're set up [and] the type of equipment that they use." Exhibit 1 at 52(4-19.) If the clients did not go, the Plaintiff would report back to the client and inform them of what she observed. Exhibit 1 at 53(5-9). Plaintiff would also have to communicate the information to

Encore, as she did not always travel with a direct supervisor.  Exhibit 1 at 53(10-12; 19-20).

The Plaintiff was not sent on vendor site visits to simply carry someone else's briefcase.  She

was there because it was part of *her job* to *represent the company and/or the client*.  When she

returned from these trips it was her job to relay to both the client and Encore the status and

progress of the vendor site.  Exhibit 1 at 53(5-12).  Furthermore, on these site trips the

Plaintiff came up with and implemented her own ways to motivate site personnel.  Pursuant

thereto, the Plaintiff had an expense allowance of $100 which was an amount she could spend

without any prior authorization.  Plaintiff testified that she used this money to purchase pizza,

soda and/or candy for the site personnel.  She might also bring them incentives and throw a

party for them in an effort to boost morale.  Exhibit 1 at 53 (1-4); 56(3-6).

The Plaintiff also exercised substantial independent judgment and discretion when

monitoring calls.  As Plaintiff, herself, testified, she would listen for and evaluate the

representative on such items as "politeness," "listening skills" and "professionalism."  Exhibit

1 at 18, *supra.*  This carries with it an inherent necessity to use one's judgment and discretion.

The Plaintiff agreed to this assertion.

> PAGE 92
> 12    Q.      Can you tell me exactly how that would work?
> 13    If you were listening in on a call that a
> 14    representative was making, I believe you told me
> 15    before that such things as tone, courtesy or
> 16    politeness might be an item on the scale, is that
> 17    correct?
> 18    A.      Yes. Correct.
> 19    Q.      And would you then make a **judgment** from one
> 20    to five as to your perception as to where that
> 21    representative fell on that given call?
> 22    A.      Yes.

Exhibit 1 at 92(12-22).

The Code of Federal Regulations delineates those persons who satisfy the "administrative capacity" exemption. It provides that the exemption is limited "to persons who perform work of substantial importance to the management or operation of the business of his employer or his employer's customers." 29 C.F.R. § 541.205(b).

From Ms. Gibson's own testimony, it is apparent that her duties were of "substantial importance" to the employer and to its customers. As an example of this, other marketing managers at Encore would often communicate their suggestions for various telemarketing programs to Ms. Gibson. Exhibit 1 at 40(5-8). Ms. Gibson worked closely with many different departments. She worked and traveled with the Director of Client Services for the startup of new programs, she worked with the Product Manager of the fitness and wellness product to get incentives to send to vendors, and she worked with the IT (information technology) department for the startup of new programs. Exhibit 1 at 43(8-11); 41(22); 42(1-7); 21(15-16). Plaintiff also worked with the accounting department to track vendors' sales. Exhibit 1 at 24(15-21).

Plaintiff was also in day-to-day contact with vendors that were working on her programs and would attend meetings and create reports detailing the information she gathered each day. Exhibit 1 at 21(10-22). Part of Plaintiff's job was to not only make sure that Encore's policies were being adhered to, but also to make sure that the clients were satisfied with the work that vendors were performing on their behalf. In pursuance of this goal, after monitoring calls or after returning from trips to vendor sites, the Plaintiff often shared her observations, judgments and evaluations to not only Encore personnel but directly to the clients as well. Exhibit 1 at 30(22)-31(14). *See also* Exhibit 1 at 53(5-12):

PAGE 53
6      A.       The client would share their feedback

```
7      to me and I would then relay that to my supervisor and
8      we would then discuss that with the vendor if need be.
9      Q.      If there was something that you felt there
10     was a problem with?
11     A.      Right.
12     Q.      Or if there was something that the client
13     felt there was a problem with it?
14     A.      Exactly.
```

It is clear that Plaintiff was a critical source of knowledge for many different departments within Encore.  It is also clear that the Plaintiff represented Encore and often represented Encore's clients when monitoring calls and when on business trips to vendor sites.  As such, she performed a duty of "substantial importance" to Encore and therefore satisfies the "administrative capacity" exemption.

In summary, Plaintiff's work at Encore was clearly nonmanual in nature, was related to the management polices and general business operations and was of "substantial importance" to Encore and its customers.  As the Fourth Circuit Court of Appeals noted in quoting statements from 29 C.F.R. § 541.207(e)(1):

> Nor, **to involve 'matters of consequence,' need the exercise of discretion and independent judgment 'have a finality that goes with unlimited authority and a complete absence of review;' it may instead 'consist of recommendations for action rather than the actual taking of action**,' and 'the fact that an employee's decision … upon occasion [is] revised or reversed … does not mean that the employee is not exercising discretion and independent judgment' of the type contemplated.

*Gilliam v. Montgomery Ward & Co., Inc.,* 1997 U.S. App. LEXIS 19881, *9 (4th Cir. 1997)[3]. (emphasis supplied.)  Ms. Gibson had a job in which she was allowed and required to make suggestions regarding the programs that with which she worked.  She also spent a great amount of time evaluating personnel performance and satisfaction and striving to improve both whether it be by monitoring phone calls and providing feedback to the representative as

---

[3] A copy of this case is attached hereto as Exhibit 5 for the Court's reference.

well as to the client, or whether it be evaluating a vendor site.  The fact that these decisions were reviewed by others and either accepted or rejected does not remove them from the administrative exemption.  Ms. Gibson's work was administrative[4] and thus it exempted her from the overtime provisions of the FLSA and the MWHL[5].

**C.**    **Plaintiff was Compensated at a Rate Exceeding $250 Per Week**

Little need be considered by this Court on the issue of compensation.  Ms. Gibson was paid an annual salary of approximately $30,000 (approximately $577/week for a 52-week work year), received a raise to approximately $38,000 per year (approximately $730/week for a 52-week work year), and then received another raise to approximately $48,000 per year (approximately $923/week for a 52-week work year).  As such, Ms. Gibson is **clearly** not the type of employee for which the FLSA and MWHL were enacted to protect.  Though the amount of salary, alone, is certainly not dispositive of whether an employee satisfies the administrative exemption, it certainly has been one factor seriously considered by this Court.  In *Stanger et al. v. Glenn L. Martin Co.,* 56 F. Supp. 163 (D.Md. 1944), the Court stated:

> In other words, the differentiation between a mere clerk and one with actual administrative ability may be said to lie very largely in, (1) the exercise of discretion and independent judgment, and **(2) in receipt of a salary that is above that customarily paid to one engaged primarily in mere manual or clerical work**.

---

[4] Other employees with job duties less demanding and substantial than those the Plaintiff admits have been held exempt.  The position of administrative assistant was held to be exempt (*Valentine v. Bank of Albuquerque*, 102 NM 489, 697 P.2d 489 (N.M. 1985)), as was that of data analyst (*Booth v. Electronic Data Sys. Corp*., 799 F. Supp. 1086 (D. Kan. 1979)).

[5] MWHL has an equivalent exemption to the FLSA exemption for "administrative capacity."  If the Court finds that the Plaintiff satisfies the FLSA's exemption, then it would necessarily also find her exempt under COMAR 09.12.41.01(B) (2003).

*Stanger,* 56 F. Supp. at 166. (emphasis supplied.)  The Court, then, should seriously consider the great amount of Ms. Gibson's compensation as an important factor here.  It should also be remembered that one of the recognized purposes for the FLSA was "to protect low paid rank and file employees, not higher salaried managerial and administrative employees who 'are seldom the victims of substandard working conditions and low wages.'"  *Counts v. South Carolina Electric & Gas,* 317 F.3d 453, 456 (4th Cir. 2003) (*quoting, Marshall v. Western Union Telegraph Co.,* 621 F.2d 1246, 1251 (3rd Cir. 1980)).

However, there is much more evidence, *supra,* than merely the amount of her compensation, that proves that Ms. Gibson was an exempt administrative employee.  It is clear by the Plaintiff's own description of her job duties as an employee of Encore that she is an exempt administrative employee under the FLSA and the MWHL and as such is simply not entitled to overtime compensation.

2.    **The Fact and Amount of Plaintiff's Damages are Uncertain and Purely Speculative, Making Her Damages' Claim Insufficient as a Matter of Law.**

The fact of damages is one of the basic elements of all civil claims. The three basic elements are: (1) violation of the law; (2) fact of injury; and (3) damages. *Haywood v. Barnes,* 109 F.R.D. 568, 581, 27 Wage & Hour Cas. (BNA) 873 (E.D.N.C. 1986); (citing *Bogosian v. Gulf Oil Corp.,* 561 F.2d 434, 454-56 (3rd Cir. 1978)).  Maryland law has long followed the general principle that, "if compensatory damages are to be recovered, they must be proved with reasonable certainty, and may not be based on speculation or conjecture." *Beynon v. Montgomery Cablevision Ltd. Pshp.,* 351 Md. 460, 513, 718 A.2d 1161 (1998) (citing *Asibem Associates, Ltd. v. Rill,* 264 Md. 272, 276, 286 A.2d 160, 162 (1972); *Charles Co. Broadcasting v. Meares,* 270 Md. 321, 311 A.2d 27 (1973)).  On the other hand, it is true that the Plaintiff need not precisely prove the amount of damages.  As courts have recognized:

> While proof, with mathematical certainty, of the amount of loss or damage is not required, in order for damages to be recoverable the evidence should be such as to enable the court or jury to determine the amount thereof with **reasonable certainty or accuracy. Neither the existence, causation nor amount of damages can be left to conjecture, guess or speculation**.

*Aiken County v. BSP Div. of Envirotech Corp*., 866 F.2d 661, 673 (4th Cir. 1989)(emphasis supplied) (*citing, Gray v. Southern Facilities*, 256 S.C. 558, 183 S.E.2d 438, 444 (1971) (principle reasserted in *Whisenant v. James Island Corp.*, 277 S.C. 10, 281 S.E.2d 794, 796 (1981))). If the Plaintiff cannot meet her burden of reasonably proving the existence and amount of damages, the Court must enter judgment for Defendant Encore as it did in *Seabury Management v. Professional Golfers' Ass'n of Am*., 878 F. Supp. 771, 784 (D. Md. 1994) (the Court granted judgment as matter of law because plaintiff "failed to satisfy burden of establishing any damages with 'reasonable certainty'").

This general rule requiring "reasonable certainty" as to damages also applies to claims, such as the Plaintiff's, brought under the FLSA and MWHL. In these cases, "an employee suing an employer under the Fair Labor Standards Act for unpaid minimum wages or unpaid overtime compensation has the burden of proving that the employee performed the work for which the employee was not properly compensated." *Anderson v. Mt. Clemens Pottery Co*., 328 U.S. 680 (1946). Under these types of claims, the rule that precludes the recovery of uncertain and speculative damages still applies to situations where the fact of damage is itself uncertain. *Marine Services Unlimited v. Rakes*, 323 Ark. 757, 766, 918 S.W.2d 132 (1996) (stating, "the burden of proving damages rests on the party claiming them and **the proof must consist of facts, not speculation**"). (emphasis supplied.) *See also, Minerva Enter., Inc. v. Howlett*, 308 Ark. 291, 824 S.W.2d 377 (1992); *Jonesboro Coca-Cola Bottling*

*Co. v. Young*, 198 Ark. 1032, 132 S.W.2d 382 (1939).

In the case *sub judice*, the Plaintiff fails to provide non-speculative evidence of either the fact or amount of damage. First, Plaintiff is claiming that she should have been paid overtime from November 1999 – May 2001. However, she began in the position in November of 1998 and has no remote possibility of beginning to prove damages until, if at all, November 2000 when she claims to have began keeping track of her hours in her personal organizer.

Second, Plaintiff claims that she arrived every morning between 7:45 a.m. and 8:15 a.m. and that she tracked what time she left according to the time of her last monitoring session. When questioned on the times that Plaintiff worked, the following exchange ensued:

> PAGE 46:
> 14    Q.      And did you sign in when you got to work or
> 15    punch a clock?
> 16    A.      No. We didn't have a sign-in sheet.
> 17    Q.      Did you report to anyone that you had gotten
> 18    to work in the morning?
> 19    A.      No. My immediate superior generally arrived
> 20    after I did so he would generally see me at my area
> 21    when he arrived.

Exhibit 1 at 46(14-21). When questioned on what time she left every night Plaintiff stated that "I would generally leave anywhere from maybe 6:00 to 7:00 p.m. at night." Exhibit 1 at 47(6-7). However, in later testimony, Plaintiff stated that she has "children that have to be picked up from after care by 6:00 o'clock." Exhibit 1 at 93(10-12). So, Plaintiff was not at the office until 6:00 or 7:00 p.m. without leaving her children unattended at aftercare. The hours she alleges to have worked are speculative at best. She also states that she did not stay late working at the office but

that it was "**generally** from home it would be anywhere from **maybe** 6:00 – 8:00 p.m.

**Depending** what time I arrived at home, it **may** be from 5:30 – 7:30. So **it varied**

depending on what time I left the office.  But **generally** I would wrap up **no later**

**than** 8:00 p.m. at night."  Exhibit 1 at 87(13-18).

Plaintiff's records are all speculative; she always uses such qualifiers as;

"maybe," "generally," it "depends," "no later than."  These are guesses from a person

who supposedly kept track of her hours in her personal organizer, attached hereto as

Exhibit 6.  A glimpse of the calendar produced by Plaintiff clearly indicates that any

time kept within its pages can only be decoded by the Plaintiff herself, as the untrained

reader cannot read the pages and say with any specificity or accuracy what hours

Plaintiff worked on any given day.  For example:

> *See* Exhibit 6-1.  **Page 1: Thursday November 2, 2000** – there was a
> monitoring session at 5:30 p.m. However, there is no indication of whether
> Plaintiff made the call from work or home, of how long it actually lasted, or if
> it in fact took place as scheduled.

The next day provided is,

> *See* Exhibit 6-2.  **Page 2: Tuesday November 21, 2000** – this day has no
> identifiably marked time for a monitoring call to begin and is speculative as to
> what time it ended, if it in fact occurred at all.

> *See* Exhibit 6-3.  **Page 3: Thursday January 11, 2001** – Again, scribble
> "monitor – Dubois" but there is no time specified as to when it started or
> ended, or whether it occurred as scheduled or not.

Exhibit 6.

Plaintiff testified that she knows that she left work everyday an hour and a half

after her last monitoring session because the sessions "**typically** lasted about an hour,

and it took **about** a half hour to write the report."  Exhibit 1 at 68(17-20).  However,

all of this is pure speculation.  Plaintiff admits that she did not have a late night

monitoring session every night.  She stated, "[o]kay. Generally I would log all hours that I worked beyond 5:00 p.m.. . . . So I would generally record any hours after 4:30 or 5:00 p.m. on a given day."  Exhibit 1 at 88(11-16).

      In the alternative, even if the Court finds that the Plaintiff has made a proper showing of some damages, by her own admission, Plaintiff is certainly not owed the amount of damages demanded in her Complaint.  There is no evidence whatsoever that Plaintiff worked an average of 60 hours per week for 81 weeks as alleged in her Complaint.  The calendar days Plaintiff produced in response to Defendant's request for production of documents are "only . . . those pages of her calendar . . .which are relevant to the issue of overtime hours worked."  *See* Plaintiff's Response to Defendant's Request for Production of Documents at ¶10, attached hereto as Exhibit 7.  These documents comprise **only 29 days** from November 2000 through May 2, 2001.  This production makes clear that even if Plaintiff is entitled to damages, she is not entitled to the full amount demanded.  Plaintiff's Complaint requests damages for 20 hours of overtime *each week* for 81 weeks. (Compl. at ¶10).  The documents provided by the Plaintiff clearly contradict such an assertion, as the calendar goes for weeks at a time without a single "overtime" entry.  Plaintiff clearly stated that, "in my daily calendar I would just track, you know, days that I had late conference calls, dates that I traveled where I worked long hours."  Exhibit 1 at 48(17-20); *see also* Exhibit 1 at 88(15-16) ("Generally I would log **all** hours that I worked beyond 5:00 p.m.. . . . So I would generally record **any** hours after 4:30 or 5:00 p.m. on a given day.") (emphasis supplied.)  If the Plaintiff logged all of her overtime, and she only produced the documents relevant to overtime, then she can only demand overtime for 29 days.

Additionally, Plaintiff stated that she had to pick her children up from daycare every day around 6:00. Exhibit 1 at 93(10-12). This conflicts with her assertion that she worked every night until 6:00, 7:00 or 8:00 p.m. Exhibit 1 at 47(9-10). Also, if Plaintiff worked from home as she claims, there has been no allowance in her "time-keeping" for time spent traveling, making dinner, or caring for her children.

All overtime alleged by Plaintiff is not only inconsistent but is purely speculative. It is a guess that is not supported by the evidence. Even though the Plaintiff claims to have recorded "**all**" the hours she worked in her personal organizer, she only produced 29 days of alleged overtime and she is not even sure when she began her documentation practice. Exhibit 1 at 63(20)-64(4). Plaintiff has only produced evidence of her personal calendar from November 2000 through May 2001. Plaintiff claims damages for a full year before she has any evidence (no matter how speculative) of any overtime allegedly worked[6].

Meanwhile, it is crucial to note that even if the Plaintiff can sufficiently prove the fact that she may have worked more than 40 hours per week on some occasion, she never did so at Encore's request or at its demand. Ms. Gibson was responsible for scheduling a monitoring session for herself and the client. If they were scheduled late in the day, that was for the convenience of Ms. Gibson and the client as she stated that some calls originated in different time zones. Exhibit 1 at 47(11-13.) However, as discussed *supra,* the monitoring sessions were far from nightly occurrences. Moreover, the Plaintiff never stated that she was denied a request to adjust her hours on days when she had to schedule late sessions with clients in different time zones. In fact, Ms. Gibson admits to leaving work early on some occasions.

---

[6] Defendant is by no means recognizing any merit, authenticity, or accuracy to Plaintiff's supposed method of tracking her hours.

Exhibit 1 at 57(22)-58(2). The attached Affidavit of Chief Operating Officer, Kim Files, corroborates this and provides that Encore allowed the Plaintiff to work a very flexible schedule. *See* Affidavit of Kim Files attached hereto as Exhibit 8. Additionally, Plaintiff admits that she "never" worked on a Sunday (Exhibit 1 at 94(16-17)) and "no more than two Saturdays a month," from "9:00 to 12:00 or no later than 1:00" p.m. Exhibit 1 at 94(18-20); 95(1-2). As such, Plaintiff has fallen far short of demonstrating that she worked an average of 60 hours per week as is alleged in her Complaint.

On the whole, Plaintiff has failed to prove the fact and amount of damages to any reasonable degree, and furthermore, has failed to prove that if, *arguendo*, she did work more than forty (40) hours per week, that this was a requirement of her employment or a demand placed upon her by anyone at Encore. To the contrary, as the Affidavit of Kim Files demonstrates, Encore was most accommodating to the Plaintiff.

In summary, Plaintiff's claim for damages is inherently faulty and insufficient as a matter of law. For, a "claimant must prove to a reasonable certainty the fact and amount of his damage," though, as stated *supra,* "mathematically precise proof is not required." *Crittenden v. Whippoorwill Ranch*, 406 N.W.2d 624, 28 Wage & Hour Cas. (BNA) 409 (Minn. Ct. App. 1989) (quoting *Pemberton v. OvaTECH, Inc*., 669 F.2d 533, 541 (8th Cir. 1982)). A finding of damages will be sustained by the court only if it is "reasonably supported by the evidence as a whole." *Crittenden , supra* (citing *Carroll v. Pratt*, 247 Minn. 198, 202, 76 N.W.2d 693, 697 (1956)). In *Crittenden, supra,* the respondents "presented largely unrebutted evidence regarding work done and unpaid wages accumulated, and this evidence amply supported the trial court's findings on damages." *Id.* The Plaintiff, here, can

make no such claim and as such, judgment on the issue of damages must be entered in favor of the Defendant as a matter of law.

**3.      Since Plaintiff has Shown No Willful Violation of the FLSA, the Statute of Limitations In This Case is Two Years and Not Three.**

The Plaintiff seeks overtime pay pursuant to the FLSA for eighty-one weeks for the time period November 1999 through May 31, 2001. (Compl. at ¶ 10.) The Plaintiff filed this suit in November 2002. The statute of limitations under the FLSA is generally only two years. However, 29 U.S.C. § 255 extends a cause of action for overtime pay from two years to three years in the case of a willful violation by the employer. 29 U.S.C. § 255(a) ("except that a cause of action arising out of a willful violation may be commenced within three years after the cause of action accrued.") A violation of the FLSA is considered "willful if the employer knew or showed reckless disregard that its conduct was prohibited by the Act." *McLaughlin v. Richland Shoe Company,* 486 U.S. 128 (1988).

In this case, even if, *arguendo,* the Plaintiff can show that she is in fact owed overtime compensation, she has still failed to demonstrate that Encore's conduct was a "willful violation" of the FLSA. There is **no** testimony or evidence in the record that even relates to this subject, and, it is the Plaintiff's burden to demonstrate a willful violation in order for her to reap the benefits of a longer statute of limitations. *EEOC v. O'Grady,* 857 F.2d 383, 388 (7th Cir. 1988). Furthermore, Encore's conduct cannot merely be demonstrated to be negligent or unreasonable. In order for the longer statute of limitations to be triggered, the employer's conduct must be "voluntary," "deliberate" and "intentional." *McLaughlin,* 486 U.S. at 133. There is nothing in the record demonstrating such deliberate willfulness. Therefore, for purposes of the FLSA, if this Honorable Court does find that the Plaintiff is owed retroactive overtime

compensation, the relevant time period should only be within the Act's 2-year statute

of limitations, and thusly only from November 2000 through May 2001.

### V.     CONCLUSION

Plaintiff is a round peg attempting to be square.  The job duties performed by Plaintiff

fit precisely into the exception carved out by 29 C.F.R. § 541.2.  Plaintiff's attempt to

minimize her job duties and involvement in the functioning of Encore is lucent.  Though

Plaintiff attempts to downplay her importance and responsibilities, by Plaintiff's own

testimony and rendition of the facts, she satisfies the "administrative" exception under both

the FLSA and MWHL.  Additionally, the Plaintiff has failed to provide proof of the fact or

amount of damages, leaving this crucial element to nothing but speculation and conjecture.

WHEREAS, the above premises being considered, the Defendant, Encore Marketing

International, respectfully requests this Honorable Court grant its Motion for Summary

Judgment in its entirety and enter judgment for the Defendant as a matter of law.

Respectfully submitted,

JOSEPH, GREENWALD & LAAKE, P.A

By: _____
        Timothy F. Maloney
        Veronica Byam
        6404 Ivy Lane, Suite 400
        Greenbelt, Maryland 20770
        (301) 220-2200
        TMaloney@jgllaw.com
        VByam@jgllaw.com

## <u>CERTIFICATE OF SERVICE</u>

  I HEREBY CERTIFY that on this _____ day of June, 2003, a copy of the foregoing was mailed first class, postage pre-paid to: Philip B. Zipin, Esquire, Neil Lebowitz, Esquire at ZIPIN, MELEHY & DRISCOLL, LLC, 8403 Colesville Road, Suite 610, Silver Spring, Maryland, 20910.

_____<br>VERONICA BYAM