## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

CARMEN GIBSON                    *

       Plaintiff              *

    v.                            *          Civil Action No.: WDQ-02-CV-3827

ENCORE MARKETING INT'L, INC.     *

       Defendant            *

*    *    *    *    *    *    *    *    *    *    *    *    *

## PLAINTIFF'S OPPOSITION TO DEFENDANT'S
## MOTION FOR SUMMARY JUDGMENT

Plaintiff Carmen Gibson, by and through her counsel, Philip B. Zipin and Neil R. Lebowitz, hereby opposes Defendant's Motion for Summary Judgment, and states as follows:

## I.  INTRODUCTION

Plaintiff Carmen Gibson initially filed her Complaint in November of 2002 against Defendant Encore Marketing International, Inc. to recover unpaid overtime compensation under the federal Fair Labor Standards Act (hereinafter "FLSA") and Maryland's Wage and Hour Law.  Ms. Gibson was employed by Defendant from October 1995 through May 2001.  *See* Pl.'s Depo. at 11, 22-23, attached hereto as "Exhibit A."  As alleged in the Complaint, from November 1999 through May 2001, which is the pertinent time period at issue in this case, Ms. Gibson worked an average of 60 hours per week.  *See* Complaint at ¶ 6.  Over the course of this 19-month time span, therefore, Ms. Gibson worked approximately 1620 hours of overtime without compensation, for which she is

owed approximately $45,330.00 in unpaid wages by Defendant.  *See id.* at ¶ 10.  In her Complaint, pursuant to the FLSA, Ms. Gibson is also seeking an additional $45,330.00 in liquidated damages, plus attorney's fees and other litigation costs.  *See generally id.*

On or about December 23, 2002, Defendant filed its Answer to the Complaint.  In the Answer, Defendant failed to assert the administrative exemption to the FLSA's overtime provisions as an affirmative defense.[1]

Thereafter, the parties engaged in discovery.  In addition to exchanging written and document discovery, Defendant took the deposition of Ms. Gibson and Plaintiff deposed Defendant's Vice President of Marketing, David Gallimore.

Discovery has now been completed and Defendant is seeking the entry of summary judgment in its favor.  As explained in greater detail below, Ms. Gibson maintains that material facts remain in dispute, that Defendant has misinterpreted and misapplied the relevant law, and that Defendant is not entitled to judgment as a matter of law.  Accordingly, this Court should deny Defendant's Motion for Summary Judgment.

## II.  STATEMENT OF MATERIAL FACTS

In its Motion for Summary Judgment, Defendant sets forth a "statement of material facts" which is less than four pages in length.  In preparing its exceedingly brief statement, Defendant indicates that it relied "nearly exclusively" upon the deposition testimony of Ms. Gibson.  Def.'s Mot. at 2.  However, in stark contrast to Defendant's four pages of "material facts," Ms. Gibson's deposition testimony actually generated a total of *96 pages* of transcript.  Not surprisingly, therefore, Defendant has painted an

---

[1] This fact alone should result in the Court's denial of Defendant's Motion for Summary Judgment.

entirely incomplete, inaccurate, and often slanted picture of Ms. Gibson's actual duties while working for the company.[2]  For example, Defendant presents the various duties performed by Ms. Gibson as if they all have equal importance.  As will be explained below, only Ms. Gibson's "primary duties" are relevant, and hence material, to the determination of whether or not she is entitled to overtime compensation.  Moreover, several of the so-called "facts" presented by Defendant are based upon mere "sound bites" of testimony which do not accurately depict the true nature of Ms. Gibson's duties.

In order to elucidate the many deficiencies in Defendant's statement of materials facts, as well as the numerous factual disputes that exist between the parties, Ms. Gibson will now turn to her own statement of material facts.

Ms. Gibson attended Johnson C. Smith University in North Carolina for two years, from the fall semester of 1984 to the spring semester of 1986.  *See* Pl.'s Ans. to Interrogatory No. 2, attached hereto as "Exhibit B."  Her major "was going to be business management," but she did not earn her degree.  Pl.'s Depo. at 8.  In fact, Ms. Gibson never even took any classes in business management because all such classes were not scheduled to begin until her third year of school, which she did not attend.  *Id*. at 84-85.

After leaving college, Ms. Gibson worked in a series of clerical jobs.  *Id*. at 8-10.  In late October of 1995, Ms. Gibson was hired by Defendant, which, as its name suggests, was engaged in the business of marketing.  *Id*. at 10-11.  The first position Plaintiff held with Defendant's company was "customer service representative."  Pl.'s

---

[2]  Nevertheless, Ms. Gibson is unsure whether these facts even need to be disputed by her.  The facts asserted by Defendant, in and of themselves, are clearly insufficient to satisfy Defendant's high burden of proving by clear and convincing evidence that the duties performed by Ms. Gibson satisfy the administrative exemption to the FLSA.

Depo. at 11.  Approximately one year later, she became a "senior customer service representative." *Id*. at 11-12.

Thereafter, in late 1997, her title was changed to "quality specialist," also known within the company as a "monitoring specialist."  *Id*. at 12.  *See also* Def.'s Ans. to Interrogatory No. 2, attached hereto as "Exhibit C."  As a monitoring specialist, Ms. Gibson's "job entail[ed] listening to the customer service rep's calls to make sure they're providing customer service . . . and following the company's policies."  Pl.'s Depo. at 12-13.

Significantly, Defendant designated each of Ms. Gibson's first three positions as non-exempt.  *See* Def.'s Ans. to Interrogatory Nos. 2, 7.  *See also* Salary Increase Sheet, attached hereto as "Exhibit D" (designating Ms. Gibson as a "non-exempt" employee while she held the position of monitoring specialist).

In December 1998, Ms. Gibson's title was changed once again to "telemarketing specialist."  Pl.'s Depo. at 16.  She held this position from December 1998 through April of 2000.  *Id*. at 16, 20.  Ms. Gibson then became one of the company's so-called "telemarketing managers," a position she held until March of 2001.  *Id*. at 28.  Finally, Ms. Gibson was renamed "campaign manager" for the period of March 2001 through May of 2001, when she was laid off by the company.  *Id*. at 22-23, 28.  It is these three positions, all of which were considered to be exempt by Defendant, that are at issue in this case.[3]

---

[3] It should be noted that the various job tiles given to Ms. Gibson over the course of her employment with Defendant are of no import to the issues presently before this Court.  The fact that the company designated her as a "manager" is simply irrelevant.  Specifically, "[t]he FLSA's overtime regulations instruct that *job titles be*

## A.  Plaintiff's Duties

In deposition, Ms. Gibson gave a detailed account of the duties she performed in all three of the allegedly exempt position held by her.  According to Ms. Gibson, as a telemarketing specialist,

> my job was to do script revisions.  I also still monitored calls.  I processed any incoming paperwork.  I would prepare reports based on the telephone calls that I monitored for my supervisors to review.  I also distributed the scripts to outside vendors[4] that we worked with.  After the scripts were approved by my supervisor.  I also processed incoming tapes from vendors.  And the tapes consist of a customer base from our clients[5] which we would need to process before we can distribute them to the outside vendors for calling.  I would also provide a report to my supervisor based on the information submitted from the vendors as to their performance.  Made necessary copies that came in from the vendors that needed to go to my superiors.  Any information that needed to be disseminated to the outside vendors from the supervisor, I would disseminate them for my superiors.

*Id.* at 15.

Ms. Gibson then offered more specific details regarding several of these clerical duties.  With respect to the so-called "script revisions," Ms. Gibson testified as follows about her extremely limited role:

Q:     Can you tell me more about what that entails?

---

*disregarded* in determining an employee's status, since '[t]itles can be had cheaply and are of *no determinative value.*'"  *D'Camera v. District of Columbia*, 693 F. Supp. 1208, 1211 (D.D.C. 1988) (emphasis added) (quoting 29 C.F.R. § 541.201(b)).

[4] As stated by Ms. Gibson, "The vendors would be the companies that [Defendant] hires to actually make the telephone solicitation calls for [the company]."  Pl.'s Depo. at 44.  These vendors "were not Encore employees."  Gallimore Depo. at 20-21, attached hereto as " Exhibit F."

[5] According to Ms. Gibson, "The clients are companies such as MBNA [or] Chevy Chase Bank.  They contact Encore to say I have about a half a million customers and I would like to market your travel products to my customers.  Those would be [the] clients."  Pl.'s Depo. at 44.  As explained further by David Gallimore, Defendant's Vice President of Marketing, "[W]e have relationships with companies, outside companies.  We call them clients.  And we market our services to their customers and they permit us to do that in exchange for [a] share of the revenue."  Gallimore Depo. at 32-33, attached hereto as "Exhibit F."

> A:     *We had scripts that were already created.*  Basically, if [the company] decided to, say, sell or offer a product to Chevy Chase Bank, *I would insert Chevy Chase's name in the script* so that while the representatives are calling, they would say they're calling on behalf of Chevy Chase.  If I needed to implement the price or the cost of the program, I would implement that into the script.

> Q:     I understand.  That was already written by someone else at Encore?

> A:     Correct.  Or an outside source.

*Id*. at 16-17 (emphasis added).  Ms. Gibson was never personally the source of the new information being added to the script and all such revisions could only be made based upon the express authorization of her superiors.  *See id*. at 15, 43, 86-87.

As for "monitoring calls" and preparing reports based thereon "for [her] supervisor to review," Ms. Gibson offered the following details:

> Q:     And you said that you were also, as a telemarketing specialist, monitoring calls?  Would this be the same that we spoke about when you were a service customer representative?  Senior customer –

> A:     No.  It's similar but different.  In the telemarketing department we did not make calls internally.  We hired companies to perform telemarketing calls for us.  So I would listen into the companies that were making the calls for us.

> Q:     And you would listen to live conversations?

> A:     Yes.

> Q:     And what was the purpose of that?

> A:     *Just to make sure that those representatives were adhering to Encore's policies and following all procedures* and they were selling the product professionally.

> Q:     And how would you follow up on that?

A:    I would document each monitoring session that I recorded, I would tape them as well as create a word document for my supervisor to review.

Q:    Would you comment upon the professionalism of the representative you listened to?

A:    Yes.  *We had a standard form that we used to monitor* and we would rate them on a scale of one to five.

Q:    For such things as – can you give me an example besides professionalism?

A:    Their tone, listening skills, grammar, enunciation, pronunciation, common courtesy, polite.  That would basically cover [it].

. . . .

Q:    And that was a pre-set form and you would rank the representative you were listening to and then you would forward that form on to your superior?

A:    Yes.

*Id*. at 17-19 (emphasis added).

Ms. Gibson subsequently clarified that, although she did "listen for" things like the representatives' tone and courtesy, that was of lesser importance because "the vendor[s] themselves would evaluate their own employees."  *Id*. at 32.  Ms. Gibson's primary focus in monitoring the calls of the representatives was to "make sure [Encore's] policies and procedures are being adhered [to] and that they're reading the script exactly word for work verbatim."  *Id*. at 33.  Ms. Gibson also testified about the source of the policies and procedures she used as her guide in monitoring the calls:

Q:    On the issue of you monitoring the calls to assure that the vendors were following procedures and meeting standards for courtesy and things like that, to your knowledge who established those procedures and standards for courtesy?

7

> A:    *The company established those standards and we would also provide the vendor with the company standards.*
>
> Q:    Okay.  Did you have any role in generating those procedures or standards?
>
> A:    *No.  I just followed the standards that were already implemented.*
>
> Q:    You said that you used a form to record those things?
>
> A:    Yes.
>
> Q:    Did you play any role in preparing the form.  Not filling it out, but in preparing the form itself?
>
> A:    *No.  Because the form was already generated as well.*

*Id*. at 85 (emphasis added).  *See also* Hannabas-Bourdon Affidavit at ¶ 8, attached hereto as "Exhibit E."  Finally, Ms. Gibson stated that, when she did rate the representatives' courtesy and the like, the ratings were not based upon her personal opinion but, instead, "on the application of standardized factors provided by the company."  Pl.'s Depo. at 96.

With respect to "process[ing] incoming tapes from vendors," Ms. Gibson provided an example to explain her very limited role the process:

> A:    If Chevy Chase decided that they wanted to market Encore's travel program, Chevy Chase would send us a list of their customers. What we would do is we would send that list of customer base to an outside vendor.  That vendor would then determine whether or not we can call the customer or not.  We have what is called a do not solicit so all of the customers do not receive telemarketing calls.  So the outside vendor would scrub off all of the customers that we could not call and provide us with a list of customers we could call.
>
> Q:    I understand.  And you would provide a report to your superior based on information from the vendors.
>
> A:    Yes.

*Id.* at 19-20.

Finally, Ms. Gibson elaborated upon her duty to "provide a report to [her] superior based on the information submitted from the vendors as to their performance." This duty essentially required Ms. Gibson to gather, tabulate, and disseminate data that had already been generated by the outside vendors. *See id.* at 24-27  She personally conducted no analysis of the data, but simply organized and passed it along to her superiors for their review. *Id.* at 26-27. *See also* Hannabas-Bourdon Affidavit at ¶¶ 6-7.  Ms. Gibson testified about this issue as follows:

A:    [The vendors] would send us a report every day as to how calling occurred that day.  How much success they had, how many sales, the percentage of contacts that they made for that day.

Q:    And you would keep track of that information daily?

A:    Yes.

Q:    And what was the purpose of that?

A:    So that my superiors can review how each vendor's performance is and compare per se which vendor's performing better than another. Generally if one vendor is performing better than another, my superior may want to do business with two vendors and they may go with the one.

Q:    So you would review these results daily and did you write a report –

A:    Yes.

Q:    – about this?

A:    Yes.  I generated a report each day.

Q:    *Would that report contain your own suggestions?*

> A:     *No.  It would all be data from the vendor.*

Pl.'s Depo. at 26-27 (emphasis added).  Any difficulties reported by the vendors would

be handled by Ms. Gibson in a similar fashion:

> Q:     If a vendor were to tell you they were having a problem that day
>          with sales, what would you do with that information?
>
> A:     I would take that information to my superiors.
>
> Q:     *And that is where your job would end?*
>
> A:     *Yes.*

*Id*. at 25 (emphasis added).

With a few limited exceptions, Ms. Gibson's job duties remained essentially the

same when her title was changed by the company to "telemarketing manager" in April

2000.  *Id*. at 20-21.  *See also* Hannabas-Bourdon Affidavit at ¶ 4.  This was due, at least

in part, to the fact that the telemarketing specialist position previously held by Ms.

Gibson was never filled.  *See* Pl.'s Depo. at 22.

Moreover, it is undisputed between the parties that when Ms. Gibson was renamed

"campaign manager" by Defendant in March of 2001, her duties did not change in any

respect.  *Id*. at 28.  *See also* Gallimore Depo. at 37, attached hereto as "Exhibit F."

**B.  Plaintiff was Very Closely Supervised in the Performance of Her Duties**

According to Ms. Gibson, "My duties at Encore were performed *at all times under*

*the supervision and/or at the direction of my superiors*."  Pl.'s Ans. to Interrog. No. 14

(emphasis added).  *See* Pl.'s Depo. at 83.  Indeed, according to Kelly Hannabas-Bourdon,

Ms. Gibson's immediate supervisor for two years and Defendant's former Director of

Teleservices, "the selection and performance of Ms. Gibson's duties were completely dictated by myself, [Vice-President of Teleservices John] Bourdon, and/or other members of upper management." Hannabas-Bourdon Affidavit at ¶ 5.

In keeping with this high level of supervision, Ms. Gibson met with and received instructions from her supervisors on a daily basis. Pl.'s Depo. at 82-83, 90. Moreover, Ms. Gibson was never permitted to take time off from work without the prior express authorization of her supervisors. *Id*. at 57.

At all times pertinent hereto, Ms. Gibson was directly supervised by one or more of the following employees: Mr. Bourdon, Ms. Hannabas-Bourdon, Mr. Gallimore, and Beth Bell.[6] *See* Pl.'s Ans. to Interrogatory No. 17. Each of these employees was on the vice-president or director level of the company's hierarchy.

In additional to her direct supervisors, Ms. Gibson also reported to various other superiors, including, but not limited to, Jackie Hudson, who was the director of the client services department, Lyndsay Marchese and Deborah Chapin, who were client services managers, and Tom Deliso, who was the director of the shares services department. *See generally* Pl.'s Depo. at 36-43.

For compelling evidence that demonstrates how truly ministerial and clerical Ms. Gibson's duties were, in contrast to the duties performed by superior employees like those listed above, the Court need only consider the task that Ms. Gibson was assigned to perform in the company's so-called "strategy meetings." These meetings were held by

---

[6] Conversely, Ms. Gibson did not supervise or manage any Encore employees. Pl.'s Depo. at 20. *See also* Pl.'s Ans. to Interrogatory No. 17.

11

Defendant in order to discuss how the company was "going to telemarket a program" or "try to increase sales revenue." *Id*. at 28. *See also id*. at 86. According to Ms. Gibson, she had "no role" in such discussions. *Id*. at 86. Her job "was basically to *take notes* during those meetings." *Id*. (emphasis added).

Ms. Gibson played a similarly limited role on the relatively infrequent occasions when she would travel to visit one of the outside vendor sites. *Id*. at 36, 49-51. Ms. Gibson was always accompanied by a superior on these trips,[7] and her role was "essentially limited to *observing* the telemarketing representatives perform their duties and *running errands* for [her superiors] such as getting pizza and other promotional items which would be used to help motivate the representatives."[8] Hannabas-Bourdon Affidavit at ¶ 9 (emphasis added). Furthermore, "Ms. Gibson was present to assist [her superiors] by performing various ministerial tasks, and was *in no way* designated or considered to be the primary representative of the company on the trip." *Id*. (emphasis added).

Finally, the layout of the Defendant's business facility also serves as a telling indicator of Ms. Gibson's relatively low-end position in Defendant's hierarchy of employees. Whereas all of the company's vice-presidents and directors had their own,

---

[7] Defendant incorrectly asserts in its Motion for Summary Judgment that "[t]hese trips were sometimes taken [by Ms. Gibson] without a supervisor." Def.'s Mot. at 5. This assertion misquotes the actual testimony of Ms. Gibson who stated that she did not always travel with a "*direct* supervisor." Pl.'s Depo. at 53 (emphasis added). Ms. Gibson made it abundantly clear, however, that she always traveled with someone from the company superior to her. *Id*. at 36, 51-54. *See also* Hannabas-Bourdon Affidavit at ¶ 9, attached hereto as "Exhibit E."

[8] As a careful review of the record makes clear, Ms. Gibson was never actually asked in deposition about the specific duties she personally performed when traveling to the vendor sites. She was only asked generally about the overall "purpose of these trips." Pl.'s Depo. at 52. In its Motion for Summary Judgment, Defendant's uses, or, more accurately, misuses, Ms. Gibson's responses to these questions in order to greatly overstate the true role played by Ms. Gibson individually when she traveled with her superiors. *See* Def.'s Mot. at 12-13.

self-contained offices, Ms. Gibson worked alongside many of the other clerical employees in one of a series of tightly-arranged cubicles. *See* Pl.'s Depo. at 20, 37, 84.

### C. Plaintiff's Overtime Hours

Ms. Gibson testified that, on weekdays, she generally worked from 8:00 a.m. until 7:00 p.m. *Id*. at 46-47. On occasion, she would begin working as early as 7:45 a.m. and she sometimes worked as late as 8:00 p.m. *Id*. at 46-47, 87. Ms. Gibson frequently worked some of these late evening hours from her home. *Id*. at 87, 93-94. *See also* Gallimore Depo. at 10. While in the office, she rarely took time out of her schedule for a lunch break. Pl.'s Depo. at 47-48. Additionally, she worked one or two Saturdays per month from approximately 9:00 a.m. to 12:00 p.m. *Id*. at 87-88, 94-95. Ms. Gibson also tended to work for extended hours when she traveled to one of the vendor sites. *Id*. at 49.

Ms. Gibson began to informally keep track of the overtime hours she worked in her own personal calendar "maybe towards the end of [19]99."[9] *Id*. at 63-64, 79. Defendant, which had wrongly deemed Ms. Gibson to be exempt, did not provide her with any formalized mechanism to record the actual hours she was working on a daily basis. *Id*. at 63. *See also* Def.'s Mot. at 5-6. Nevertheless, Ms. Gibson's supervisors were well aware of the long hours that she was working on behalf of the company. *See* Pl.'s Depo at 56. *See also* Hannabas-Bourdon Affidavit at ¶ 10; Gallimore Depo. at 10.

---

[9] Ms. Gibson currently possesses pages from this calendar for the six-month period of November of 2000 through the time she was laid off in May 2001. Pl.'s Depo. at 79. Pages from previous months "would have been at Encore in [her] desk which [she] had no access to on [her] last day." *Id*.

### D. Sworn Affidavit of Kelly Hannabas-Bourdon

Ms. Gibson's testimony regarding her duties, level of supervision, and overtime hours, as recounted hereinabove, is fully corroborated by her immediate supervisor of two years, Kelly Hannabas-Bourdon.[10]  *See generally* Hannabas-Bourdon Affidavit.  Ms. Hannabas-Bourdon was Ms. Gibson's immediate supervisor from December of 1998 through December of 2000, during which time Ms. Gibson worked as a telemarketing specialist as well as a telemarketing manager.

For additional details, the Court is referred to Ms. Hannabas-Bourdon's sworn Affidavit, in which she provides an in-depth discussion of the nature of Ms. Gibson's duties as well as the lengthy hours she worked on behalf of Defendant.[11]

### III.  LEGAL ARGUMENT

According to the Fourth Circuit Court of Appeals, "The FLSA was enacted with the purposes of protecting employees and imposing minimum labor standards upon covered employers, including the payment of a specified minimum wage and overtime pay for covered employees."  *Ball v. Memphis Bar-B-Q Co.*, 228 F.3d 360, 363 (4th Cir.

---

[10]  Plaintiff notes that Ms. Hannabas-Bourdon is expressly listed as a witness in her Answers to Interrogatories.  *See* Pl.'s Ans. to Interrogatory Nos. 10, 17.  Conversely, Defendant did not list Kim Files as a witnesses in any of its discovery responses.  Accordingly, the Affidavit of Ms. Files attached to Defendant's Motion for Summary Judgment should be disregarded by this Court.  *See* Fed. R. Civ. P. 37(c)(1) ("A party that without substantial justification fails to disclose information required by Rule 26(a) or 26(e)(1), or to amend a prior response to discovery as required by Rule 26(e)(2), is not, unless such failure is harmless, permitted to use as evidence at a trial, at a hearing, or on a motion any witness or information not so disclosed.").  Regardless, Ms. Files' Affidavit is of limited value because, unlike Ms. Hannabas-Bourdon, Ms. Files worked in an entirely different division of the company from Ms. Gibson, and, therefore, almost certainly had relatively little contact with her.  *See* Gallimore Depo. at 63-64 (testifying that Ms. Gibson worked in the telemarketing department and Ms. Files worked in the operations department).

[11]  Plaintiff's counsel obviously communicated with Ms. Hannabas-Bourdon in order to obtain her Affidavit.  As this Court knows, such contact with a former employee is now clearly permissible under the recently amended Rule 4.2(a) of the Maryland Rules of Professional Conduct.  In speaking with Ms. Hannabas-Bourdon, counsel certifies that he strictly adhered to the dictates of Rule 4.4(b).

2000).  Congress' reasoning behind enacting the overtime pay provisions of the FLSA "was twofold: (1) to spread employment by placing financial pressure on employers to hire additional employees rather than have current employees work longer hours, and (2) to compensate employees for the burden of working long hours." *Conway v. Takoma Park Vol. Fire Dept., Inc.*, 666 F. Supp. 786, 790 (D. Md. 1987) (citing *Walling v. Helmerich & Payne*, 323 U.S. 37, 40 (1944)).  *See also Graham v. Babinski Properties*, 562 N.W.2d 395, 397-98 (S.D. 1997) (same).  Moreover, "[t]he Supreme Court has directed that the Act must be construed 'liberally to apply to the furthest reaches consistent with congressional direction.'"  *Roy v. County of Lexington*, 141 F.3d 533, 540 (4th Cir. 1998) (quoting *Tony & Susan Alamo Found. v. Secretary of Labor*, 471 U.S. 290, 296 (1985)).

"Section 7(a)(1) of the FLSA, 29 U.S.C. § 207(a)(1), requires that employees be paid time and a half for work over forty hours a week.  Section 13(a)(1) of the FLSA, 29 U.S.C. § 213(a)(1), however, provides an exemption from the overtime pay requirements for persons 'employed in a bona fide executive, administrative, or professional capacity.'"  *Shockley v. City of Newport News*, 997 F.2d 18, 21 (4th Cir. 1993).

Significantly, "[e]mployers must prove by *clear and convincing evidence* that an employee qualifies for exemption."  *Id.* (emphasis added).  *See also Yuen v. U.S. Asia Commercial Dev. Corp.*, 974 F. Supp. 515, 519 (E.D. Va. 1997).  As this Court is well aware, this is the highest standard of proof that can be imposed on a party in a civil proceeding.  In attempting to make this showing, "[t]he employer has the burden of establishing by affirmative evidence all the necessary requirements of the exemption,"

*Dalheim v. KDFW-TV*, 706 F. Supp. 493, 501 (N.D. Tex. 1988), *aff'd*, 918 F.2d 1220 (5th Cir. 1990), and also "bears the full burden of persuasion for the facts requisite to an exemption." *Clark v. J.M. Benson Co.*, 789 F.2d 282, 285-86 (4th Cir. 1986). *See also Pezzillo v. General Tel. & Elec. Info. Sys., Inc.*, 414 F. Supp. 1257, 1268 (M.D. Tenn. 1976) ("The employer must show that each employee meets every requirement of the claimed exemption."). Accordingly, "if the record is unclear as to some exemption requirement, the employer will be held not to have satisfied its burden." *Martin v. Cooper Elec. Supply Co.*, 940 F.2d 896, 900 (3rd Cir. 1991) (citing *Idaho Sheet Metal Works, Inc. v. Wirtz*, 383 U.S. 190, 206 (1966)).

As stated recently by the U.S. District Court for the Northern District of New York, "These exemptions [from the FLSA's overtime pay requirements] are *narrowly construed against the employers* seeking to assert them and their application limited to those [employees] *plainly and unmistakably within their terms and spirit*, with the burden of establishing such applicability resting squarely upon the employer's shoulders." *Bennett v. Progressive Corp.*, 225 F. Supp.2d 190, 215 (N.D.N.Y. 2002) (citations omitted) (emphasis added). *See also Arnold v. Ben Kanowski, Inc.*, 361 U.S. 388, 392 (1960); *Roy*, 141 F.3d at 540; *Shockley*, 997 F.2d at 24 ("Courts construe exemptions to the FLSA narrowly 'in order to further Congress' goal of providing broad federal employee protection.'" (citation omitted)).

Moreover, under the current circumstances of this case, Defendant's burden is raised even higher by virtue of the fact that this matter is before the Court in the form of the company's motion for summary judgment, which requires the Court to "view all facts

and inferences most favorably to [Ms. Gibson], who is entitled to have the credibility of [her] evidence assumed, [her] version of events in dispute accepted, and internal conflicts resolved in [her] favor." *Elries v. Denny's, Inc.*, 179 F. Supp.2d 590, 595 (D. Md. 2002) (citing *Charbonnages de France v. Smith*, 597 F.2d 406, 414 (4th Cir. 1979)).  Indeed, in cases like this one where the moving party bears the burden of proof, the Fourth Circuit has declared that "judgment as a matter of law may be awarded, *but only in 'extreme cases.'"*[12]  *Gilliam v. Montgomery Ward & Co.*, No. 96-1210, 1997 WL 429454, at *8 (4th Cir. July 31, 1997) (emphasis added) (quoting 9A Wright & Miller, *Federal Practice and Procedure* § 2535, at 325 (2d ed. 1995)).  *See also Yuen*, 974 F. Supp. at 527 n.15.

## A.  Plaintiff's Duties do Not Satisfy the Administrative Exemption

The so-called "short test" for the administrative exemption to the overtime pay requirement of the FLSA is the one applicable to this case.  "In relevant part, that rule applies to any employee whose weekly wage exceeds $250 per week and requires that the employee's primary duty [consists of] office or non-manual work, directly related to management policies or general business operations, involving the exercise of discretion and independent judgment."[13]  *Burke v. County of Monroe*, 225 F. Supp.2d 306, 317

---

[12]  Procedurally speaking, Defendant is in essentially the same position as a plaintiff seeking summary judgment in an action for fraud.  In a fraud case, as in this case, the party bearing the burden of proof must establish each element of his or her claim by clear and convincing evidence.  For this reason, "allegations of fraud are *rarely* resolved on motions for summary judgment."  *Logistics Trading, Inc. v. Borden, Inc.*, 1990 WL 52203, at *2 (S.D.N.Y. April 19, 1990) (emphasis added).  *See also In re Bidermann Indus. U.S.A., Inc.*, 241 B.R. 76, 91 (S.D.N.Y. 1999) (stating that "an affirmative finding [of fraud] can rarely be made as a matter of law.").  Accordingly, as a procedural matter alone, the likelihood of an employer in an FLSA exemption case prevailing by summary judgment should be equally rare.  *See generally K & K Jump Start/Chargers, Inc. v. Schumacher Elec. Corp.*, 82 F. Supp.2d 1012, 0123 (W.D. Mo. 2000).  *See also infra* Part IV.

[13]  It should be noted that Maryland law raises the bar even higher by expressly requiring that the employee may be deemed exempt only if she "*customarily and regularly* exercises discretion and independent judgment." COMAR § 09.12.41.01 (emphasis added).  This is not merely a distinction without a difference, but instead

(W.D.N.Y. 2002) (citing 29 C.F.R. § 541.2(e)(2)).  *See also Shockley*, 997 F.2d at 28.  As detailed above, "'[t]he criteria provided by [the] regulations are *absolute* and the employer must prove [by clear and convincing evidence] that any particular employee meets *every* requirement before the employee will be deprived of the protection of the Act.'"  *Bothell v. Phase Metrics, Inc.*, 299 F.3d 1120, 1125 (9th Cir. 2002) (emphasis added) (quoting *Mitchell v. Williams*, 420 F.2d 67, 69 (8th Cir. 1969)).

Ms. Gibson concedes that her primary duty consisted of non-manual work.  However, she does not concede that her primary duty[14] was (1) directly related to Defendant's management policies or general business operations or (2) that it involved the exercise of discretion and independent judgment.  Ms. Gibson will now address each of these elements, in reverse order, below.

### 1. Plaintiff did Not Exercise Discretion and Independent Judgment

In order to prevail in this case, Defendant must prove by clear and convincing evidence that Ms. Gibson exercised discretion and independent judgment in the performance of her primary duty for the company.  As stated by the Department of Labor's regulations:

---

constitutes a substantive variation on the federal regulations and should be considered as such by the Court.  Indeed, this language precisely mirrors a portion of the so-called "long test" for the administrative exemption under federal law, which the Fourth Circuit has deemed "more stringent" than the short test.  *See Clark*, 789 F.2d at 285 n.1.

[14] It is worth noting that Defendant also bears the burden of proving which of Ms. Gibson's various duties was her so-called "primary duty."  Plaintiff maintains that none of her duties rose to the level of exempt work, rendering the issue essentially moot.  However, even if Defendant could establish that one or more of Ms. Gibson's duties were in the nature of exempt work, it must additionally show that such work constituted her primary duty.  For purposes of summary judgment, Defendant simply cannot make this showing because there is a dearth of evidence on this issue.  Specifically, Defendant never asked Ms. Gibson in deposition about which duty was her primary duty or even which duty took up the most of her time.  *See, e.g., Bennett v. Progressive Corp.*, 225 F. Supp.2d 190, 218 (N.D.N.Y 2002) (denying summary judgment because, among other reasons, fact questions remained regarding "what constitutes [plaintiff's] 'primary duties.'").

> In general, the exercise of discretion and independent judgment involves the comparison and evaluation of possible courses of conduct and acting or making a decision after the various possibilities have been considered. The term . . . implies that the person has the authority or power to make an independent choice, free from immediate direction or supervision and with respect to matters of significance.

*Burke*, 225 F. Supp.2d at 317 (quoting 29 C.F.R. § 541.207(a)). *See also Brock v. National Health Corp.*, 667 F. Supp. 557, 566 (M.D. Tenn. 1987) ("For an exemption to exist, the employee must perform work requiring the exercise of discretion and independent judgment, thus, *the employee must be a decision-maker*." (emphasis added)).

Significantly, the regulations further dictate that "'the term discretion and independent judgment *does not apply* to the kinds of decisions normally made by clerical and similar types of employees." 29 C.F.R. § 541.207(d)(2) (emphasis added). On a related note,

> an employee who merely applies his knowledge in following prescribed procedures or determining which procedure to follow, or who determines whether specified standards are met or whether an object falls into one or another of a number of definite grades, classes, or other categories, with or without the use of testing or measuring devices, is not exercising discretion and independent judgment within the meaning of § 541.2. This is true even if there is some leeway in reaching a conclusion, as when an acceptable standard includes a range or tolerance above or below a specified standard.

*Id*. at § 541.207(c)(1).

Applying the above legal principles to the facts of this case, it is readily apparent that Ms. Gibson's duties merely involved the exercise of clerical skills, rather than the exercise of discretion and independent judgment. Unlike exempt administrative employees, Ms. Gibson did not compare and evaluate possible courses of conduct and then act or make a decision after the various possibilities had been considered. On the

contrary, Ms. Gibson had no decision-making authority whatsoever with respect to matters of significance, and instead simply collected, tabulated, and disseminated data as well as performed other ministerial tasks in strict accordance with the instructions received from her supervisors.  *See supra* Part II.

Indeed, in stark contrast to the clerical duties performed by Ms. Gibson, the types of activities which generally constitute the exercise of discretion and independent judgment under the regulations far exceed the scope of any task she performed.  As noted by the regulations, "[A]lmost every employee is required to use some discretion."  29 C.F.R. § 541.207(d)(1).  However, for an employee to be deemed exempt, "the discretion and independent judgment must be *real and substantial*, that is, they must be exercised with respect to *matters of consequence*."  *Id*. (emphasis added).  *See also Clark*, 789 F.2d at 288 (same).  In this regard, "the regulations indicate that the type of discretion and independent judgment that must be exercised refers to the kinds of decisions normally made by persons who formulate policy within their spheres of responsibility or who participate in this process or who exercise authority to commit the employer in a substantial respect, financial or otherwise."  *Cooke v. General Dynamics Corp.*, 993 F. Supp. 56, 65 (D. Conn. 1997) (citing 29 C.F.R. § 541.207(d)(2)).  *See also* Opinion Letter, Wage & Hour Div., Dep't of Labor, 1997 WL 972382 (Oct. 20, 1997) (same).  As detailed above, *see supra* Part II, decisions such as these were strictly reserved for the numerous employees of Defendant with titles and responsibilities far superior to those of Ms. Gibson.  Ms. Gibson did not even formulate policy for the telemarketing department,

much less the company as a whole, and she certainly could not commit the company to do much of anything.  *Id.  See generally* Hannabas-Bourdon Affidavit.

Nevertheless, in its Motion for Summary Judgment, Defendant focuses heavily on Ms. Gibson's call monitoring duties, apparently convinced that the monitoring constituted exempt administrative work involving the exercise of discretion and independent judgment.  Indeed, Defendant even asserts, albeit incorrectly, that Ms. Gibson's job "consisted mainly" of performing this task.  Def.'s Mot. at 9.  Defendant's argument is faulty for several reasons.

First of all, the monitoring was *not* Ms. Gibson's primary duty during the time period at issue in this case.  Even Defendant's own Vice President of Marketing admits this fact.  *See* Gallimore Depo. at 30.

Second, even if monitoring was Ms. Gibson's primary duty, Defendant has already conceded that such work is non-exempt since that is exactly how the company designated her when she previously performed this precise task as a monitoring specialist.  *See supra* Part II.  *See also* Def.'s Ans. to Interrogatory Nos. 2, 7.

Lastly, regardless of where Defendant stands on this issue, the task of monitoring calls places Ms. Gibson squarely into that category of employees "who determine[] whether specified standards are met" in performing their duties.  *See* 29 C.F.R. § 541.207(c)(1).  Under the Department of Labor's regulations, it is abundantly clear that all such employees are engaged in non-exempt work.

In filing its Motion for Summary Judgment, Defendant is obviously seeking to preclude the consideration of this case by a jury and prevail instead as a matter of law.

21

However, Plaintiffs remind this Court that "any inquiry into exempt status is necessarily fact intensive." *Cooke*, 993 F. Supp. at 60. *See also Harris v. District of Columbia*, 741 F. Supp. 254, 256 (D.D.C. 1990) ("[D]eciding whether an employee is exempt must be a voyage through fact-bound waters."). Specifically, "the determination of whether an employee's primary duty includes work requiring the exercise of discretion and independent judgment is to be based on all the facts involved in the particular employment situation," *Id*. at 65 (citing 29 C.F.R. § 541.207(b)), and "[w]hether an employee's duties require 'real and substantial' discretion, and whether this discretion is exercised with respect to 'matters of consequence' are questions of fact." *Yeun*, 974 F. Supp. at 527-28 (citing *Clark*, 789 F.2d at 288). Accordingly, the resolution of such questions is better reserved for a jury, in consideration of all the evidence presented at trial, rather than a court at the summary judgment stage of the proceedings. *See Bennett v. Progressive Corp*. 225 F. Supp.2d 190, 218 (N.D.N.Y. 2002) (questions related to the determination of whether the administrative exemption applies "are factually-intensive inquiries not appropriate for resolution at the summary judgment stage.").

### 2. *Plaintiff's Primary Duty did Not Directly Relate to Defendant's Management Policies or General Business Operations*

Even if Defendant could establish by clear and convincing evidence that Ms. Gibson exercised discretion and independent judgment in the performance of her primary duty, the company will still be unable to prove, as a matter of law, that her duty "directly related to [Defendant's] management policies or general business operations." Under the Department of Labor's regulations, this phrase "limits the exemption to persons who

perform work of substantial importance to the management or operation of the business of [her] employer." 29 C.F.R. § 541.205(a). "This requirement is met if the employee engages in 'running the business itself or determining its overall course or policies,' not just in the day-to-day carrying out of the business' affairs." *Bothell*, 299 F.3d at 1125 (quoting *Bratt v. County of Los Angeles*, 912 F.2d 1066, 1070 (9th Cir. 1990)).

In keeping with this requirement, the regulations further dictate that "[a]n employee performing routine clerical duties *obviously* is not performing work of substantial importance to the management or operation of the business even though [s]he may exercise some measure of discretion and judgment as to the manner in which [s]he performs [her] clerical tasks." 29 C.F.R. § 541.205(c)(2) (emphasis added). Accordingly, "it is clear that bookkeepers . . . and clerks of various kinds hold the run-of-the-mine (sic) positions in any ordinary business and are not performing work directly related to management policies or general business operations." *Id*. at § 541.205(c)(1). *See also id.* at § 541.208(c) ("[A]ny general office or bookkeeping work is nonexempt work.").

Moreover, "[a]n employee's job can even be 'indispensable' and still not be of the necessary 'substantial importance' to meet the 'directly related' element. In assessing whether an employee's work is of substantial importance, it is necessary yet again to look at 'the *nature* of the work, not its ultimate consequences.'" *Dalheim*, 918 F.2d at 1231 (quoting *Clark*, 789 F.2d at 287 (emphasis in original)).

In this case, as detailed above, Ms. Gibson's primary duty was highly clerical in nature and involved the collection, tabulation, and dissemination of data in accordance with standardized company procedures. *See supra* Part II. Ms. Gibson's job duties did

not require her to analyze the data she gathered.  *Id*.  Her personal input regarding the significance of that data was neither requested nor provided.  *Id*.

This is significant because, in order for an employee to be deemed an exempt administrator, she must give "advice on matters that involve policy determinations, *i.e.*, how a business should run or run more efficiently, [and] *not merely provid[e] information*."  *Bratt*, 912 F.2d at 1070 (emphasis added).  In other words, "*More responsibility than the tabulation of data is necessary to classify an employee as exempt under the Act*.  The employees' activities *must include analyses and conclusions* directly related to management policies . . . for the employees to be classified as exempt employees." *National Health Corp.*, 667 F. Supp. at 566-67 (emphasis added).  *See* Opinion Letter, Wage & Hour Div., Dep't of Labor, 1996 WL 1031785 (June 28, 1996) (finding that employee whose duties involved "the collection and dissemination of information" was *not* administratively exempt because employee "perform[ed] technical tasks, which do not constitute making or implementing policy or the performance of management functions, necessary for the application of the exemption.").  *See also Rainey v. American Forest and Paper Assoc., Inc.*, 26 F. Supp.2d 82, 90 (D.D.C. 1998) (finding that "convey[ing] information to other employees [is] a role that falls short of work that affects management or business operations.").

Thus, it is clear that the "administrative duties described by the DOL regulations require a position of *sufficient authority to enable an employee to decide how [management] policies will be put into place*."  *Rainey*, 26 F. Supp.2d at 97 (emphasis added).  As demonstrated above, Ms. Gibson certainly had no such authority.  She was in

no way personally involved in either "running the [Defendant's] business itself or determining its overall course or policies." *Bratt*, 912 F.2d at 1070.

Simply stated, "[t]here is a difference between one 'who merely works around the place' [and] one who has something to say about 'running the place.'" *National Health Corp.*, 667 F. Supp. at 566 (quoting *Walling v. Newman*, 5 Wage & Hour Cas. 436, 446 (S.D.N.Y. 1945)). Employees in the former category are fully entitled to overtime compensation, those in the latter are not. Ms. Gibson obviously falls into the former category, and, therefore, Defendant simply cannot satisfy this element of the administrative exemption under the facts and circumstances of this case.[15]

### 3. Defendant's Job Description for Plaintiff is Irrelevant and Should be Disregarded

In support of its Motion for Summary Judgment, Defendant quotes and attaches copies of the job descriptions for both the telemarketing specialist and telemarketing manager positions. Defendant places great emphasis on the fact that Ms. Gibson testified that she "agreed" with these descriptions. Def.'s Mot. at 9-10. Significantly, however, when Ms. Gibson was actually asked to elaborate upon a few of the specific duties listed in the job descriptions, it became readily apparent that the descriptions, in reality, did not present an accurate depiction of her day-to-day duties at all. Pl.'s Depo. at 72-75.

---

[15] It must be noted that the issue of whether this element has been satisfied is clearly a fact intensive one. "As the regulations note, there are *no specific rules* that will indicate the precise point at which work becomes of substantial importance to the management and operation of a business." *Cooke*, 993 F. Supp. at 60 (emphasis added) (citing 29 C.F.R. § 541.205(c)(1)). Therefore, making such a determination as a matter of law should be reserved for only the most straightforward cases. *See, e.g., Bothell*, 299 F.3d at 1128-29 (reversing lower court's grant of summary judgment in favor of employer and holding that the "substantial importance" question should have been reserved for the fact-finder at trial).

For example, when asked, "[W]hat about the annual audits of all agencies," Ms. Gibson replied, "We really didn't adhere to that." *Id.* at 74. Similarly, when questioned about "Decision making regarding placement of programs," Ms. Gibson responded, "That's generally done by the director or my superior."[16] *Id.*

Clearly, these job descriptions, which were generated by Defendant, should carry little weight before this Court in light of Ms. Gibson's detailed testimony regarding her actual duties.[17] *See Cooke*, 993 F. Supp. at 61 ("Whether an employee is exempt is determined by the employee's actual work activities, not by the employer's characterization of those activities through a . . . job description."). *See also Bennett*, 225 F. Supp.2d at 218 (same).

Indeed, in contrast to Ms. Gibson's testimony, the job descriptions set forth a list of the supposed duties in a series of either one-word or very generalized comments, and, therefore, are of negligible value at best. *See D'Camera v. District of Columbia*, 693 F. Supp. 1208, 1211 (D.D.C. 1988) (declaring that "lists of responsibilities unsupported by descriptions of what those responsibilities entail" are "of no determinative value"). *See also Ale v. Tennessee Valley Authority*, 269 F.3d 680, 689 (6th Cir. 2002) ("[T]he determination of whether an employee is exempt is an inquiry that is based on the particular facts of [her] employment and not general descriptions.").

---

[16]   Within moments after Ms. Gibson gave this response in deposition, Defendant's counsel ceased her questioning about the remaining duties listed in the job descriptions and changed the subject by saying, "I think I'm done with that." Pl.'s Depo. at 75.

[17]   Nevertheless, it should be noted that the various duties listed in the job descriptions, even if accurate, do not describe an exempt employee. *See generally* Def.'s Mot. at 9-10.

Moreover, there is simply no way to decipher from the descriptions alone which duties might constitute "primary duties" or even exactly what role Ms. Gibson might play in the performance of those duties.  Indeed, Ms. Gibson expressly testified in deposition that "[o]thers played a role" in performing the duties set forth in the job descriptions and that, to the extent she personally participated, her role was performed at all times "under the direction and supervision of [her] superiors."  Pl.'s Depo. at 89.

Accordingly, Defendant's over-reliance on its own, self-serving job descriptions should hold no sway over this Court.  The Court should apportion much greater weight to Ms. Gibson's lengthy testimony regarding her day-to-day activities than to the vague and completely unexplained "duties" set forth in the descriptions.

### B.  Plaintiff Has Provided Affirmative Evidence of Her Overtime Hours Sufficient to Preclude Summary Judgment

Defendant argues at considerable length in its Motion for Summary Judgment that Ms. Gibson has presented speculative evidence of her damages such that her claim cannot survive summary judgment.  *See* Def.'s Mot. at 17-24.  This argument is highly specious and can be readily dismissed.

Ms. Gibson expressly testified in deposition that she regularly and repeatedly worked overtime while employed by Defendant.  *See supra* Part II.  In providing this testimony, Ms. Gibson set forth an accurate approximation of the hours she worked based upon her recollection of arrival times, leaving times, work in the evenings, and work on Saturdays.  *Id.*  She also presented written documentation, in the form of notations on her

personal calendar, to support her claims. *Id*. In addition, Ms. Gibson's supervisors have testified that they were aware of the long hours she worked. *Id*.

This sworn testimony is clearly more than sufficient to avoid summary judgment. *See Graham v. Babinski Properties*, 562 N.W.2d 395, 398 (S.D. 1997) (applying federal law) ("An employee's recollection of hours worked may establish a prima facie case" for overtime wages under the FLSA.). *See also Hernandez v. Mendoza*, 199 Cal. App.3d 721, 726 (Cal. Ct. App. 1988) (applying federal law) ("Once an employee shows that [s]he performed work for which [s]he was not paid, the *fact* of damage is certain; the only uncertainty is the *amount* of damage." (emphasis in original) (citations omitted)).

Indeed, the FLSA actually places the burden upon the *employer*, not the employee, to keep an accurate account of all hours worked by its employees. *Anderson v. Mt. Clemens Pottery*, 328 U.S. 680, 687 (1946). For this reason, once an employee produces sufficient evidence to show the amount and extent of overtime work as a matter of just and reasonable inference, which Ms. Gibson has clearly done here, "[t]he burden then shifts to the *employer* to show the precise number of hours worked or to present evidence sufficient to negate 'the reasonableness of the inference to be drawn from the employee's evidence.'" *Brock v. Seto*, 790 F.2d 1446, 1448 (9th Cir. 1986) (emphasis added) (quoting *Anderson*, 328 U.S. at 688). *See also Cummins v. Carteret Broadcasting Co.*, 137 F. Supp. 547, 551 (E.D.N.C. 1956) (same). "The employer 'cannot be heard to complain that the damages lack the exactness and precision of measurement that would be possible had [it] kept records in accordance with' the FLSA." *Nash v. Resources, Inc.*, 982 F. Supp. 1427, 1435 (D. Or. 1997) (quoting *Anderson*, 328 U.S. at 688).

In the context of summary judgment, where all facts must be considered in the light most favorable to the non-moving party, this burden shifting principle all but precludes the entry judgment as a matter of law in favor of an employer. *See, e.g.*, *Santelices v. Cable Wiring*, 147 F. Supp.2d 1313, 1328-29 (S.D. Fla. 2001) (denying employer's motion for summary judgment even though employee did not state with precision the number of hours of overtime he worked where he did establish sufficient evidence from which a fact finder could draw an inference of how many overtime hours were worked and burden of refuting such imprecision fell on employer, who had a legal obligation to keep accurate records and provided no such records); *Goldenberg v. Kristein Leather Co.*, 209 F. Supp. 703 (D. Mass. 1962) (holding that FLSA places upon employer legal burden of maintaining records of employees' overtime and, therefore, even if plaintiffs' answers to interrogatories established that they were unable to prove exact days and hours when alleged overtime work was performed, employer would not, on that account, be entitled to summary judgment). *See also Petrlik v. Community Realty Co.*, 347 F. Supp. 638, 644 (D. Md. 1972) (holding that, in determining overtime compensation to which employees were entitled under the FLSA, court would resolve any doubts in evidence as to dates and hours worked in favor of employees, and would accept the employees' evidence, presented "largely through reconstruction," regarding their overtime hours).

Therefore, contrary to the argument of Defendant that Ms. Gibson has not satisfied her burden of proof with respect to damages, it is actually Defendant who has yet to satisfy its burden.  Ms. Gibson has provided affirmative evidence that she worked

numerous overtime hours, as alleged in great detail in her Complaint. Defendant, who did not formally record the hours worked by Ms. Gibson on a day-to-day basis, has not and cannot possibly completely refute this evidence. Accordingly, Defendant clearly cannot obtain summary judgment on this basis.

### C. Defendant's Violation of the FLSA was Willful and the Statute of Limitations Attributable to this Case is Therefore Three Years

Despite its argument to the contrary, Defendant's violation of the FLSA in this case was clearly "willful," and Ms. Gibson is therefore entitled to recover damages for her unpaid overtime wages dating back three years.

In this Circuit, "[t]he standard for determining willfulness is whether the employer either knew, or showed reckless disregard, as to whether [its] conduct violated the Act." *Martin v. Deiriggi*, 985 F.2d 129, 135 (4th Cir. 1993). Significantly, the willfulness determination under the FLSA is a mixed question of law and fact in which "factual issues predominate." *Reich v. Monfort*, 144 F.3d 1329, 1334 (10th Cir. 1998).

The facts of this case clearly demonstrate the willful nature of Defendant's conduct. First of all, Ms. Gibson's own immediate supervisor for two years and Defendant's former Director of Teleservices, Kelly Hannabas-Bourdon, has stated under oath that Ms. Gibson should have received additional compensation from the company in light of the nature of her duties and the long hours she worked. *See* Hannabas-Bourdon Affidavit at ¶ 11. This testimony, at a minimum, constitutes prima facie evidence in support of Ms. Gibson's claim that Defendant's upper management exhibited reckless disregard for the requirements of the FLSA in denying her overtime wages.

Moreover, Defendant's method for determining the exempt or non-exempt status of its employees likewise establishes that the company willfully violated the Act. As detailed above, Ms. Gibson was first designated as an exempt employee in December of 1998. *See supra* Part II. In making this designation, the company relied upon a "grading system" that was established nearly two decades earlier and has never been modified since. *See* White Depo. at 9-16, attached hereto as "Exhibit G."[18]

In a nutshell, when a new employee is hired by Defendant or when a current employee changes positions, the Human Resources Department refers to a lengthy list of job titles with corresponding number codes and then inputs the number code for the job that has been filled into a DOS-based software system. *Id*. Then, depending upon the code input into the computer, the software tells Human Resources whether the new employee is exempt or non-exempt. White Depo. at 15.

Defendant's Director of Human Resources, Felicia Watkins White, does not know who authored the list or who set up the software system, and the company no longer even has a user manual for the software. *Id*. at 14-15, 35. She also has never "personally inquired with the Department of Labor to help determine the exempt status of an Encore employee," and is not aware of anyone else in the company having done so. *Id*. at 35-36. *See also* Gallimore Depo. at 12. As for Ms. White herself, she has a rather rudimentary understanding of the exemptions from the FLSA overtime provisions as demonstrated by her incorrect testimony that the three types of exemptions are "[a]dmin, *technical*, and

---

[18]    Attached hereto are excerpts from the deposition transcript of Felicia Watkins-White, Defendant's Director of Human Resources. Her deposition was taken by Plaintiff's counsel in another case involving a former employee's claim for overtime compensation. However, her sworn testimony is equally applicable, and equally admissible, in this case.

professional."  White Depo. at 32-33 (emphasis added).  As this Court knows, the three general exempt classes are administrative, *executive*, and professional.

Therefore, in "determining" the exempt or non-exempt status of employees like Ms. Gibson, Defendant has used and continues to use a system that is based entirely upon the mindless input of pre-existing job codes rather than any thoughtful analysis of the duties actually being performed by the employee inhabiting that job.  Defendant certainly should be conducting such an analysis because, as with Ms. Gibson's position, the duties associated with other positions at the company almost certainly have changed significantly over the years.  It is simply inconceivable that any job on Defendant's list is performed in the same manner as it was 20 years ago.

Of course, any effort by Defendant to conduct a thoughtful, ongoing analysis of its employees' exempt status would be complicated greatly by the fact that the person in charge of the Human Resources department doesn't know the exemption categories, and no one at the company has apparently ever consulted with the Department of Labor in order to obtain its valuable input.

Based upon these facts, Ms. Gibson will clearly be able to satisfy her burden at trial of establishing a willful violation of the FLSA by Defendant.  At a minimum, Ms. Gibson certainly has presented enough evidence to this Court to survive summary judgment on this issue.  *See, e.g.*, *Smallwood v. Liberty Mut. Ins. Co.*, 2000 WL 1480614, at *15 n.29 (D.N.H. March 6, 2000) ("Because willfulness is a fact-intensive issue that requires a plaintiff to demonstrate that the defendant had the requisite state of mind, I am

particularly reluctant to take the issue away from the jury at the summary judgment stage."). Accordingly, Defendant's Motion for Summary Judgment should be denied.

## IV. CONCLUSION

The facts set forth above, and the legal principles applicable to those facts, clearly demonstrate that Defendant has not and cannot meet its burden of proving by clear and convincing evidence that Ms. Gibson's primary duty satisfies the administrative exemption to the FLSA's overtime provisions. This is particularly true since Defendant is before this Court seeking summary judgment, which compels the Court to construe all facts and inferences therefrom in the light most favorable to Ms. Gibson. For this reason, as succinctly stated by the U.S. District Court for the Western District of Missouri, "'[s]ummary judgments in favor of parties who have the burden of proof are rare, and rightly so.' [This] admonition applies with even greater force when, as here, [the] heightened evidentiary standard [of clear and convincing evidence] accompanies the burden of proof." *K & K Jump Start/Chargers, Inc. v. Schumacher Elec. Corp.*, 82 F. Supp.2d 1012, 0123 (W.D. Mo. 2000) (quoting *Turner v. Ferguson*, 149 F.3d 821, 824 (8th Cir. 1998)).

Accordingly, Plaintiff Carmen Gibson respectfully requests that this Honorable Court deny Defendant Encore Marketing International, Inc.'s Motion for Summary Judgment.

Respectfully submitted,

_____
Philip B. Zipin, Bar No.: 03932
Neil R. Lebowitz, Bar No.: 25155
Zipin, Melehy & Driscoll LLC
8403 Colesville Road, Suite 610
Silver Spring, Maryland 20910
301-587-6364
Counsel for Plaintiff

## CONDITIONAL REQUEST FOR HEARING

Plaintiff Carmen Gibson hereby respectfully requests a hearing on Defendant Encore Marketing International, Inc.'s Motion for Summary Judgment if the Court is inclined to grant said Motion.

Respectfully submitted,

_____
Philip B. Zipin, Bar No.: 03932
Neil R. Lebowitz, Bar No.: 25155
Zipin, Melehy & Driscoll LLC
8403 Colesville Road, Suite 610
Silver Spring, Maryland 20910
301-587-6364
Counsel for Plaintiff