**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

| | | |
|---|---|---|
| CARMEN GIBSON | * | |
|     Plaintiff | * | |
| v. | * | Civil Action No.: WDQ-02-CV-3827 |
| ENCORE MARKETING INT'L, INC. | * | |
|     Defendant | * | |

\*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*

**AFFIDAVIT OF KELLY HANNABAS-BOURDON**

I am over the age of 18 and competent to testify to the following matters:

1. I was employed by Encore Marketing International, Inc. from February 19, 1998 through January 3, 2001.

2. In December of 1998, when I held the title of "senior telemarketing manager," I hired Carmen Gibson for the position of "telemarketing specialist." Thereafter, I remained Ms. Gibson's immediate supervisor for the next two years, i.e., until December 2000. Throughout this time, Ms. Gibson reported to me on a daily basis.

3. From September 1999 through April 2000, Ms. Gibson was also directly supervised by Encore's Vice President of Teleservices, John Bourdon. Mr. Bourdon, who is currently my husband, left the company in April 2000. We were married on October 21, 2000.

4. Ms. Gibson's title changed to "telemarketing manager" when I was promoted to Director of Teleservices in April 2000. Ms. Gibson's duties, however, did not materially change. This was due, at least in part, to the fact that the company never

hired a replacement for Ms. Gibson to perform the duties of "telemarketing specialist." Moreover, the parameters of my working relationship with Ms. Gibson remained essentially the same despite her title change.

5. Throughout the period of my supervision of Ms. Gibson, she never had any say regarding the company's policy determinations or how the company ran its business. In fact, Ms. Gibson had no decision-making authority whatsoever with respect to any matters of significance. Moreover, the selection and performance of Ms. Gibson's duties were completely dictated by myself, Mr. Bourdon, and/or other members of upper management.

6. Ms. Gibson's duties were strictly clerical in nature, relating to the collection, tabulation, and dissemination of pre-existing data. Ms. Gibson never personally analyzed this data, but merely transmitted it from one source to another.

7. Specifically, Ms. Gibson's job primarily involved gathering information such as sales figures, so-called "do not solicit" customer lists, and the like generated by either the vendors and/or other outside sources and then tabulating that information and forwarding it along to members of upper management, including myself, for our review.

8. Furthermore, this information was always collected by Ms. Gibson in a standardized way. For example, when Ms. Gibson would monitor the telemarketing calls being made by the vendors, her role was to verify that the particular representative making the call complied with Encore's written telemarketing policies and procedures, all of which were previously generated by the company and set forth in great detail.

9. Ms. Gibson did occasionally travel to the vendor sites, but never did so alone. Instead, she was always accompanied by a superior, even if not a direct supervisor. I personally traveled with Ms. Gibson a couple of times, and her role on these trips was essentially limited to observing the telemarketing representatives perform their duties and running errands for me such as getting pizza and other promotional items which would be used to help motivate the representatives. Ms. Gibson was present to assist me by performing various ministerial tasks, and was in no way designated or considered to be the primary representative of the company on the trip. That was exclusively my role.

10. When I was Ms. Gibson's supervisor, I was fully aware that she was working in excess of 40 hours per week. I knew that, in performing her assigned duties, Ms. Gibson frequently needed to work well into the nighttime hours and sometimes on Saturdays. Ms. Gibson occasionally worked these overtime hours from her home.

11. I was not the person within the company responsible for determining whether employees were or were not entitled to receive overtime. However, based upon the duties that she performed and the long hours that she worked, I personally believe that Ms. Gibson should have been paid additional compensation by the company.

I SOLEMNLY AFFIRM under the penalties of perjury and upon personal knowledge that the contents of the foregoing Affidavit are true.

July 16, 2003  
Date

*Kelly Hannabas-Bourdon*  
Kelly Hannabas-Bourdon

3