**IN THE UNITED STATES DISTRICT COURT
FOR THE DISCTRICT OF MARYLAND
Southern Division**

CARMEN GIBSON      :
     Plaintiff     :
           :
v.           : **Civil Action No.:  L-02-CV-3827**
ENCORE MARKETING
INTERNATIONAL, INC.    :
     Defendant    :

**DEFENDANT'S REPLY TO OPPOSITION
TO MOTION FOR SUMMARY JUDGMENT**

COMES NOW, the Defendant, Encore Marketing International, Inc., (hereinafter

"Encore"), and pursuant to the Federal Rules of Civil Procedure, submits this Reply to

Opposition to Motion for Summary Judgment and reiterates its request for this Honorable

Court to grant Defendant's Motion for Summary Judgment in its entirety and enter judgment

for the Defendant as a matter of law, and in furtherance thereof states as follows:

**STATEMENT OF MATERIAL FACTS NOT IN DISPUTE**

In the case *sub judice* the law is simply whether the Plaintiff's job was properly

classified as exempt from both the FLSA and MWHL[1].  At the center of such inquiry is an

application of Plaintiff's job duties and responsibilities to the administrative employee

exemption.  If the job duties and responsibilities fit within the exemption, then the job was

properly classified as exempt and the employee is not entitled to additional compensation for

hours worked over forty per week or, as here, eighty per pay period.  What makes this case

proper for summary judgment is that both parties have largely agreed as to what Plaintiff's job

duties and responsibilities were.  Thus, Defendant's statement of material facts in its

---

[1] The Plaintiff was exempt under the FLSA's administrative exemption.  MWHL has an equivalent exemption to
the FLSA exemption for "administrative capacity."  If the Court finds that the Plaintiff satisfies the FLSA's
exemption, then it would necessarily also find her exempt under COMAR 09.12.41.01(B) (2003).

Memorandum in Support of Motion for Summary Judgment (hereinafter Defendant's "Memorandum") is relatively short because, boiled down to the *material* facts in this case, there is nothing in dispute.

In contrast, the Plaintiff spends some thirteen (13) pages of its Opposition providing the Court with countless facts that are not even in dispute between the parties, and if it is in dispute it is not material.  This is nothing but an attempt to barrage the Court with meaningless, immaterial, facts and/or facts that are not in dispute.  It is a vain effort to cloud the issue and an attempt to make the litigation appear much more complicated, fact intensive and jury-worthy than it actually is.  Furthermore, in the case of facts that were pulled from Plaintiff's deposition, not only was the page of the deposition cited, but a copy of the entire page was attached for the Court's reference and so the Court could see the statement in its context.  This is the same procedure followed herein.  Therefore, any insinuation or express statement that the Defendant or its Counsel is misrepresenting facts to the Court is improper, unsupported and offensive. Despite Plaintiff's efforts to cloud the issue and project disputed facts, the following *material* facts still remain **undisputed.**

Plaintiff's claims in this case are based on positions held from November 1999 – May 2001, including Telemarketing Process Specialist, Telemarketing Account Manager, and Campaign Manager.  Plaintiff began employment with Encore in October 1995 as a Customer Service Representative.  Plaintiff was always compensated on a bi-weekly basis and received fringe benefits, including medical and dental insurance as a consequence of her employment with Encore.  *See* Deposition of Carmen Gibson attached hereto as Exhibit 1 at 45(16-18); Compl. at ¶15.  She was promoted several times with each promotion being accompanied with a raise.  *See* Exhibit 1 at 13(22) – 14(1-4).  In December 1998, Plaintiff was again

promoted, this time to Telemarketing Process Specialist. At this point, the Plaintiff became a salaried employee with a pay increase to $32,000.00. Then, in June 2000, Plaintiff was promoted to Telemarketing Account Manager, and received a pay raise to approximately $38,000.00. Finally, in March 2001, Plaintiff became a Campaign Manager with a pay raise to approximately $48,000.00. At the time of Plaintiff's termination on May 31, 2001, her annual salary was $48,000.00. See Pl.'s Ans. Interrog. at ¶14-15, attached as Exhibit 2 to Defendant's Motion for Summary Judgment. Additionally, Telemarketing Specialist and Telemarketing Account Manager were not entry-level positions. In fact, it took Plaintiff over 3 years before advancing to these positions. Hence, the job descriptions are sufficiently detailed for those in the industry.

Plaintiff states that the Telemarketing Specialist position included, "listening to customer service rep's telephone calls to make sure that they're providing customer service, quality customer service, to make sure they're not being rude to the customers, that they're being professional to the customers and they're following the company's policies." Exhibit 1 at 12(21-22); 13(1-5). She further stated that her duties included, but were not limited to: script[2] revisions including implementing clients' suggested/desired language, monitoring representatives calls and providing feedback, processing paperwork, and preparing reports. Exhibit 1 at 15(5-22).

As a Telemarketing Account Manager, Plaintiff stated that she was responsible for duties including, but not limited to: reviewing reports from outside vendors, disseminating information to vendors, monitoring customer service representatives, working with the information technology department to startup new programs, working with the accounting

---

[2] Script is the sheet detailing what a customer representative is supposed to say when making telephone calls. Exhibit 1 at 17 (1-11).

department, day-to-day contact with vendors, reviewing vendors' performance results daily, and attending meetings.  Exhibit 1 at 21(8-22).  In addition to the added responsibility, Plaintiff also received a corresponding pay increase.

In March 2001, Plaintiff became a Campaign Manager.  Her annual salary rose to approximately $48,000.00.  Exhibit 1 at 22(16-21).  As Campaign Manager, Plaintiff's duties basically remained the same. Exhibit 1 at 28 (8-13).

Throughout the relevant time period herein (the time period for which overtime compensation is demanded in the Complaint), a large part of Plaintiff's duties and responsibilities included call monitoring.  The Plaintiff listened to live telephone calls made by vendors and observed and evaluated vendor performance.  Plaintiff explained:

```
PAGE 17
13    A.    No. It's similar but different. In the
14    telemarketing department we did not make calls
15    internally. We hired companies to perform
16    telemarketing calls for us. So I would listen into
17    the companies that were making the calls for us.
18    Q.    And you would listen to live conversations?
19    A.    Yes.
PAGE 18
1     Q.    And what was the purpose of that?
2     A.    Just to make sure that those representatives
3     were adhering to Encore's policies and following all
4     procedures and they were selling the product
5     professionally.
10    Q.    Would you comment upon the professionalism
11    of the representative you listened to?
12    A.    Yes. We had a standard form that we use to
13    Monitor and we would rate them on a scale of one to
14    five.
15    Q.    For such things as – can you give me an
16    Example besides professionalism?
17    A.    Their tone, listening skills, grammar,
18    Enunciation, pronunciation, common courtesy, polite.
```

Exhibit 1 at 17(12)-18(5); (10-18).

Furthermore, during the positions of Telemarketing Manager and Campaign Manager, the Plaintiff went on business trips to vendor sites on behalf of Encore and/or one of Encore's clients. Exhibit 1 at 50(4-22). These trips were not day trips, but required spending at least one night out of town. Exhibit 1 at 49(15-20). These trips were sometimes taken without a direct supervisor. Exhibit 1 at 51(11) – 53(21). Plaintiff's statement that she "was always accompanied by a superior on these trips" is a mischaracterization. *See* Pl's Opp. at 12. Instead, Plaintiff would travel with someone who may have more tenure or be higher on Encore's corporate structure, but since these individuals worked in a different department, they were not direct superiors. Exhibit 1 at 53(19-21); 36(1-15). During these trips, taken "maybe once every three months, maybe twice a month" (Exhibit 1 at 50(14-15)), the Plaintiff had an automatic expense account of $100 for any purchases, which she made at her discretion. Exhibit 1 at 54(10-19); 56(3-6).

Another key function of Plaintiff's job as Telemarketing Manager was day-to-day contact with each vendor that would call on any of Encore's programs and daily review of the vendors performance. Exhibit 1 at 21(18-20). In essence, Plaintiff was the contact person at Encore for the vendor's hired by Encore for telemarketing campaigns. *See* Letter from American Express attached hereto as Exhibit 2. Plaintiff also attended meetings with personnel such as "the president of the company, the vice-president of the company, or accounting department or client services department." *See* Exhibit 1 at 27(12-14), 21(20-22); Pl.'s Ans. to Interrog. at ¶14, attached as Exhibit 2 to Defendant's Motion. Each of the material facts stated above are supported by Plaintiff's testimony to which the Court has been respectfully referred, and is attached hereto.

**ARGUMENT**

1.    **Affidavit of Kelly Hannabas-Bourdon Should Be Stricken**

This Court, in <u>Camden v. State of Maryland</u>, 910 F. Supp. 1115 (D. Md. 1996),

thoroughly discussed the issue of *ex parte* interviews with former corporate employees.  First,

and contrary to Plaintiff's argument, Judge Messitte noted that in federal actions, the

Maryland Rules of Professional Conduct do not control.  "Although a federal court in a civil

action follows state law on privileges when the action is premised on state law, federal

common law on privileges applies with regard to federal actions."  <u>Id</u>. at 1119.  Likewise, "the

ethical standards by which federal courts measure an attorney's professional conduct are

standards defined by federal law."  <u>Kitchen v. Aristech Chemical</u>, 769 F. Supp. 254, 258 (S.D.

Ohio 1991).  Though this case is based upon both state and federal claims, both parties

extensively brief only the federal claim arguments.  In the end, the <u>Camden</u> Court held that "a

lawyer representing a client in a matter may not, subject to few exceptions, have *ex parte*

contacts with the former employee of another party interested in the matter when the lawyer

knows or should know that the former employee has been extensively exposed to confidential

client information of the other interested party."  <u>Camden</u>, 910 F. Supp. at 1116.  The two

narrow exceptions that permit such ex parte contact with former employees are (i) the consent

of the other interested party's counsel; or (ii) approval of the court.  <u>Id</u>.  <u>See also</u>, <u>Plan.

Comm. v. Driggs</u>, 217 B.R. 67, 69 (D. Md. 1998) .

However, in this case, the measures, if any, taken by Plaintiff's Counsel to ensure the

protection of confidential information are unknown.  Indeed, the <u>Camden</u> Court warned about

this very issue, stating:

> prophylactic provision must be made for monitoring.  This can be
> accomplished if either organization counsel is present to object or if the court

has set appropriate ground rules in advance.  But **what seems certain is that adversary counsel and the former employee himself (particular given that he may harbor hostility against his former employer) cannot be left to judge**.

Id. at 1121-1122.  (emphasis supplied.)  In this case, the *ex parte* contact by Plaintiff's Counsel was with Mrs. Kelly Hannabas-Bourdon.  Mrs. Bourdon was in Defendant's employ from February 1998 to January 3, 2001.  She was a senior manager who was terminated by the company in January 2001.  *See* Affidavit of Felicia Watkins White attached hereto as Exhibit 3.  Given her termination, Mrs. Bourdon's "hostility" or bias towards the company can be somewhat presumed, but is relatively unknown.  Furthermore, according to Plaintiff's own testimony, Mrs. Bourdon was the **only one** who was expressly and directly informed of Plaintiff's alleged overtime hours.  Exhibit 1 at 56(7-20).  This potentially makes Mrs. Bourdon the only Encore employee (and a senior management level employee at that) who had notice of the facts that form the very basis of Plaintiff's lawsuit.  This means that Mrs. Bourdon was necessarily involved in the decision or at least in discussions regarding whether or not to pay the Plaintiff overtime.  Therefore, any information concerning this is confidential to Encore and protected by the attorney-client privilege.

Defendant's main objections to the *ex parte* interview and to Mrs. Bourdon's affidavit are two fold:  (i) that Defendant was not notified and/or that the Court was not consulted so that appropriate parameters could be set; and (ii) that information and statements were elicited from Encore's former employee and used by the Plaintiff that effectively seek to bind the company and impute liability to Encore.  The Plaintiff questioned Encore's former employee solely on knowledge she acquired during and within the scope of her employment and regarding the very facts that form the basis of this suit and go to such elements as notice and willfulness (Kelly Hannabas-Bourdon Affidavit at ¶10; 11), and attempts to use these

7

statements as party admissions and as prima facie evidence of Plaintiff's case.  See Opp. at

30.  This effort to impute liability to Encore without previous notice and the right to counsel is

unreasonable, unethical, unprofessional and improper.  "[I]f the employee is somehow

involved in a matter which is the subject of dispute between the parties, the employee's

statements may constitute an employer admission and an attorney should not interview the

employee without permission" McCallum v. CSX Transp., Inc., 149 F.R.D. 104, 111

(M.D.N.C. 1998).

It is unknown why Defendant was not notified of the interview or why the Court was

not consulted beforehand, these measures would have been so easily and quickly

accomplished.  Now, the parties and this Court are faced with evidence that was improperly

obtained and must be dealt with.  The only proper option is for the Court to strike Mrs. Kelly

Hannabas-Bourdon's affidavit[3].  In the alternative, the Defendant respectfully requests that all

of Mrs. Bourdon's statements, in her affidavit and in any future pleading or testimony, be

considered simply third-party statements and not constitute any  party admissions by Encore.

## 2.    Raising Affirmative Defense in Summary Judgment Motion is Acceptable

The timing of when to raise an affirmative defense is a procedural requirement which

is governed by Federal Rule of Civil Procedure 8(c).  A defendant's failure to raise an

affirmative defense in their answer does not amount to a waiver of such defense absent unfair

surprise or prejudice to the Plaintiff.  Furthermore, a defendant does not waive an affirmative

defense if it is first raised in a pre-trial dispositive motion.  See Brinkley v. Harbour

Recreation Club, 180 F.3d 598, 612-613 (4th Cir. App. 1999); See also Peterson v. Airline

---

[3] Though motions for sanctions and to disqualify counsel sometimes accompany requests to strike  evidence
obtained through improper ex parte interviews, as in Camden, 164 F. Supp.2d at 687 ("ex parte communications
with a former employee that result in a lawyer obtaining confidential information or documents may result in

Pilots Ass'n, 759 F.2d 1161, 1164 (4th Cir. 1985)(waiver is not automatic, but requires a showing of prejudice or unfair surprise); Polsby v. Chase, 970 F.2d 1360, 1364 (4th Cir. 1992)(noting that affirmative defenses may be pleaded in pretrial motions and that the district court did not abuse its discretion by permitting defendant to raise an affirmative defense after the answer). Plaintiff does not claim, and in fact has not been unfairly surprised, nor has she been prejudiced by Defendant's inadvertent delay in raising its affirmative defense. Additionally, Plaintiff had ample time and opportunity to respond to Defendant's Motion for Summary Judgment. In fact, Defendant consented to allow Plaintiff an extension on the filing date of her opposition to the Motion for Summary Judgment. Therefore, in no way did Defendant's raising of he administrative exception at summary judgment prejudice or unfairly surprise the Plaintiff.

### 3. This Case Should Be Determined by Summary Judgment.

The Plaintiff goes to great lengths to demonstrate to the Court that this case is not the type that should be decided at the summary judgment stage. Plaintiff goes as far as to cite fraud cases out of the Southern District for New York as "persuasive authority." Obviously, this case is fundamentally different from a fraud case and Plaintiff's argument is therefore misguided. The Fourth Circuit has clearly stated that the question of "whether an employee's duties are administrative is a question of law appropriate for summary judgment." Shockley v. City of Newport News, 908 F.2d 18, 26 (4th Cir. 1993). Such precedent goes beyond any miniscule amount of persuasion offered by a fraud case. Furthermore, the Defendant's Motion for Summary Judgment and this Reply are based solely upon facts that are genuinely material and relies heavily upon the Plaintiff's own statements to support such facts. As

---

sanctions regardless of whether Rule 4.2 is held to apply"), the Defendant here does not seek this severe relief, but only requests that the Affidavit be stricken from the record and not be considered by this Honorable Court.

such, the facts, even when viewed in the light most favorable to the Plaintiff, still warrants granting summary judgment in favor of the Defendant as a matter of law.

### 4.    Plaintiff Expressly Adopted Encore's Job Descriptions

Any and all descriptions of Plaintiff's job duties and responsibilities have been expressly agreed to by the Plaintiff, under oath, with counsel present.  When all material facts have been stated by Plaintiff and agreed to be valid and true by Defendant, summary judgment should be granted, as there are simply no material facts to dispute.  See, Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  See also, Catawba Indian Tribe of South Carolina v. South Carolina, 978 F.2d 1334, 1339 (4th Cir. 1992); Fed. R. Civ. P. 56(c).

Plaintiff's statement that a job title is not dispositive in determining an employee's status, is technically accurate.  However, job descriptions that have been adopted by the employee as accurate descriptions of a position can speak volumes regarding job responsibilities and duties.  See, McAllister v. Transamerica Occidental Life Insurance Co., 325 F.3d 997, 998 (8th Cir. 2003) (court quotes Plaintiff's job description and states that during her deposition Plaintiff acknowledged the description as an accurate portrayal of what her job entailed.); Haywood v. North American Van Lines, 121 F.3d 1066, 1073 (7th Cir. 1997) (where plaintiff agreed that job descriptions accurately described actual duties, the court used the job descriptions as evidence thereof.)  The following exchange occurred during Plaintiff's deposition:

        Page 71
            20    Q    Here is what's been marked as Exhibit Number
            21  3.  Can you take a look at this for me, please.  And
            22  if you know, tell me what that is.
        Page 72
            1     A    Okay.  This is basically the job duties for
            2  the telemarketing specialist.
            3     Q    And did you prepare that list?

```
 4     A   No.  That list was previously prepared when
 5  I assumed the position of telemarketing specialist.
 6     Q   I understand.  And as you look at that
 7  list -- and you can take your time -- tell me if you
 8  generally agree with the items that are listed there
 9  as being the telemarketing specialist responsibilities
10  or job duties?
11     A   Yes.  I agree.
```

Plaintiff's Depo at 71(20) – 72(11).   Job descriptions adopted by Plaintiff are attached hereto

as Exhibits 4 and 5 respectively.

Exhibit 4 is the job description for the Telemarketing Specialist position.  The

description states that Plaintiff's job duties included: scripts; contact product managers for

product updates, request premiums to enhance product, revision (client changes), and

distribution (clients, managers and vendors); monitoring – scheduling, client remote, weekly

remote, provide remote overview, commendation, track vendor performance,

recommendation; quality management – vendor quality assurance, quality

manual/presentation for all new vendors, site recommendations;  vendor training; and

campaign. *See* Exhibit 4 for full list.  Plaintiff agreed, with her counsel present, that these

responsibilities are those of the Telemarketing Specialist.

Plaintiff also agreed that the job description for Telemarketing Account Manager was

an accurate depiction of the duties and responsibilities.

```
20     Q   I'm going to show this to you.  It was
21  previously produced by your counsel.  What is that, if
22  you know?
Page 73
 1     A   This is the job description for the
 2  telemarketing account manager.
 3     Q   And is that something that was pre-prepared
 4  or did you prepare that?
 5     A   It was pre-prepared.
 6     Q   By somebody else at Encore?
 7     A   Correct.
```

8    Q    And take your time if you need it, but tell
9    me if you generally agree with the job duties that are
10    listed there.
11        MR. LEBOWITZ:  Read it first.
12        MS. BYAM:  Take your time reading it.
13    **A    Yes.  I agree with it.**

Exhibit 1 at 72(19) – 73(13).

The Telemarketing Account Manager required additional responsibility and duties

than Plaintiff's previous position. Specifically the job included: (1) revenue generation /

financial implications, i.e., accountable for revenue of all Telemarketing programs, establish

and apply continuous process improvements to determine efficiencies and viability of

programs, decision making to change direction of program or discontinue program based on

analysis of results; vendor management – daily contact with all vendor partners to insure their

solid performance of results, quarterly site visits to evaluate training, calling, and operations,

annual audits of all agencies utilizing standardized evaluation criteria, decision making

regarding placement of programs, strong communication, follow-through, and negotiating

skills; and maintaining partnerships within Encore.  *See* Exhibit 5 for full list.

Even on direct examination by her own counsel, Plaintiff did not disavow the

descriptions or recant her testimony agreeing with these descriptions.  On direct, she merely

stated that other people also aided her.  Exhibit 1 at 89(1-6).  Plaintiff's statement that she did

not solely perform these duties is not dispositive.  For, Defendant has not claimed that

Plaintiff was the **only** person who performed these duties.  Defendant's only claim is that she

agrees with the descriptions and therefore they constitute evidence in this case.

## 5.    Plaintiff Satisfies the Administrative Exemption

FLSA was not created for well paid, high-level employees, such as Plaintiff.  The

statute was enacted to "eliminate labor conditions detrimental to the maintenance of the

minimum standard of living necessary for health, efficiency, and general well-being of workers." Id. at 999 (citing 29 U.S.C. § 202(a)). Plaintiff was not in a working condition that threatened her ability to maintain a minimum standard of living. Plaintiff was in a position that raised her standard of living. She completed two years of college, did not graduate, obtained a job in which she worked her way to a top position in the telemarketing department, where her immediate supervisor was the Vice President of marketing (not telemarketing) and paid her $48,000 a year, salary. Plaintiff was given so much flexibility in her schedule that she monitored calls from her home or her cell phone. Exhibit 1 at 93(17) – 94(4).

Furthermore, 29 U.S.C.A. § 541.2, clearly states that an administrative employee excepted from FLSA is one "who regularly and directly assists an employee employed in a bona fide executive or administrative capacity[.]" There is no argument that the Plaintiff's immediate supervisor was employed in an executive position.

Stanger v. Glenn L. Martin Co., 56 F. Supp. 163, 166 (D. Md. 1944) states that the term "administrative" is properly applied to persons performing a variety of miscellaneous but important functions in business. Because the class of administrative persons is so broad, it can include employees who establish precedents and assist in determining policies. Id.

Plaintiff's work with the Defendant satisfies the "administrative" exemption under FLSA and MWHL. The Defendant agrees that the "short test" for the administrative exemption to the overtime pay requirement of the FLSA is the one applicable to this case. This is so because the Plaintiff indisputably earned much more than $250.00 per week. (Pl.'s Ans. Interrog. at ¶ 15.). Defendant, herein, will address the remaining two elements in the order done so by Plaintiff in her Opposition.

**A.      Plaintiff's work required the exercise of discretion and independent judgment.**

Plaintiff's self-serving emphasis of the mundane parts of her day still qualify her positions as exempt. In fact, Plaintiff's attempt to mechanize her day, emphasizes the tasks that required discretion and independent judgment that much more. For example, Plaintiff stated that monitoring calls required her to, "just to make sure that those representatives were adhering to Encore's policies and following procedures and they were selling the product professionally." Exhibit 1 at 17(12-22) - 18(1-5). Defendant agrees that those are the basic functions of call monitoring. However, when each facet is examined it is revealed that Plaintiff must have exercised independent judgment in monitoring calls. Even if, *arguendo*, there was a form that Plaintiff was required to fill out that had a rating scale, it was the Plaintiff's job, based on the conversation she listened to, to determine at what level the representative performed. In fact, Plaintiff stated that when rating representatives she used her own judgment. Exhibit 1 at 92(19) – 93(4). In the end, it was solely up to the Plaintiff to determine how well the representative conducted a call.

Even more, when monitoring calls the Plaintiff was responsible for the immediate decisions relative to how the program was being represented in live conversations. If representatives were not presenting the programs in accordance with the monitor's [Plaintiff's] opinion of how it should be presented, the monitor could: (1) immediately have that agent removed from the program for the day and retrained; (2) have that agent permanently removed from the program; or (3) immediately shut down all telemarketing call by that vendor if the inefficiency is rampant. *See* Excerpts from Deposition of David Gallimore attached hereto as Exhibit 6 at 66(20)–67(17); 69(10-14). Additionally, "not only does the telemarketing manager have the authority to do [the above options], but they have the obligation to do it." Exhibit 6 at 69(7-9). The call monitoring responsibility is designed

to provide immediate feedback so that Encore can judge how the program is doing, how the consumers are responding to the offer that they're presenting, and how the telemarketing vendor on the whole is doing.  Exhibit 6 at 67(18)–68(2); 22(14)–24(3); 28(12)–29(21).  That is why representatives are monitored generally on a day-to-day basis; to ensure that they're maximizing the results of the program.  Exhibit 6 at 68(3-6).

Plaintiff drafted reports based on what **she heard**.  Just because there was a policy manual that Plaintiff could reference does not mean she did not exercise discretion and independent judgment.  See, McAllister at 1001; Dymond v. United States Postal Service, 670 F.2d 93, 95-96 (8th Cir. 1982)(postal inspectors held to be exempt administrative employees even though they were required to follow procedures, standards and policies set forth in a detailed field manual.)  A policy manual cannot detail every situation and how to handle it, nor can a form rate what a person listened to.  Plaintiff had to use her independent judgment when rating the telemarketing representatives.  See supra.

Plaintiff states that she supervised no employees.  Exhibit 1 at 20(3-5).  However this is not accurate.  All of the telemarketing employees were off-site.  Plaintiff may not have directly supervised Encore employees, but she indirectly supervised and evaluated vendors.  See, supra.  Every call Plaintiff listened in on was an example of this supervision.

Finally,the Department of Labor's broad regulations give a general definition for "discretion and independent judgment" as used in the statute, however, there is more.  McAllister v. Transamerica Occidental Life Insurance Co., 325 F.3d 997 (8th Cir. 2003), states that,

> The term discretion and independent judgment . . . does not necessarily imply that the decisions made by the employee must have a finality that goes with unlimited authority and a complete absence of review. The decisions made as a

result of the exercise of discretion and independent judgment may consist of recommendations for action rather than the actual taking of action.

Id. at 1001 (citing § 541.207(e)(1)).  It is enough that Plaintiff have the ability to make recommendations for action rather than being the person who actually takes such action.  This approach is logical when viewed in the grand scheme of the administrative exception.  As this Court has stated before, exempt employee's decisions "need not be immune from review, revision, or reversal. The types of decisions that qualify may be in the form of **recommendations to superiors and subject to review and approval**."  Sticker v. Easter Off Road Equip., Inc., 935 F. Supp. 650 (D. Md. 1996).  (emphasis supplied.)  It remains undisputed that Ms. Gibson often advised both her superiors and higher-ranking Encore employees about matters of consequence.  Exhibit 1 at 38(8-15).

Plaintiff enjoyed a job in which she was allowed and encouraged to make suggestions.  The fact that some decisions were reviewed by others and sometimes amended or reversed does not remove them from the administrative exemption realm.

> **B.      Ms. Gibson's work was directly related to Encore's management policies or general business operations.**

Plaintiff concedes that her work on a daily basis consisted of office or nonmanual work.  However, Plaintiff does not concede that the work is directly related to Encore's management policies or general business operations.   Furthermore, Plaintiff argues that even if she exercised discretion and independent judgment, there is no evidence that it was her "primary duty."  However, much of Plaintiff's argument is in vain.  The amount of discretion and independent judgment exercised within Plaintiff's primary duty is not an issue.  It is a criteria under the "long test", however, it has been agreed that the short test applies here.  See, McAllister at 1002 (the percentage of time devoted to the exercise of discretion and

independent judgment may have been relevant if we had been called upon to apply the long test, as that test covers employees who customarily and regularly exercises discretion and independent judgment).  Pursuant to the short test, an employee qualifies as an administrative employee if they meet the more liberal standard requiring that their duties merely **include** work that requires the exercise of discretion and independent judgment.  29 C.F.R. § 541.2. Nonetheless, Defendant shall, briefly, state the shortcomings of Plaintiff's argument.

While primary duty is generally determined by the duty which encompasses the major part, or over fifty percent of an employee's time, that is not the end of the inquiry.  Time alone is not the sole test and if an employee does not spend fifty percent of their tine in administrative functions, such as advising the management, planning, negotiating, representing the company, purchasing, promoting sales, and business research and control, other factors should be considered.  29 C.F.R. § 541.205; <u>Gagnon v. Resource Technology, Inc.</u>, 19 Fed. Appx. 745, 748 (10th Cir. 2001).  However, in this case it is apparent that Plaintiff's primary duties did consisted of administrative functions.  Also, according to Plaintiff, she spends approximately five hours per day on call monitoring.

Each report that Plaintiff drafted or assembled functioned to advise management on the current situation of the telemarketing department.  She was the company representative to each client that had a telemarketing campaign with Encore.  When they had a problem, the client did not phone the Vice President of Marketing, they called Plaintiff to have it resolved. While, her purchasing ability was not unlimited, it was a **luxury** afforded to Plaintiff.  Rank and file Encore employees did not enjoy this luxury or status.  Plaintiff also promoted sales every time she visited a vendor site at the startup of a campaign to "do maybe like a rah rah session for the reps there, buy them pizza, soda.  Maybe bring some incentives."  Exhibit 1 at

53(2-4). Plaintiff later asserts that the primary reason for going on these trips was to observe, run errands, and perform ministerial tasks to assist superiors. Pl's Opp. at 12. However, this is most troublesome. Plaintiff's deposition testimony stated that while she did not always travel with her direct supervisor, those that she did travel with were in different departments than herself. Exhibit 1 at 36(1-15). Plaintiff's deposition testimony contradicts her Opposition arguments. Her statement that Lyndsay Marchese is a superior that she "reports to" is a drastic overstatement. Pl's Opp. at 11. Plaintiff seems to make this overstatement several times within her Opposition, for example, also regarding Jackie Hudson. When referring to Jackie Hudson at deposition Plaintiff stated that Jackie "was the director of Client Services. So we also traveled together to some of the vendors. And I **worked closely with her for the startup of new programs as well.**" Exhibit 1 at 43(8-11). At no time did she assert that she "reported" to Ms. Hudson. Nor did she make an indication that Ms. Hudson had any impact or involvement with the telemarketing department other than to assist her. To make these assertions in her Opposition without any support from deposition transcript or any other evidence is absurd. When Plaintiff's recital of her relationship with Jackie Hudson and Lyndsay Marchese are contrasted with her frequent recitals of her relationship with persons such as David Gallimore and Kelly Hannabas, it becomes evident that Plaintiff's Opposition is an exaggeration. In response to a question to list persons with whom she had "any type of supervisory or management relationship," Plaintiff listed "John Bourdon, Kelly Hannabas, Beth Bell, and David Gallimore." There have been no supplemental answers to this interrogatory. Pl.'s Ans. Interrog. at ¶ 17, attached hereto as Exhibit 7. Furthermore, Plaintiff's statement that she met with her direct supervisor face to face daily, is a physical impossibility. Exhibit 1 at 82-84. David Gallimore had approximately 15 direct reports

during the time he supervised the Plaintiff. It its a physical impossibility that he met with

them all for an hour a day like the Plaintiff claims.  Exhibit 6 at 75(20) – 76(10).

Furthermore, **Kelly Hannabas was never located in the Lanham office**.  She was

permanently stationed in Jacksonville, Florida.  Plaintiff may have spoke with her by phone

daily, but that would be the extent of most contact.  Exhibit 3 at ¶6.  It is curious that Plaintiff

managed to omit this fact in her thirty-three (33) page Opposition and 11 paragraph Affidavit.

      Lamentably, there are more customary examples of Plaintiff's attempts to belittle the

correlation between her traveling and the determination that she is in fact an administrative

employee.  Plaintiff states in her Opposition that she traveled "relatively infrequently."  <u>See</u>

Pl's Opp. at 12.  However, in her deposition when asked how frequently she traveled, Plaintiff

stated "[I]t varied. Sometimes maybe once every three months. Maybe twice in one month. **It**

**was frequent travel** but when I did, it was pretty close together or as far as, you know,

maybe once every three months or twice in a month."  Exhibit 1 at 50(12-18).

      Furthermore, under the short test, Plaintiff's primary duty is more often than not, what

she does that is of principal value to Encore.  It is not the collateral tasks that she performs,

even if they consume more than fifty percent of her time.  <u>Cooke v. General Dynamics</u>

<u>Corporation, et al.</u>, 993 F. Supp. 56, 59 (D.Conn. 1997).  According to <u>Cooke v. General</u>

<u>Dynamics Corp.</u>, the primary duty is actually determined by the employer because it calls for

that which is of "principal value" to the employer.  The optimum way to demonstrate what

was Plaintiff's principal value to Encore is through an understanding of Encore's business.

David Gallimore, the Vice President of Marketing testified as to how the Marketing and

Telemarketing departments fit into Encore's overall business.  He stated, "we have

relationships with companies, outside companies.  We call them clients.  And we market our

services to their customers and they permit us to do that in exchange for share of the revenue. So we are somewhat responsible and accountable back to them on all program performance." Exhibit 6 at 32(18) – 33(5).  Because program performance logically depends on and correlates to vendor performance, Plaintiff's evaluation supervision and management of vendor performance was of significant value to Encore.  Therefore, vendor oversight was Plaintiff's principal value to Encore.

Moreover, Plaintiff was for many months the entire in-house telemarketing department.  Exhibit 1 at 22(2-4).  All of Plaintiff's duties related to this department and the general functioning of the department.  Although there were no employees to directly oversee housed within Encore, Plaintiff's daily duties included vendor oversight and this directly related to whether a campaign would be successful.

### C.    Ms. Gibson was paid on a salary basis.

It is undisputed that Ms. Gibson was paid biweekly.  For the positions at issue, Ms. Gibson was originally paid by Encore at a rate of approximately $32,000.00 per year and, after two raises, approximately $48,000.00 per year.  Exhibit 2 to Defendant's Motion at ¶ 15.  As the amount of salary, alone, is certainly not dispositive of whether an employee satisfies the administrative exemption, it certainly has been one factor seriously considered by this Court.  In Stanger et al. v. Glenn L. Martin Co., 56 F. Supp. 163 (D. Md. 1944), the Court stated:

> In other words, the differentiation between a mere clerk and one with actual administrative ability may be said to lie very largely in, (1) the exercise of discretion and independent judgment, and (2) **in receipt of a salary that is above that customarily paid to one engaged primarily in mere manual or clerical work.**

Stanger, 56 F. Supp. at 166. (emphasis supplied.)  The Court, then, should seriously consider the amount of Ms. Gibson's compensation as an important factor here.  One of the recognized purposes for the FLSA was "to protect low paid rank and file employees, not higher salaried managerial and administrative employees who 'are seldom the victims of substandard working conditions and low wages.'"  Counts v. South Carolina Electric & Gas, 317 F.3d 453, 456 (4th Cir. 2003).

### 6.      Plaintiff has not fulfilled her duty to prove damages.

Despite Plaintiff's insinuations, the Defendant did comply with its record keeping duties pursuant to the FLSA and MWHL and, Defendant, in fact, provided payroll records to the Plaintiff in the course of discovery.  Defendant has complied with its duty under FLSA and MWHL.  However, Defendant's record keeping duties and Plaintiff's substantive requirement to prove damages are two very different burdens.

As stated *supra,* it is true that under the FLSA, the Defendant employer has the obligation to keep accurate payroll records.  The Defendant has done so and provided these records to the Plaintiff during discovery.  Plaintiff never questioned or challenged the authenticity or validity of these records.  See, Payroll records attached hereto as Exhibit 8.

However, **the Plaintiff** must still prove to some degree of certainty, the damages she seeks.  "An employee suing an employer under the Fair Labor Standards Act for unpaid minimum wages or unpaid overtime compensation has the burden of proving that the employee performed the work for which the employee was not properly compensated."  Anderson v. Mt. Clemens Pottery Co., 328 U.S. 680 (1946).

Plaintiff's argument applying the law on reasonable inferences to the measly evidence she has offered on damages is misapplied.  See, Pl's Opp. at 28.  Plaintiff's evidence of

damages does not even whisper the sound of a "reasonable inference." The law on reasonable inference does not allow nor require the jury to take a speculative leap from the evidence provided to the conclusion Plaintiff asks them to draw. Instead, the burden is placed on the Plaintiff. "The burden rests upon the employee to show that he performed overtime work for which he was not properly compensated and to show the extent and amount of such work as a matter of just and reasonable inference." Mitchell v. Caldwell, 249 F.2d 10, 11 (10th Cir. 1957). See also Anderson v. Mt. Clemens Pottery Co., 328 U.S. 680 (1946).

In the case *sub judice*, the Plaintiff fails to provide non-speculative evidence of either the fact or amount of damage. First, Plaintiff is claiming that she should have been paid overtime from November 1999 – May 2001. However, she began in the position in November of 1998 and has no remote possibility of beginning to prove damages until, if at all, November 2000 when she claims to have began keeping track of her hours in her personal organizer.

A glimpse of the calendar produced by Plaintiff clearly indicates that any time kept within its pages can only be decoded by the Plaintiff herself, as the untrained reader cannot read the pages and say with any specificity or accuracy what hours Plaintiff worked on any given day. Therefore a jury could not be expected to reasonably infer the hours worked. For example, see, Exhibits 6-1, 6-2 and 6-3 attached to Defendant's.

All overtime alleged by Plaintiff is not only inconsistent but is purely speculative. It is a guess that is not supported by the evidence. Even though the Plaintiff claims to have recorded "**all**" the hours she worked in her personal organizer, she only produced 29 days of alleged overtime and she is not even sure when she

began her documentation practice.  Exhibit 1 at 63(20)-64(4).  Plaintiff has only

produced evidence of her personal calendar from November 2000 through May 2001.

Plaintiff claims damages for a full year before she has any evidence (no matter how

speculative) of any overtime allegedly worked[4].

Furthermore, the Plaintiff has produced no evidence via witness testimony or

documentation that she actually worked the overtime hours that she alleges to have worked.

Plaintiff's bald assertion that "defendant corporation" knew of her overtime hours is simply

untrue[5].  Gallimore, whom Plaintiff cites for the proposition that Encore knew of her overtime

hours, responded to such inquiry by stating:

> PAGE 10
> 11    Q      Were you aware that Ms. Gibson worked
> 12    at home at night sometimes?
> 13    A      Yes.
> 14    Q      And how were you aware of that?
> 15    A      **Because she told me that.**
> 16    Q      **Was there any sort of documentation you**
> **17    saw that backed up her assertion?**
> **18    A      No.**
> PAGE 11
> 1            The remote monitoring of the
> 2    telemarketing calls, did she submit some
> 3    documentation related to those when she worked at
> 4    night on that?
> 14    Q      did she show you anything that showed
> 15    that she worked at night.
> 16    A      Not to my knowledge, not to my
> 17    recollection, no.
> PAGE 12
> **1    Q      Did you ever see any documents which**
> **2    would indicate that she worked on Saturday?**
> **3    A      No.**

---

[4] Defendant is by no means recognizing any merit, authenticity, or accuracy to Plaintiff's supposed method of
tracking her hours.
[5] Plaintiff's attempted use of Mr. Gallimore as a corporate designee, speaking on behalf of Encore, within her
opposition is impermissible.  Defendant's counsel emphasized at deposition that Mr. Gallimore was not
designated as the corporate designee.  Plaintiff's attempt to now use Mr. Gallimore's as a spokesman for Encore
is distasteful and improper.  Exhibit 6 at 59(5-10).

Exhibit 5 at 10(11) – 12(3).  Additionally, when asked whether Plaintiff always performed her duties from the office, Mr. Gallimore stated that "No.  Carmen had an unusual shift.  She would – I don't know if you would call it a shift, **but she would work less than eight hours in the office and often finish up at home**, from her home."  Exhibit 6 at 69(18) – 70(4). (emphasis supplied.)  The mere fact that David Gallimore knew that Plaintiff "worked from home" is not dispositive that the work was overtime, as noted above, or that Encore was aware that Plaintiff was performing overtime work.

In summary, Plaintiff's claim for damages is inherently faulty and insufficient as a matter of law.  For, a "claimant must prove to a reasonable certainty the fact and amount of his damage," though, as stated *supra,* "mathematically precise proof is not required." Crittenden v. Whippoorwill Ranch, 406 N.W.2d 624, 28 Wage & Hour Cas. (BNA) 409 (Minn. Ct. App. 1989) (quoting Pemberton v. OvaTECH, Inc., 669 F.2d 533, 541 (8th Cir. 1982).

### 7.    **Plaintiff has Not Demonstrated Defendant's Willful Violation**

The discussion of the knowledge of Felicia Watkins-White, Encore's **current** Director of Human Resources, is a mischaracterization of testimony that leaves the Plaintiff stating incorrect facts and drawing improper inferences.  Ms. White was not the human resources person who hired Ms. Gibson.  At that time, John Ross was the Director of Human Resources. Mr. Ross was not deposed by the Plaintiff.  Exhibit 3 at ¶ 3.

Ms. White was deposed and testified at deposition solely based on her personal knowledge, and **not as a corporate designee**, in the civil case involving former Encore employee Dana Grasso.  **Ms. White was not deposed in this case at all**.  Since Ms. White was not deposed as a corporate designee, **she did not purport to speak for Encore** at her

deposition in the Grasso case.  Her statements as to her own understanding of the FLSA must

therefore be taken in their proper context.  Again, Ms. White was not even the Director of

Human Resources when the Plaintiff was hired, and the Plaintiff never deposed that Director,

or Encore's corporation counsel, or any Encore corporate designee to ascertain the

Defendant's corporate knowledge and understanding of the FLSA, actions to comply

therewith or decision to designate **this Plaintiff** as exempt.  The record is simply devoid of

any such evidence.

Therefore, without evidence from anyone who can personally testify or testify on

behalf of Encore as to why and how Ms. Gibson was deemed exempt, Plaintiff's quest for the

three-year statute of limitation necessarily fails.  For, as stated in Defendant's Motion, it is the

Plaintiff's burden to demonstrate a willful violation.  <u>EEOC v. O'Grady</u>, 857 F.2d 383, 388

(7th Cir. 1988).

<u>**CONCLUSION**</u>

By Plaintiff's own testimony and rendition of the facts, she satisfies the

"administrative" exceptions.  Plaintiff's attempt to put facts in dispute that are not material is

transparent.  All material facts have been set forth for the Court in Defendant's Motion for

Summary Judgment.  Plaintiff's claims under the FLSA and MWHL that she is due back-pay

for overtime are insufficient and unfounded as a matter of law.  Additionally, the Plaintiff has

fatally failed to provide, with any degree of certainty, the amount of damages, leaving this

crucial element to nothing but speculation and conjecture.  As such, even if the Plaintiff does

have appropriate claims under the FLSA and MWHL, her claims must necessarily fail due to

the purely speculative fact and amount of damages.

WHEREAS, the above premises being considered, Defendant, Encore Marketing International, respectfully requests this Honorable Court grant its Motion for Summary Judgment in its entirety and enter judgment for the Defendant as a matter of law.

Respectfully submitted,

JOSEPH, GREENWALD & LAAKE, P.A

By: _____

      Timothy F. Maloney
      Veronica Byam
      6404 Ivy Lane, Suite 400
      Greenbelt, Maryland  20770
      (301) 220-2200