0001
1 IN THE UNITED STATES DISTRICT COURT
2 FOR THE DISTRICT OF MARYLAND
3 --------------------------------x
4 CARMEN GIBSON, :
5 Plaintiff :
6 v. : Civil Action No.:
7 ENCORE MARKETING INTERNATIONAL, : L-02-CV-3827
8 INC., :
9 Defendant :
10 --------------------------------x
11
12 Deposition of CARMEN GIBSON
13 Greenbelt, Maryland
14 Wednesday, May 14, 2003
15 10:12 a.m.
16 Job No.: 1-16239
17 Pages 1 - 100
18 Reported by: Alda Mandell, RPR
19
20
21
22
0002
1 Deposition of CARMEN GIBSON, held at the offices of:
2
3 JOSEPH, GREENWALD & LAAKE, P.A.
4 6404 Ivy Lane
5 Suite 400
6 Greenbelt, Maryland 20770
7 (301)220-2200
8
9
10
11
12 Pursuant to agreement, before Alda Mandell,
13 Registered Professional Reporter and Notary Public of
14 the State of Maryland.
15
16
17
18
19
20
21
22

0003
1 A P P E A R A N C E S
2
3 ON BEHALF OF PLAINTIFF:
4 NEIL R. LEBOWITZ, ESQUIRE
5 Zipin, Melehy & Driscoll, LLC
6 Suite 610
7 8403 Colesville Road
8 Silver Spring, Maryland 20910
9 (301) 587-6364
10
11 ON BEHALF OF DEFENDANT:
12 VERONICA BYAM, ESQUIRE
13 JOSEPH, GREENWALD & LAAKE, P.A.
14 6404 Ivy Lane
15 Suite 400
16 Greenbelt, Maryland 20770
17 (301)220-2200
18
19
20
21
22

0012

1 position we would handle escalated calls from the
2 representative, process all of the representatives'
3 paper work.
4 Q Just so we're clear on titles, who were the
5 representatives?
6 A Other employees that worked for the company.
7 Q I see. So these were employee calls that
8 you were getting?
9 A These were calls that the customer service
10 reps would receive. They were not able to handle the
11 call because the customer may have been irate or
12 upset. So therefore the call was transferred to the
13 senior customer service rep.
14 Q I understand. And approximately how long
15 were you in that position?
16 A About a year or a little less.
17 Q Okay. And what was your next position at
18 Encore?
19 A I was a quality specialist.
20 Q Can you explain to me what that job entails?
21 A Basically that job entails listening to the
22 customer service rep's telephone calls to make sure

0013

1 they're providing customer service, quality customer
2 service, to make sure they're not being rude to the
3 customers, that they're being professional to the
4 customers and they're following the company's
5 policies.
6 Q So you would be listening in on live
7 conversations?
8 A Exactly.
9 Q And reviewing the customer service
10 representative's manner?
11 A Yes.
12 Q Mannerisms?
13 A Yes.
14 Q Procedure?
15 A Yes.
16 Q I understand. Okay. And approximately how
17 long did that position last for you?
18 A That position lasted approximately six
19 months -- six to seven months.
20 Q Let me digress for just a moment. With each
21 of these positions from customer service rep to senior
22 customer service to quality specialist, were these

0014

1 promotions?
2 A Yes.
3 Q So did you get a raise each time?
4 A Yes.
5 Q And what position were you in after quality
6 specialist?
7 A I was still a quality specialist but I
8 transferred to a different department.
9 Q What department were you in before?
10 A Customer service.
11 Q And then what department did you go to?
12 A Telemarketing.
13 Q So you had the same job responsibilities?
14 A Yes.
15 Q You were just in a different department,
16 telemarketing department, now?
17 A Yes.
18 Q I see. What position was next?
19 A After quality specialist I became the
20 telemarketing specialist.
21 Q Telemarketing specialist. Approximately how
22 long did you hold that position?

0015

1 A I held that position for probably about 15
2 months.
3 Q And what were your job duties as the
4 telemarketing specialist?
5 A As the telemarketing specialist my job was
6 to do script revisions. I also still monitored calls.
7 I processed any incoming paper work. I would prepare
8 reports based on the telephone calls that I monitored
9 for my supervisor to review. I also distributed the
10 scripts to outside vendors that we worked with. After
11 the scripts were approved by my supervisor. I also
12 processed incoming tapes from vendors. And the tapes
13 consist of a customer base from our clients which we
14 would need to process before we can distribute them to
15 the outside vendors for calling. I would also provide
16 a report to my superior based on the information
17 submitted from the vendors as to their performance.
18 Made necessary copies that came in from the vendors
19 that need to go to my superiors. Any information that
20 needed to be disseminated to the outside vendors from
21 the supervisor, I would disseminate them for my
22 superiors.

0017

1 A We had scripts that were already created.
2 Basically if we decided to, say, sell or offer a
3 product to Chevy Chase Bank, I would insert Chevy
4 Chase's name in the script so that while the
5 representatives are calling, they would say they're
6 calling on behalf of Chevy Chase Bank. If I needed to
7 implement the price or the cost of the program, I
8 would implement that into the script.
9 Q I understand. That was already written by
10 somebody else at Encore?
11 A Correct. Or an outside source.
12 Q Okay. And you said that you were also, as a
13 telemarketing specialist, monitoring calls? Would
14 this be the same that we spoke about when you were a
15 service customer representative? Senior customer --
16 A No. It's similar but different. In the
17 telemarketing department we did not make calls
18 internally. We hired companies to perform
19 telemarketing calls for us. So I would listen into
20 the companies that were making the calls for us.
21 Q And you would listen to live conversations?
22 A Yes.

0018

1 Q And what was the purpose of that?
2 A Just to make sure that those representatives
3 were adhering to Encore's policies and following all
4 procedures and they were selling the product
5 professionally.
6 Q And how would you follow up on that?
7 A I would document each monitoring session
8 that I recorded, I would tape them as well as create a
9 word document for my supervisor to review.
10 Q Would you comment upon the professionalism
11 of the representative you listened to?
12 A Yes. We had a standard form that we use to
13 monitor and we would rate them on a scale of one to
14 five.
15 Q For such things as -- can you give me an
16 example besides professionalism?
17 A Their tone, listening skills, grammar,
18 enunciation, pronunciation, common courtesy, polite.
19 That basically would cover.
20 Q So is that included -- I believe you said
21 something to the effect of that you prepare reports
22 based on calls monitored?

0020

1  vendors?
2     A   Yes.
3     Q   Did you supervise anybody while you were a
4  telemarketing specialist?
5     A   No.
6     Q   What was your work environment?  Were you in
7  an office?
8     A   I worked in a cubicle not really outside of
9  my boss's office, but I worked in a cubicle with a
10  couple of other individuals in the department that
11  also worked in the cubicle.
12     Q   And after telemarketing specialist, what was
13  your next position?
14     A   Then I was a telemarketing manager.
15     Q   So we're speaking now about the year 2000 --
16     A   Yes.
17     Q   -- approximately?  And how long were you
18  telemarketing manager?
19     A   For about 15 months.
20     Q   So that would bring us into 2001?
21     A   Yes.  Correction.  13 -- it was actually

22   April 2000 until my last day, which was May 2001.  So

0021

1 that would be 13 months.
2 Q And did you have a direct supervisor?
3 A Yes. My direct supervisor was Kelly
4 Hannabas.
5 Q The same person?
6 A Yes. From April 2000 through December 2000.
7 From December 2000 to May 2001 it was David Gallimore.
8 Q And what were your responsibilities as the
9 telemarketing manager?
10 A As the telemarketing manager my
11 responsibility was again to review reports from the
12 outside vendors, distribute or disseminate product
13 information to the vendors. I would still continue to
14 monitor. I would still continue to do list
15 processing. I would -- or I did work with the IT
16 Department for startup of any new programs. I
17 gathered reporting information from our Accounting
18 Department. I was in day-to-day contact with each
19 vendor that would call on any of our programs. And I
20 reviewed their performance results daily. I attended
21 meetings and provided reports to my superior for all
22 of the above.

0022

1 Q Can you think of anything else?
2 A I basically still did some of the
3 responsibilities of a telemarketing specialist because
4 that position was never filled.
5 Q Would it be correct to say that you took on
6 additional responsibility as well as a telemarketing
7 manager?
8 A Yes.
9 Q And did you receive a raise when you became
10 telemarketing manager?
11 A Yes.
12 Q Do you recall approximately what your salary
13 was at that position?
14 A It was 38,000.
15 Q Excuse me. 38,000?
16 A Yes. And in March of 2001 it increased to
17 43,000. I'm sorry. 48. 48. I'm sorry.
18 Q 48,000?
19 A Yes.
20 Q So in March 2001 it increased to 48,000?

21 A Yes.
22 Q When did you leave Encore?

1 A May 30th, 2001 I think was my last day.
2 Q Just as we did before, I want to review some
3 of the items you just told me so I can understand
4 better. You continued to monitor calls. Is that the
5 same that we talked about for the telemarketing
6 specialist?
7 A Yes.
8 Q So that was monitoring calls for the outside
9 companies?
10 A Yes.
11 Q And you reviewed the performance of the
12 representative that you listened to?
13 A Yes.
14 Q And you would comment on the performance to
15 your superior?
16 A Yes.
17 Q I believe you said you worked with the IT
18 Department for startup of new programs?
19 A Yes.
20 Q Can you explain that to me? First of all,
21 I'm wondering what the new programs are.
22 A Okay. Each time we brought on a new client

1 each client may have specific recommendations for
2 transmitting files back and forth and what that means
3 is the outside vendor, when they make a sale over the
4 phone, they have to transmit that sale to us and each
5 vendor has different requirements. So I have to make
6 sure that our IT Department can accommodate any new
7 vendors that take on business for us so that they are
8 able to transmit data back and forth.
9 Q Okay. I understand. And I think you said
10 you gathered reporting information from the Accounting
11 Department?
12 A Yes.
13 Q Is that correct? What sort of reporting
14 information?
15 A The Accounting Department would receive a
16 report from the vendors as to how many sales were
17 transmitted. So I would gather that data from the
18 Accounting Department for our records so that we can
19 account for how many sales the vendors are saying they
20 reported to us. So it was almost like a

21 cross-reference check.
22 Q And did you say that you were in day-to-day

1 suggestions?
2 A No. It would all be data from the vendor.
3 Q Data. And you said you attended meetings?
4 A Yes.
5 Q Were these internal Encore meetings?
6 A Yes.
7 Q Would these meetings be a set schedule?
8 A They could be set schedule, last minute,
9 strategy planning meetings.
10 Q Tell me if we can't generalize this, but who
11 else would attend these meetings?
12 A It could be the president of the company,
13 the vice-president of the company, or Accounting
14 Department or Client Service Department.
15 Q So it differed?
16 A Yes.
17 Q And why did you attend these meetings?
18 A Because if we were going to have new
19 programs coming in for telemarketing, then I would
20 have to prepare all of the necessary paper work or
21 documentation to send out to the clients or to the
22 vendors.

1 Q Okay. And you said it might be a strategy
2 meeting. What might that entail?
3 A As far as how we're going to telemarket a
4 program or different offers that we may want to try to
5 increase sales revenue.
6 Q And did you hold the position of
7 telemarketing manager through your last day at Encore?
8 A Yes. It was actually changed -- David
9 Gallimore changed the title to campaign manager in
10 March of 2001 when he gave me a raise.
11 Q So it changed in title. Did it change any
12 of your responsibilities?
13 A No.
14 Q Bear with me just a moment, please.
15 A Okay.
16 MS. BYAM: I'm going to ask the court
17 reporter to mark this as Exhibit Number 1,
18 please.
19 (Exhibit 1 was marked for identification and
20 was retained by counsel.)

21 BY MS. BYAM:
22 Q Mrs. Gibson, I'm going to show you what

0030

1 A Basically just calling the phone company,
2 getting an 800 number to provide a conference line so
3 that you can have multiple people dial in to have a
4 discussion. Or it was used when we monitored the
5 vendors if the clients wanted to listen in.
6 Q And would you listen in on those calls as
7 well?
8 A Yes.
9 Q So were those calls that you were
10 monitoring?
11 A Yes.
12 Q And again, this is to make sure that the
13 proper procedure was being followed?
14 A Yes.
15 Q And the proper politeness --
16 A Yes.
17 Q -- courtesy, et cetera, as we talked before?
18 A Yes. And it was an opportunity for the
19 clients to listen.
20 Q As well?
21 A Yes.
22 Q Would you speak with the client ever

0036

1    Q    And Lyndsay -- I don't know how you
2  pronounce her last name.
3    A    Marchese.  She was one of the client service
4  managers and we traveled together to some of the
5  vendor sites with some of the clients.  I worked with
6  her on a day-to-day basis as well.
7    Q    When you were in which position?
8    A    In the telemarketing specialist and campaign
9  manager position.
10    Q    Was Lyndsay superior to you or were you the
11  same?
12    A    She was a superior to me in a different
13  department.  She worked on the client service.  But
14  yeah, she would be not an immediate superior, but yes,
15  based on her position, yes.
16    Q    Okay.  And Deborah Chapin?
17    A    Yes.  She held the same position as Lyndsay
18  Marchese.  She was also a client service manager.
19    Q    Did you work with her on a day-to-day basis

20  as well?
21     A   Yes.
22     Q   And that was when you were a telemarketing

0037

1  specialist?

2     A   And manager.

3     Q   And campaign manager?

4     A   Yes.

5     Q   Michael Stott?

6     A   Michael Stott was also a telemarketing

7  manager.  He held the same position as I did.

8     Q   Were you seated in the same geographic area

9  as he was?

10     A   Yes.  Right across from each other.

11     Q   And was that the entire time you were a

12  telemarketing specialist?

13     A   Yes.

14     Q   What about Pamela Rubin?

15     A   Pamela Rubin.  She is the person that would

16  provide me with the reports for the sales that were

17  being transmitted from the vendors.

18     Q   She would provide you with the reports?

19     A   Yes.

20     Q   Did you have day-to-day contact with her?

21     A   Yes.

22     Q   And Joyce Fulton?

0038

1    A   Joyce Fulton.  She worked on the Encore
2   product so I required a lot of data from her or
3   information about the travel program.  So she was so
4   to speak like the assistant.
5    Q   You were in day-to-day contact with her as
6   well?
7    A   Yes.
8    Q   Tom Deliso?
9    A   He was the manager or director of Shared
10   Services who was Pamela Rubin's boss.  And we
11   basically shared reporting information, discussed
12   reports.  I also advised him as to when new programs
13   were going to be started so that he can prepare his
14   group as well for the preparation of the incoming
15   sales from the outside vendors.
16    Q   So was he in a different department from
17   you?
18    A   Yes.  Their department was called Shared
19   Services.
20    Q   Oh.  Yes.  Okay.  David Gallimore you said
21   was a supervisor, your direct supervisor, from
22   approximately March --

0040

1 A He was one of the marketing managers that I
2 worked with.
3 Q And what was your relationship with him,
4 with marketing manager?
5 A We basically shared data. He gave me his
6 suggestions for various telemarketing programs that we
7 could try and I would then pass those on to my
8 superior for final decision.
9 Q And did you also provide him information --
10 A Yes.
11 Q -- about anything?
12 A Yes.
13 Q And what would that be?
14 A After his suggestions was either approved or
15 denied, I would relay the feedback to him.
16 Q And what about Rodena Brown?
17 A That was Dave Gallimore's administrative
18 assistant.
19 Q And so what was your relationship with her?
20 A Basically she scheduled all my appointments
21 with David. Since he was the Executive VP, I
22 basically had to make an appointment for us to have

0041

1 our day-to-day meetings.
2 Q Is that pretty much all of your dealings
3 with Rodena?
4 A Yes.
5 Q And Laura Dickson?
6 A She is a product manager and she also sat in
7 the area by Dana Grasso.
8 Q And so what was your relationship with Laura
9 Dickson?
10 A We worked on her scripting ideas for her
11 travel product.
12 Q Were you in pretty much day-to-day contact
13 with Laura?
14 A For some of our clients, yes.
15 Q And Dana Grasso, what was her -- you said
16 Laura Dickson was a product manager. Dana Grasso
17 was --
18 A A product manager.
19 Q -- the same?
20 A Yes.
21 Q And what was your relationship with Dana?

22 A Basically she was a product manager for

0042

1 another product, Premier Fitness and Wellness. And
2 what I would do is I would get any incentives from her
3 that we can use to send to our vendors like maybe
4 little stress balls, any pins or logos that we can
5 send out to the vendors as a little incentive that
6 they can use for prizes for the best caller or top
7 producer. Things of that nature.
8 Q And the next name is Beth Bell?
9 A She became my superior approximately in
10 March or April of 2001.
11 Q 2001?
12 A Yes.
13 Q Would that be -- okay. I'm a little
14 confused.
15 A Okay.
16 Q I have Dave Gallimore from December 2000 to
17 May 2001?
18 A Okay. Then my correction. Dave was still
19 my superior so to speak but Beth was my immediate
20 supervisor.
21 Q I understand. So Beth became your immediate
22 supervisor in the spring of 2001?

0043

1 A Yes.
2 Q Did she sit geographically close to you?
3 A Yes.
4 Q Was she in an office?
5 A No. She was in a cubicle.
6 Q She was in a cubicle. And the last name is
7 Jackie Hudson?
8 A She was the director of Client Services. So
9 we also traveled together to some of the vendors. And
10 I worked closely with her for the startup of new
11 programs as well.
12 Q And what did that entail?
13 A Basically she would speak with the client
14 firsthand and she would relay the information back to
15 me as to what the client requested maybe script wise
16 or the different promotions that the client wanted to
17 offer.
18 Q I understand. And what would you do with
19 that information?
20 A I would then implement that information into
21 the script.

22 Q And just to clarify, there's a difference

1 July.
2 Q July of 2000?
3 A Yes.
4 Q And so in July of 2000 you were
5 telemarketing manager?
6 A Yes.
7 Q And your salary was approximately 38,000 per
8 year?
9 A Yes.
10 Q And then as we spoke of before, in March
11 2001 your title changed to campaign manager?
12 A Yes.
13 Q And your salary increased to 48,000 per
14 year?
15 A Yes.
16 Q And it says here you were paid on a biweekly
17 basis, is that correct?
18 A Yes.
19 Q And how were you paid? Were you paid with a
20 check?
21 A I had direct deposit into my bank account
22 and then I received a copy of the check.

1 Q Direct deposit every two weeks?
2 A Yes.
3 Q I think I'm done with that if you want to
4 set it aside.
5 A Okay.
6 Q Let's go back if we could to when you were
7 telemarketing specialist. You said you thought that
8 was approximately for 15 months in 1999 to 2000?
9 A Yes.
10 Q And so while you were holding that position,
11 what time of day did you generally get to work?
12 A I generally got to work anywhere from
13 quarter to 8:00 to 8:15 at the latest.
14 Q And did you sign in when you got to work or
15 punch a clock?
16 A No. We didn't have a sign-in sheet.
17 Q Did you report to anyone that you had gotten
18 to work in the morning?
19 A No. My immediate superior generally arrived
20 after I did so he would generally see me at my area
21 when he arrived.

22 Q So you would arrive between quarter of 8:00

0047

1 and 8:15 every day?
2 A Right.
3 Q Monday through Friday?
4 A Yes.
5 Q And when would you generally leave?
6 A I would generally leave anywhere from maybe
7 6:00 to 7:00 p.m. at night. In the evening rather.
8 Q And did that vary?
9 A Yeah. Some days I left at, you know, 6:00,
10 6:30. But generally 7:00. On some nights maybe 8:00
11 depending on if we had late conference calls because
12 some of our vendors were on different time zones so
13 that affected our time on the East Coast.
14 Q And when was lunch?
15 A Lunch, generally anytime after 12:00, after
16 1:00. Whenever I can get an opportunity to get away.
17 Or I'd bring my lunch.
18 Q How long would you take for lunch?
19 A Generally I'd run out and get a bite and
20 come back because during the lunch hour I had
21 monitoring sessions. So generally I'll eat through my
22 monitoring sessions. There was a cafe right across

0048

1 the street I would run out and get a bite, come back
2 and eat at my desk or bring my lunch.
3 Q And did you keep track of your hours?
4 A Yes, I did.
5 Q Did you do that for your own benefit or was
6 that -- we're talking telemarketing specialist?
7 A Right.
8 Q Did you do that for your own benefit or did
9 you do that because someone at Encore asked you to?
10 A I did that for my own personal benefit and
11 also because Kelly Hannabas asked me to because we
12 were not paid overtime. So she asked me to track the
13 time so we can use it so to speak as comp. time.
14 Q Comp. time?
15 A Comp. time I think is what she called it.
16 Q So how did you keep track of your hours?
17 A In my daily calendar I would just track, you
18 know, days that I had late conference calls, dates
19 that I traveled where I worked long hours. That's
20 basically how I would track it.
21 Q So you would do that yourself in your own

22 personal calendar?

0049

1 A Yes.
2 Q And did you ever provide that information to
3 Kelly?
4 A Anytime she needed it, yes. If she asked
5 for it, yes.
6 Q Did she ask for it on occasion?
7 A She asked for it on some occasions. For
8 example, like when I traveled, you know. Because
9 sometimes those are 12-hour days. So she would
10 inquire.
11 Q Okay. Let's talk about that.
12 A Okay.
13 Q Where would you go when you traveled?
14 A We went to visit the various vendor sites.
15 Q So would that be a day trip?
16 A It could be a two-day trip or a three-day
17 trip.
18 Q Does that generally entail getting on a
19 plane?
20 A Yes. I'm sorry.
21 Q That's okay. I'm just trying to figure out
22 if it was in the immediate Washington, D. C., Maryland

0050

1 area or whether you had to --
2 A Yes.
3 Q -- fly.
4 A I would go by car to Pennsylvania or I would
5 fly as well to another site in Pennsylvania, which
6 would be Pittsburgh, fly to Canada, fly to North
7 Carolina. And I think those were where most of our
8 bigger vendors were.
9 Q So you would travel to their principal
10 office sites?
11 A Yes.
12 Q Approximately how frequently would you be
13 traveling?
14 A It varied. Sometimes maybe once every three
15 months. Maybe twice in a month. It was frequent
16 travel but when I did, it was pretty close together or
17 as far as, you know, maybe once every three months or
18 twice in a month.
19 Q Okay. And we're still talking when you were
20 a telemarketing specialist?
21 A Yes. And campaign manager. I traveled

22 both.

1 Q And telemarketing manager?
2 A Yes.
3 Q Those three --
4 A Yes.
5 Q -- titles? So from approximately 1999 to
6 2001?
7 A I don't think I started traveling until
8 2000. I don't recall a trip in '99. It may have
9 occurred but I think more of my travel occurred in
10 2000.
11 Q Okay. And to clarify a little bit more
12 about these, would you go with anyone else from Encore
13 on these trips?
14 A Yes.
15 Q Always?
16 A Yes.
17 Q And who might you go with?
18 A I would go with Dave Gallimore, the client
19 service manager --
20 Q We mentioned one of their names.
21 A Lyndsay Marchese, Deborah Chapin. They were
22 the client service managers. As well as their

1 clients, MBNA or Chevy Chase Bank. Sometimes the
2 clients would come on the trip with us.
3 Q And what was the purpose of these trips?
4 A Basically so that the clients can see the
5 actual vendor facility, see how they're set up, the
6 type of equipment that they use. Just basically, you
7 know, meet the group that's actually calling their
8 clients to just say, you know, we're not just a name
9 but we're actually here, you know, to visit you, to
10 show our face. You know, to be in support of you
11 calling. Generally if some campaigns were successful,
12 the clients would go there just so they can see the
13 company. Because a lot of times clients don't visit
14 vendors. But in our situation our clients like to
15 visit the vendor facility. Just kind of see how --
16 you know, appearance, the look, and just to see if
17 they have updated equipment. Because we may tell them
18 these things but a lot of clients want to actually see
19 it for themselves.
20 Q And what about when the clients didn't go on
21 the trip? What would the purpose of those trips be?

22 A Okay. Generally then it would be myself and

0053

1 maybe another client manager just to be on site at the
2 startup of the program to do maybe like a rah rah
3 session for the reps there, buy them pizza, soda.
4 Maybe bring some incentives.
5 Q And would you report back on -- if the
6 client did not go and it was just you and another
7 Encore employee, would you report back on what your
8 perceptions were of the client site?
9 A Yes.
10 Q And you would report back to others at
11 Encore?
12 A Yes.
13 Q Excuse me. I think I said clients. The
14 vendor sites?
15 A Yes.
16 Q And your trips would be sometimes two-day
17 trips, sometimes three-day trips?
18 A Yes.
19 Q Did you always travel with a direct
20 supervisor?
21 A No.
22 Q So Dave Gallimore would go sometimes --

0054

1 A Yes.
2 Q -- with you?
3 A And in the past I traveled with John
4 Bourdon.
5 Q Okay. In any of your three titles that we
6 were talking about, telemarketing specialist,
7 telemarketing manager, campaign manager, did you ever
8 purchase anything for Encore?
9 A As far as work materials?
10 Q As far as I'm wondering, especially with the
11 traveling we just talked about, did you ever file
12 expense reports?
13 A Yes.
14 Q And what did those entail?
15 A It would entail the pizza that was purchased
16 at the vendor facility. It would entail my meals and
17 maybe some incentives. Sometimes I would buy them
18 candy and bring it to the center. It would entail the
19 rent-a-car and my hotel accommodations.
20 Q So how did that work? Did you have a credit
21 card that was only for business use?

22 A No. Generally the company would supply you

0056

1 A All of that documentation is in my file at
2 Encore.
3 Q Did you have to get pre-approval before you
4 purchased your incentives that you were talking about?
5 A Generally we have a $100 limit that we can
6 spend so that's our pre-approval amount.
7 Q Okay. Did you ever ask anyone at Encore,
8 any other Encore employee, for overtime wages or for
9 lost wages?
10 A Yes. I did make mention to Kelly Hannabas
11 about that and at that point, that's when she told me
12 that I needed to start tracking my time.
13 Q And was that when you were a telemarketing
14 specialist?
15 A Yes.
16 Q And Kelly was your direct superior?
17 A Yes.
18 Q Did you communicate with anyone else besides
19 Kelly?
20 A No. Just Kelly.
21 Q So she suggested that you start keeping
22 track of your time. Did anything else come out of

0057

1 your conversations with her?
2 A No. She just said, you know, maybe it could
3 be used as comp. time in the future. I don't think
4 there was much really that she could do.
5 Q Okay. And do you know what she meant by
6 comp. time? How did you understand that?
7 A Well, she said what I should do is record my
8 time and maybe if I needed to leave early one day I
9 can maybe use comp. time to accommodate for hours
10 already worked. That way I would not be charged an
11 hour leave.
12 Q Okay. If you did need to leave one day
13 early then, did you just leave or --
14 A Well, it would have to be preapproved.
15 Q It would have been preapproved by Kelly?
16 A Correct.
17 Q And did you keep track of the days that you
18 left early?
19 MR. LEBOWITZ: Objection. Assumes facts not
20 in evidence. You may answer.
21 BY MS. BYAM:

22 Q Did you ever leave work early between 1999

0058

1 and 2001?
2 A Yes. On some occasions.
3 Q And did you keep track of those days?
4 A Yes.
5 Q So that would also be in your work cal --
6 A Organizer. Yes.
7 Q Organizer?
8 A Yes.
9 Q Have you discussed this litigation with
10 anyone other than myself today and your counsel?
11 A No.
12 Q Not even your husband?
13 A No.
14 Q You haven't discussed this litigation with
15 your husband at all?
16 A No. I told him I was going to a deposition
17 today. That was it. I actually forgot to even
18 mention it to him.
19 Q So does he know that you filed suit against
20 Encore?
21 A Yes. That he does.
22 Q Do you have any children?

0060

1 Q And when you were a senior customer service
2 representative, was that managing the Call Center or
3 the Customer Service Department?
4 A No. It was just basically handling
5 escalated calls from the other representatives and
6 processing their paper work.
7 Q Right. And at that time -- I'm sorry, I'm
8 talking when you were a senior customer service rep --
9 do you remember what your salary was?
10 A It was probably maybe $10.20 an hour.
11 Q So you were paid on an hourly basis then?
12 A Yes.
13 Q And did you keep track of your time then?
14 A Yes. We filled out our own time sheet on a
15 weekly basis.
16 Q And then where did those time sheets go?
17 A It would go to my supervisor.
18 Q So what was the daily procedure for that?
19 When you first got in in the morning, would you fill
20 in the time sheet what time you arrived?
21 A No. When we first got on, our log-in time

22 was through our telephones. We would sign on through

0061

1 our telephones and that would record our hours.
2 Q And so then I'm assuming you would log off
3 at the end of the day and that would record your
4 hours?
5 A Correct.
6 Q And that number you would transfer to a time
7 sheet --
8 A Yes.
9 Q -- and hand that in at the end of the week?
10 A Correct.
11 Q So you did that when you were a customer
12 service rep and when you were a senior customer
13 service rep?
14 A As a senior -- well, yeah, we would still
15 log into the phone so I would think, yeah, as a senior
16 rep, yeah. That was still our sign-in procedure, to
17 sign onto our phones when we arrived.
18 Q Okay. And at that time did you ever work
19 more than 40 hours a week?
20 A Yes.
21 Q And you would log that into your time
22 sheets?

0063

1 A I can't recall. It is a possibility that I
2 did but I can't recall to be exact.
3 Q You're not sure?
4 A Right.
5 Q Okay. And correct me if I'm wrong. I
6 recall you being Quality Assurance in the Customer
7 Service Department and then maintaining the same
8 position but switching departments?
9 A Correct.
10 Q Correct? Okay. And then after that, did
11 you become a telemarketing specialist?
12 A Yes.
13 Q Okay. So I'm caught up. And when you were
14 a telemarketing specialist, I believe you told me
15 before you no longer logged in through a phone?
16 A Correct.
17 Q So there was no automatic way to keep track
18 of your time?
19 A Right.
20 Q But you started keeping track of your time
21 in approximately the year 2000 when Kelly Hannabas

22 suggested it to you?

0064

1 A Or '99. I'd have to go back and look at my
2 calendar as to when I actually started. But it may
3 have been approximately -- maybe towards the end of
4 '99.
5 Q Okay. And did you continue keeping track of
6 your own time when you were a telemarketing manager
7 and campaign manager --
8 A Yes.
9 Q -- up until the day you left Encore?
10 A Correct.
11 Q And on the day you left -- your last day was
12 May 30th, 2001?
13 A Yes.
14 Q How did you come to leave Encore?
15 A The company was downsizing and my position
16 was one that they decided they no longer needed.
17 Q Did other co-workers also leave at that same
18 time?
19 A Yes.
20 Q Was that the first time you were laid off
21 from an employment position?
22 A No. I worked for America Online back in

0068

1 also note Fleet, which was one of our clients, that
2 December and January they were going to have an
3 upcoming campaign and they were going to market a
4 product called MedAdvantage. They previously marketed
5 that product in November. So this was a note to
6 myself that I needed to go back and look at the
7 November results when they marketed the product from
8 the previous year.
9 I also sent scripts to Shell, which is
10 one of our oil card companies. And Glasgow I think is
11 one of our vendor locations in Canada and they were
12 calling for our client household and here I monitored
13 three representatives that are listed and I wrote
14 notes from their calls.
15 Q Okay. And where on your calendar would you
16 be keeping track of the hours that you worked?
17 A Okay. Here my conference call was scheduled
18 for 5:30. They generally last for one hour. So I
19 would have concluded work at 6:30, say, 7:00 o'clock
20 after doing my report on that day.
21 Q Okay. So I wouldn't necessarily know that

22 from looking but on that day there's a telephone

0071
1        MS. BYAM:  Thank you.  I think we're done
2    with that for now.  Actually, we're going to take
3    a break.  Go off the record.
4        (A brief recess was taken.)
5        MS. BYAM:  Back on the record.
6  BY MS. BYAM:
7    Q    Just so you know where we're going, I have
8  two more items to show you and ask questions about and
9  hopefully get out of here in about 20 or 30 minutes.
10    A    Okay.
11        MS. BYAM:  I'm going to set these aside for
12    now and ask the court reporter to mark what was
13    previously produced by counsel.  These are two
14    pages.  You can mark that as Exhibit Number 3,
15    please.
16        (Exhibit 3 was marked for identification and
17    was retained by counsel.)
18        MS. BYAM:  Back on the record.
19  BY MS. BYAM:
20    Q    Here is what's been marked as Exhibit Number
21  3.  Can you take a look at this for me, please.  And
22  if you know, tell me what that is.

0072

1 A Okay. This is basically the job duties for
2 the telemarketing specialist.
3 Q And did you prepare that list?
4 A No. That list was previously prepared when
5 I assumed the position of telemarketing specialist.
6 Q I understand. And as you look at that
7 list -- and you can take your time -- tell me if you
8 generally agree with the items that are listed there
9 as being the telemarketing specialist responsibilities
10 or job duties?
11 A Yes. I agree.
12 Q Okay. And then I believe your next job was
13 the telemarketing account manager?
14 A Yes.
15 Q And I'm going to ask the court reporter to
16 mark this Exhibit Number 4.
17 (Exhibit 4 was marked for
18 identification and was retained by counsel.)
19 BY MS. BYAM:
20 Q I'm going to show this to you. It was
21 previously produced by your counsel. What is that, if
22 you know?

0073

1 A This is the job description for the
2 telemarketing account manager.
3 Q And is that something that was pre-prepared
4 or did you prepare that?
5 A It was pre-prepared.
6 Q By somebody else at Encore?
7 A Correct.
8 Q And take your time if you need it, but tell
9 me if you generally agree with the job duties that are
10 listed there.
11 MR. LEBOWITZ: Read it first.
12 MS. BYAM: Take your time reading it.
13 A Yes. I agree with it.
14 BY MS. BYAM:
15 Q As we did before, I'm just going to ask you
16 a couple questions about these items.
17 A Sure.
18 Q Under vendor management, quarterly site
19 visits to evaluate training, calling and operations.
20 Do you see that?
21 A Yes.

22 Q Are those the site visits that we discussed

0082

1    Q    And it ended there?
2    A    Yes.
3        MS. BYAM:  I think that's all I have for
4    now, counsel.  Do you have any questions?
5        MR. LEBOWITZ:  I have a few.  Yes.
6        EXAMINATION BY COUNSEL FOR THE PLAINTIFF
7  BY MR. LEBOWITZ:
8    Q    Ms. Gibson, can you detail for me how
9  frequently you would meet with your supervisors?
10    A   I would meet with my supervisors daily.
11    Q   And what would you discuss during those
12  meetings?
13    A   We would discuss --
14        MS. BYAM:  Can I ask to clarify what
15    position we're talking about here?
16  BY MR. LEBOWITZ:
17    Q    Telemarketing specialist, telemarketing
18  services manager and campaign manager.  With respect
19  to those three, did you meet with your supervisors on
20  a daily basis?
21    A   Yes.
22    Q    And what did you discuss during your

0083

1  employment in those roles?
2      A   My supervisor would basically give me
3  direction as to how he wanted the campaigns to run for
4  that day and I would basically contact the vendor and
5  let them know what my supervisor's suggestions were.
6  So we generally met every morning to do that.
7      Q   Okay.  Did you have contact -- again during
8  your roles as telemarketing specialist, telemarketing
9  manager, and campaign manager, did you have -- well,
10  let me ask you first was the meeting that you just
11  described, that was an in-person meeting?
12     A   Yes.
13     Q   Did you have meetings with them that were
14  not in person, by phone, e-mail?
15     A   Yes.
16     Q   Other ways?  How often would you say you
17  would have contact with them in other ways?
18     A   Generally just if they're traveling or not
19  in the office, then we would have a conversation by
20  phone.
21     Q   And in terms of in-person meetings, would
22  you meet with them once a day, more than once?  Did it

0084

1  vary?
2      A    Once a day, sometimes twice depending, you
3  know, if my superior wanted to change a direction
4  based on the reports that I provided to them.
5      Q    You testified earlier that Beth Bell was in
6  a cubicle, is that correct?
7      A    Yes.
8      Q    Were there any other vice-presidents or
9  directors in cubicles?
10     A    No.  All vice-presidents and directors had
11 an office but Beth Bell was just my immediate
12 supervisor.  She was not given a title.  Her title was
13 actually the same as mine, campaign manager.  So when
14 she was made my immediate supervisor, she wasn't given
15 a new title at that time.  So she was still in a
16 cubicle as myself.
17     Q    And I'm going to jump around here a little
18 bit because I'm just touching on some things.  You
19 testified that your major was going to be business
20 management.  Can you explain to me what you meant by
21 that?
22     A    Right.  Generally the first two years of

0087

1 the client service manager would give me
2 authorization.
3 Q Could you alter a script without such
4 authorization?
5 A No.
6 Q You were also asked to discuss your arrival
7 time and leaving time to and from work. Let me ask
8 you about nights and weekends. Did you week evenings
9 at home?
10 A Yes, I did.
11 Q What was your schedule with respect to
12 working at night?
13 A Generally from home it would be anywhere
14 from maybe 6:00 to 8:00 p.m. Depending what time I
15 arrived at home, it may be from 5:30 to 7:30. So it
16 varied depending on what time I left the office. But
17 generally I would wrap up no later than 8:00 p.m. at
18 night.
19 Q What about weekends?
20 A Weekends I generally worked from 9:00 to
21 12:00, no later than 1:00.
22 Q On which day?

0088

1 A On Saturday. No Sunday.
2 Q There was also some talk about you keeping
3 track of your time on your own on your personal
4 calendar. Do you recall that testimony?
5 A Yes.
6 Q Were you keeping track of your arrival time
7 and leaving time from work or only different things
8 that would come up on a given day that might be late
9 in the day? If you understand my question. Maybe you
10 could explain it better.
11 A Okay. Generally I would log all hours that
12 I worked beyond 5:00 p.m. because my hours were
13 generally from 8:00 to 5:00 -- from 8:00 to 4:30. I'm
14 sorry. Those were my given hours. So I would
15 generally record any hours after 4:30 or 5:00 p.m. on
16 a given day.
17 Q What about night work at home or weekend
18 work? Was any of that recorded?
19 A Yes.
20 Q In terms of your arrival time to work
21 though, you didn't record that?

22 A No.

0092

1 are from phone calls that I've listened in on.
2 Q And the latter would be notes to yourself --
3 A Yes.
4 Q -- for your future reference when typing?
5 A Correct.
6 Q Okay. And again touching on what counsel
7 asked you regarding the monitoring of calls and the
8 forms, did you testify before that there would be some
9 sort of a scale on the form I believe you said from
10 one to five?
11 A Right. Exactly.
12 Q Can you tell me exactly how that would work?
13 If you were listening in on a call that a
14 representative was making, I believe you told me
15 before that such things as tone, courtesy or
16 politeness might be an item on the scale, is that
17 correct?
18 A Yes. Correct.
19 Q And would you then make a judgment from one
20 to five as to your perception as to where that
21 representative fell on that given call?
22 A Yes.

0093

1 Q And so you'd make that judgment and then at
2 the end you would forward that form on to a superior,
3 is that correct?
4 A Yes.
5 Q You said I believe -- you testified that you
6 worked from home. Was that every single night while
7 you were in the three positions?
8 A Generally it's the latter remotes in the day
9 or the evening. Generally if there was a remote that
10 may have occurred after 5:30 -- because I have
11 children that have to be picked up from after care by
12 6:00 o'clock -- so generally if there was a 6:00
13 o'clock, 7:00 o'clock remote, then those would be done
14 from home.
15 Q So remote meaning --
16 A I'm sorry.
17 Q That's Okay. I'm just going to clarify.
18 Remote would be -- what would that be?
19 A Monitoring.
20 Q Okay. And you could do that from -- you did
21 not have to be in the office?

22 A Right. You can do that from anywhere

0094

1 because you would dial in an 800 number.
2 Q I understand. That could even be done from
3 a cell phone?
4 A Exactly.
5 Q But you testified that even if you were
6 doing a remote from outside of Encore, you still kept
7 track of those hours if they were past 5:00 o'clock?
8 A Yes. I have a computer at home.
9 Q And if those are not included in this
10 calendar or in what's going to be produced by counsel,
11 I would ask for -- if that's a separate documentation,
12 I would also request that.
13 A It would be included.
14 Q It would be included in what I've asked?
15 A Yes.
16 Q Never worked on Sunday?
17 A No.
18 Q I think you said on Saturdays from 9:00 to
19 12:00 or no later than 1:00?
20 A Yes.
21 Q Is that correct? Was that every single
22 Saturday?
0095
1 A No. It was some Saturdays of the month. No
2 more than two Saturdays a month.
3 Q And this is that same time period --
4 A Yes.
5 Q -- that we've been talking about? And when
6 we discussed before the telemarketing specialist and
7 your arrival in the morning, that was, you testified,
8 between 7:45 and 8:15 a.m.?
9 A Correct.
10 Q Does that hold true for when you were
11 telemarketing manager and campaign manager?
12 A Yes. My hours were from 8:00 a.m. to 4:30
13 p.m.
14 Q So it varied maybe by a half an hour in the
15 morning times, between 7:45 and 8:15?
16 A Correct.
17 Q But that was generally the half hour when
18 you would arrive during the specialist, manager and
19 campaign manager?
20 A Yes.
21 Q How much of your time, when you -- obviously

22 this is going to be an approximation -- but how much