4

COPY

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
(Southern Division)

- - - - - - - - - - - - - - -x

CARMEN GIBSON,

      Plaintiff,

  vs.                        Civil Action No.

ENCORE MARKETING         WDQ-02-CV-3827
INTERNATIONAL, INC.,

      Defendant.
- - - - - - - - - - - - - - -x

              Silver Spring, Maryland

              Tuesday, July 1, 2003

Deposition of:

        DAVID A. GALLIMORE,

a witness, called for examination by counsel for the Plaintiff, pursuant to notice, held in the Law Office **of Zipin, Melehy & Driscoll,** 8403 Colesville Road, Suite 610, Silver Spring, Maryland, beginning at 1:25 p.m., before Linda C. Marshall, Registered Professional Reporter and a Notary Public in and for the State of Maryland, when were present:

*precise 'DReporting SerUices*
(301) 210-SO92
*ac. & v'q*

DEPOSITION OF DAVID A. GALLIMORE
CONDUCTED ON TUESDAY, JULY 1, 2003

6 (Pages 21 to 24)

21

1  being made by outside vendors as we've discussed,
2  correct?
3      A    That's correct.
4      Q    These were not Encore employees; is
5  that correct?
6      A    That is correct.
7      Q    You talked about some of them, but
8  where were the vendors located generally?  Were
9  they nationwide or?
10     A    At that time, we used -- that rough
11 period of time we used two vendors and they were
12 in Pennsylvania, and in the site down in North
13 Carolina.
14         And there were a couple of other sites
15 that I don't recall exactly where they were and
16 then we also had brought in a third vendor who
17 had a location up in Canada.
18     Q    And Ms. Grasso monitored the calls -
19         MS. BYAM: You mean Ms. Gibson.
20         MR. LEBOWITZ: I'm sorry. Thank you.
21         //

22

1  BY MR. LEBOWITZ:
2      Q    Ms. Gibson monitored the calls being
3  made by these vendors from her office in Lanham,
4  Maryland, correct?
5      A    That is correct.
6      Q    She did it by phone; is that correct?
7      A    That is correct.
8      Q    And when she monitored the calls, she
9  filled out a form, correct?
10     A    I have no specific knowledge of that.
11     Q    She never submitted any forms to you
12 based on the calls she monitored?
13     A    Never.
14     Q    Did she transmit any information to you
15 in writing based on the call monitoring?
16     A    No. The way that call monitoring
17 worked -- the calls are monitored by phone and
18 sometimes they are done in person when she
19 visited the site. And she obviously monitored
20 agents on site.
21         But as they were monitoring the phone,

23

1  the interaction took place between Carmen, the
2  call center facilitator. And on occasion, I --
3  with somewhat of frequency there was a client
4  representative involved in the call as well.
5          So, the -- during the call Carmen
6  managed the entire process as the vendor manager,
7  as the telemarketing manager. And she would
8  respond immediately after the completion of each
9  call.
10         She would respond to the call center
11 facilitator to give them feedback on the, on the
12 agent's performance and whether there was,
13 whether they followed the script accordingly and
14 whether they read the script with enough
15 enthusiasm and issues like that.
16         So she provided immediate feedback at
17 the conclusion of each call that was monitored.
18 And at the end of each call session, she would be
19 asked by the facilitator to provide an overall
20 rating of the monitoring session.
21         And sometimes the client would be asked

24

1  to do that as well. And that was all done
2  verbally and done instantly before the conclusion
3  of the monitoring session.
4      Q    So, a couple questions based on that.
5  To your knowledge, she did not complete forms at
6  all based on the calls that she monitored? It
7  was all verbal?
8      A    To my knowledge, yes. I just can't see
9  a situation where a form would have been
10 completed. If she did it, I have no knowledge of
11 it.
12     Q    This call center facilitator, who did
13 that person work for?
14     A    The call center, the vendor. I use
15 that interchangeably.
16     Q    What's a VQR?
17     A    I don't know.
18     Q    Vendor Quality Report, are you familiar
19 with that?
20     A    Not specifically, no.
21     Q    No one submitted Vendor Quality Reports

DEPOSITION OF DAVID A. GALLIMORE
CONDUCTED ON TUESDAY, JULY 1, 2003

7 (Pages 25 to 28)

---

Page 25

1  to you back in 2001?
2    A  I don't recall seeing any such
3  document.
4    Q  Are you familiar at all with internal
5  set of policies and standards that Encore used in
6  monitoring these phone calls made by the
7  telemarketer?
8    A  I'm aware that there was at one point
9  in time a procedural manual that may have
10 included something like that, but I have not,
11 never specifically did I read the entire manual
12 or am I aware of the existence of such a manual.
13   Q  From the time that you came to the
14 office in Maryland until the time that Ms. Gibson
15 left the company, did anyone else directly
16 supervise her within the company other than you?
17   A  Can you repeat your --
18   Q  Were you Ms. Gibson's only direct
19 supervisor during the time you were together at
20 Encore?
21   A  No.

Page 26

1    Q  Who was another supervisor, direct
2  supervisor?
3    A  Beth Bell.
4    Q  When did Beth Bell become her direct
5  supervisor?
6    A  Sometime in the spring of 2002.
7    Q  So, how long would you estimate you
8  were Ms. Gibson's direct supervisor overall?
9    A  Well, that would be from early 2001
10 until the spring of 2002.
11   Q  You mean spring 2001. She left spring
12 of 2001, May?
13   A  Maybe I gave you the wrong dates then.
14   Q  All right.  We can start over. My
15 understanding is that you came to the company
16 sometime in mid-2000, albeit in a role that was a
17 little less defined and Ms. Gibson left the
18 company May 30th of 2001?
19   A  Okay.
20   Q  So with that framework in mind, how
21 long would you say you were her direct

Page 27

1  supervisor?
2    A  Well, it would have been from early
3  2001 to whatever day she left the company.
4    Q  So how does Beth Bell fit in that?
5    A  Oh, I'm sorry. Sometime in the spring
6  of 2001, Beth became her supervisor for a matter
7  of weeks, shorter period of time.
8    Q  All right.
9    A  Beth was the last supervisor.
10   Q  In terms of her direct line of command
11 while both you and Ms. Gibson were with Encore,
12 who else would have been a direct supervisor to
13 Ms. Gibson? We've talked about you and Ms. Bell.
14 Is there anyone else?
15   A  I'm not sure.
16   Q  Well, from the time you joined the
17 company until the time she left, which was a
18 little less than a year, was there anyone else to
19 your knowledge who was her direct supervisor
20 other than yourself and Ms. Bell?
21   A  I'm not aware of anyone else.

Page 28

1    Q  What about someone who was not
2  necessarily her direct supervisor, but was
3  somewhat superior to her to whom she reported to?
4    A  I don't think I understand the
5  question.
6    Q  Was there someone above you that she
7  reported to to your knowledge?
8    A  No, not to my knowledge.
9    Q  What about someone below you in terms
10 of the structure she reported to?
11   A  Not to my knowledge.
12   Q  So, this information that Ms.- Gibson
13 was collecting based on her monitoring of these
14 phone calls, how was it transmitted back to the
15 company. If she's not telling it to you and she
16 has no other supervisors, who was she telling it
17 to?
18   A  What information?
19   Q  The information she gathers from
20 monitoring the calls?
21   A  Well, maybe I can explain it this way.

DEPOSITION OF DAVID A. GALLIMORE
CONDUCTED ON TUESDAY, JULY 1, 2003

8 (Pages 29 to 32)

## 29

The purpose of monitoring the calls is not to provide a report to the organization. The purpose is to weed out the agents on the phone who are non-performers, and those that are not complying with the script. And it's an effort to improve the overall program performance.

So it's whatever documentation that she, that she created, if she did create, would certainly, I would say, support that initiative or that effort.

So, I can't answer your question in terms of what did she do with it or where did it go. I have no knowledge of that, but I can only speak to the purpose of the monitoring process itself.

Q  Well, in terms of these decisions about weeding out people and deciding one vendor versus another, to your knowledge who in the company was making those decisions while Ms. Gibson was monitoring the calls?

A  Carmen would make those decisions.

## 30

Q  While she was working for you, would you say the monitoring of these phone calls was Ms. Gibson's primary duty?

A  No, not primary duty.

Q  How much time would you say she spent doing it to your knowledge?

A  I don't have a specific recollection of how much time she actually spent on a call.

Q  In terms of her other duties as teleservices manager and then campaign manager when her title changed, is it fair to say that Ms. Gibson was often required to collect and tabulate data?

A  Can we go back? You said something about title and --

Q  What I'm really focusing on is the time during which you were her supervisor, which would have been over that time period, her titles were, my understanding, teleservices manager and campaign manager.

Obviously, I'm not asking you to

## 31

testify about something before you became her supervisor. But during the time period you were her supervisor, is it fair to say that Ms. Gibson was often called upon to collect and tabulate data?

A  I don't think I can answer that. That's such a general question. What data are we talking about?

Q  Well, data from the vendors, data from the clients or information, if you prefer that term to data. Was she collecting and tabulating that sort of information?

A  The information that I'm familiar with that Carmen would be responsible for would be the specific program, the results. Each morning vendors report to us the previous night's performance.

Carmen was responsible for analyzing the results. And if results were not on target, she would have to address that issue with the vendors directly.

## 32

She would -- if it was a chronic problem, she would certainly have to discuss that with me. She also was responsible for reporting the results, the daily results back to clients. And program to-date results as well.

And whether she physically produced the reports or not, 1 can't specifically say. There may have been others that actually produced the physical document.

Q  Just so that the record is clear, when you talk about reporting results back to clients, what do you mean by clients?

A  Clients would be our partners, the companies for whom we are conducting the market.

Q  Can you elaborate upon that just a little bit, the type of marketing you're doing for them?

A  Well, in this case, it would be telemarketing. So we have relationships with companies, outside companies. We call them clients. And we market our services to their

DEPOSITION OF DAVID A. GALLIMORE
CONDUCTED ON TUESDAY, JULY 1, 2003

9 (Pages 33 to 36)

33

1 customers and they permit us to do that in
2 exchange for share of the revenue.
3     So we are somewhat responsible and
4 accountable back to them on all program
5 performance.
6   Q   So, the clients are different from the
7 suppliers, right? The suppliers are providing
8 the materials, if you will, that are then
9 marketed through the clients?
10   A   That sounds correct
11   Q   Okay. Got it.
12     Going back to one of the things you
13 said earlier, you talked about how she would
14 analyze the results. What did you mean by
15 analyze the results?
16   A   Well, she wasn't a robot, so she would
17 have to -- as a manager responsible for program
18 performance she would have to look at the results
19 and determine whether they were good, bad or
20 indifferent
21     And she would have to come up with, you

34

1 know, resolution. What kind of action, what
2 action needed to be taken in that range, wide
3 range of actions that could have been taken.
4   Q   You also mentioned if the results were
5 not on target, she'd have to take some action.
6 Who set targets?
7   A   Well, targets are collectively set
8 based on profitability.
9   Q   Who collectively set them?
10   A   That's an internal process where we
11 have a finance person that looks at the revenue,
12 and all the factors that go into determining if
13 something is going to be profitable.
14     Once we make that determination, we
15 establish what the performance targets are going
16 to be.
17   Q   And who was that person back in the
18 first half of 2001?
19   A   Well, it's actually done in combination
20 with the telemarketing manager. I'd be involved
21 and the finance person.

35

1   Q   Isn't it also a telemarketing director?
2 Well, let me ask you this first. Was there a
3 telemarketing director back in this first half of
4 2001?
5   A   Yes.
6   Q   Who was that?
7   A   Beth Bell.
8   Q   Prior to her taking on that role, do
9 you know who the prior telemarketing director
10 was?
11   A   There was none.
12   Q   You talked about how she took the
13 information and before there was reports back to
14 clients. Did she disseminate to people within
15 the company, within Encore as well to your
16 knowledge?
17   A   Yes.
18   Q   Who did she give that information to?
19   A   The information would go to me. And it
20 would also go to the account manager associated
21 with that particular client There may be others

36

1 in that. I don't recall exactly.
2   Q   To your knowledge, did she report the
3 information to people outside the company other
4 than clients?
5   A   To my knowledge, no.
6   Q   What percentage of your time, what
7 percentage of her time would you estimate was
8 spent doing those types of activities while she
9 was under your supervision?
10     MS. BYAM: Objection, form.
11 BY MR. LEBOWITZ:
12   Q   Want me to restate it or do you
13 understand?
14   A   I don't.
15   Q   The types of activities we were just
16 discussing in terms of the information she
17 collected and reported, what percentage of time
18 say in a given month would she spend doing that
19 type of activity while she was under your
20 supervision?
21   A   I don't specifically recall.

DEPOSITION OF DAVID A. GALLIMORE
CONDUCTED ON TUESDAY, JULY 1, 2003

15 (Pages 57 to 60)

57

1   A   He is not.
2   Q   Do you know when he left?
3   A   I don't recall exactly when he left.
4   Q   Gabrielle Nickens-Garner?
5   A   Yes.
6   Q   Is he still with the company or she
7   still with the company?
8   A   She is not.
9   Q   Rob Channon, is he still with the
10  company?
11  A   He is not.
12  Q   What was his title when he left, do you
13  know?
14  A   I don't know.
15  Q   Rodena Brown still with the company?
16  A   She is not.
17  Q   She was your administrative assistant?
18  A   She was.
19  Q   When did she leave?
20  A   Some time in 2002.
21  Q   Laura Dickson is not with the company,

58

1   correct?
2   A   She is.
3   Q   Oh, she is. I'm sorry.
4       What's her title now?
5   A   She's a temporary employee.
6   Q   She was a product manager, correct?
7   A   Correct.
8   Q   Does the company still have any product
9   managers?
10  A   Officially, no.
11  Q   Beth Bell, we talked about. And Jackie
12  Hudson, do you know that name?
13  A   Yes, I do.
14  Q   Is she still with the company?
15  A   She's not with Encore.
16  Q   Who does she work for now?
17  A   She works for Advisory Communications
18  Systems.
19  Q   Are those the people that run Law
20  Phone?
21  A   That's correct.

59

1   Q   What is the relationship between Encore
2   and ACS?
3   A   I'm not sure what you're asking.
4   Q   The business relationship?
5       MS. BYAM: I have to object. Neil, as
6   you know, Dave Gallimore was not designated as a
7   corporate designee. I want to make the record
8   clear, he's not answering for Encore or on behalf
9   of Encore.
10      MR. LEBOWITZ: I'm asking if he knows?
11      THE WITNESS: I don't know how to
12  answer the question. It's a really broad
13  question.
14  BY MR. LEBOWITZ:
15  Q   All right. Is Robin Detrick still with
16  the company?
17  A   She is not.
18  Q   Just a few minor issues here.
19      Your prior employers, which you
20  discussed during the last deposition, I need
21  addresses for them. Do you recall?

60

1   A   I don't recall.
2   Q   You don't recall any of them?
3   A   No, not off the top of my head, no.
4   Q   Why did you leave Safeguard?
5   A   Why did I leave Safeguard? It's
6   complicated.
7   Q   I got that impression from the Business
8   Week article?
9   A   Essentially, it was a change in control
10  and senior management staff was dismissed.
11  Q   Do you have any knowledge of the March
12  of this year Attorney General opinion from the
13  State of Vermont about Encore and the for free
14  airline tickets offer.
15  A   What was the question?
16  Q   Do you have any knowledge about the
17  State of Vermont, Office of Attorney General's
18  ruling with regard to Encore's for free airline
19  tickets offer?
20  A   I have no specific knowledge of that?
21  Q   All right.

DEPOSITION OF DAVID A. GALLIMORE
CONDUCTED ON TUESDAY, JULY 1, 2003

17 (Pages 65 to 68)

65

1  Q All right. I have nothing further.
2      MS. BYAM: Can we take a five minutes
3  break? Is that okay?
4      MR. LEBOWITZ: Sure.
5      (Recess taken.)
6      EXAMINATION BY COUNSEL FOR THE DEFENDANT
7  BY MS. BYAM:
8  Q Mr. Gallimore, I just have a couple of
9  questions for you. Can you tell me approximately
10 how many people you supervised in the spring of
11 2001?
12 A Somewhere in the. neighborhood of 30
13 approximately.
14 Q And you spoke a little bit, you
15 testified a little bit about call monitoring that
16 Ms. Gibson did.
17     After each call monitoring session, did
18 Carmen come to you to speak with you or did she
19 communicate with you in any way after each call
20 monitoring session?
21 A It was on an unusual occasion that she

66

1  would come and speak to me after a call
2  monitoring session.
3      The only time she would do that would
4  be if something went terribly wrong or a client
5  was extremely upset or something like that
6  happened.
7      Otherwise, she conducted the monitoring
8  sessions and took appropriate action based on the
9  outcome of each call.
10 Q So correct me if I'm wrong, but if
11 there's a call monitoring session going on and
12 Carmen was the one who was monitoring, would she
13 make a decision on the performance of the
14 representative she was listening to?
15     MR. LEBOWITZ: Objection, leading.
16     THE WITNESS: Well, I can describe how
17 the process works.
18 BY MS. BYAM:
19 Q Please do.
20 A As the telemarketing, campaign manager,
21 teleservices manager, whatever. I guess we used

67

1  interchangeable names here, but it's all the same
2  thing.
3      That individual is responsible for the
4  immediate decisions relative to how the program
5  is being represented on the phone, the individual
6  representative that's on the phone, they're
7  adherence to the script. And not only adherence,
8  but also their delivery of the script, the
9  scripted materials.
10     If they're not doing it in accordance
11 to the telemarketing managers, in their opinion,
12 immediately at that time while this is occurring,
13 they can ask that agent to be removed from the
14 program for the day and retrained.
15     They can ask that that agent be removed
16 permanently from the program or they can commend
17 that agent for doing a good job.
18     So it's a - it's designed to provide
19 immediate feedback so that we, as a company, can
20 judge how the program is doing, how the consumers
21 are responding to the offer that we're

68

1  presenting, how the telemarketing vendor on a
2  whole is doing.
3      So that's why they're monitored
4  generally on a daily basis to insure that they're
5  doing what they're supposed to and they're making
6  the program, maximizing the results.
7  Q   From what you just said, if Carmen was
8  monitoring calls, did she have the sole
9  authority -- I believe you said it was immediate
10 feedback. Did she have the sole immediate
11 authority to tell a representative to go for more
12 training?
13     MR. LEBOWITZ: Objection, leading.
14     THE WITNESS: Again, let me clarify how
15 the process works.
16     The telemarketing manager has absolute
17 authority to remove a person from a program
18 immediately. So, in other words, if -- if an
19 agent used foul language, for example, Carmen or
20 any other telemarketing manager, Beth or any of
21 them, would instruct the, the call coordinator on

DEPOSITION OF DAVID A. GALLIMORE
CONDUCTED ON TUESDAY, JULY 1, 2003

18 (Pages 69 to 72)

Page 69

the telemarketing side, not a call coordinator. I forget the exact name. The facilitator, the call facilitator, our telemarketing manager would instruct them to get the supervisor, the floor supervisor and remove that person from the program immediately.

And that was not only - not only does the telemarketing manager have the authority to do that, but they have the obligation to do it.

In addition to that, the telemarketing manager can immediately shut down all telemarketing calls by that vendor if there is significant inefficiency across the board, if it's rampant.

And if the vendor is not managing the program correctly, then they can on the spot, on the dime shut it down.

Q   Did Carmen always perform her duties from the Lanham office?
A   No. Carmen had an unusual shift. She would -- I don't know if you would call it a

Page 70

shift, but she would work less than eight hours in the office and often finish up at home, from her home. So, she did remote monitoring from her home.
Q   Did you authorize that schedule?
A   I did not personally authorize that schedule.
Q   Do you know who schedules the monitoring sessions?
A   The campaign manager schedules the monitoring sessions at that individual's convenience within, within the confines of the shift that needs to be monitored.

So in other words, there's a day shift of telemarketing calling that takes place and a evening shift. And the telemarketing manager can schedule that call for the beginning of the shift, the middle of the shift, end of the shift, whatever is more convenient for them.
Q   You just said that Carmen would at times not work eight hours in the office, but

Page 71

would work from home. Is that what you said?
A   That is correct.
Q   Do you know why she worked from home? Do you know why her schedule was that way?
    MR. LEBOWITZ: Objection, calls for speculation.
    MS. BYAM: If you don't know, tell me you don't know.
    THE WITNESS: Well, I know the answer. She had child care issues and I think we - I know that this, her schedule was adjusted and we were flexible. So to accommodate her being able to take care of her child.
BY MS. BYAM:
Q   The what did you call it, the procedural manual that you testified to earlier. I believe you said you recall there being a manual, but you don't think you read it all the way through. Do you recall that testimony?
A   I do recall.
Q   Do you know what the purpose of that

Page 72

manual was?
A   Yeah, the purpose actually are two-fold. In doing business with certain clients or partners, we're required to have procedures, documented procedures that our telemarketing vendors have to adhere to and just in general how we conduct our telemarketing campaigns.
Q   Telemarketing vendors have to adhere to?
A   Yes.
Q   So the procedural manuals go to the vendors?
A   We do provide procedural manuals to the vendors. I have not seen them in a while, but we do provide them with documentation of how we conduct the campaign and certain standards they have to adhere to.
Q   I believe I have only one more question.

If you could clarify your meetings with Ms. Gibson. I'm speaking about a one-on-one

DEPOSITION OF DAVID A. GALLIMORE
CONDUCTED ON TUESDAY, JULY 1, 2003

19 (Pages 73 to 76)

73

1  meeting between the two of you that you testified
2  would -- you said they would be -- you
3  characterized them as regular contact?
4      A  Mm-hmm.
5      Q  Can you describe to me in general how a
6  meeting would proceed?
7          MR. LEBOWITZ: Objection, asked and
8  answered?
9  BY MS. BYAM:
10     Q  Do you understand the question?
11     A  You asked how the meetings would come
12 about.
13     Q  I'm asking you to describe if I was
14 outside watching the meeting, would I see you
15 talking, for example, and Carmen merely
16 listening?
17     A  Well, I can --
18     Q  Vice versa?
19     A  Well, generally, these -- again, this
20 is a generalization because I don't recall the
21 various, each specific instance.

74

1      Q  Sure.
2      A  But, generally, Carmen would call me or
3  e-mail and tell me that, you know, she had to go
4  over a few things.
5          Like anyone else in the department, any
6  of my direct reports, I didn't have a standing or
7  sitting meeting with her, not that I recall.
8          But there may be a period of time where
9  if we're working on a particular campaign we may
10 decide to meet every morning or every afternoon
11 until we iron out whatever details needed to be
12 ironed out.
13         So that's kind of the nature of how
14 these meetings may occur. So, they were regular
15 in the sense that we met on somewhat of a regular
16 basis, but they were not defined and they were
17 not rigid time frames.
18         So in those meetings there'd be, I
19 would call it, an exchange. You know, I
20 didn't -- the meetings were not for me to tell
21 Carmen what to do and how to go about doing it.

75

1          And likewise, the meeting, Carmen
2  didn't come to the meeting to tell me what she
3  had done and how she had actually done all those
4  things.
5          The meetings were designed just to
6  cover things that needed to be resolved. Things
7  that may be problematic, new scripting ideas, how
8  we might go about trying to improve a particular
9  list, a particular campaign. Maybe a particular
10 vendor location that's under-performing and we
11 may need to discuss ways of -- what course of
12 action to improve that performance.
13         So everything is generally designed in
14 and around trying to maximize performance. And
15 if things are going well and we're hitting
16 target, there's nothing to discuss.
17         If we need to improve things or have
18 new ideas or if there are issues, then those are
19 the things that we discussed.
20     Q  You said a little bit earlier you had
21 about 30 direct reports.

76

1      A  Yes.
2      Q  And we're talking spring of 2001?
3      A  Yes. They weren't all direct reports,
4  but probably half of them were.
5      Q  Did you have regular contact with all
6  of them?
7      A  I had the same type of contact where
8  again having that many direct reports, it's
9  physically impossible to meet with everybody
10 every day.
11         So it's little bit like triaging in the
12 sense that if there's something new, if there's a
13 problem, a issue, then that person would get an
14 audience.
15         MS. BYAM: I don't have anything
16 further.
17         MR. LEBOWITZ: I just have a couple.
18 FURTHER EXAMINATION BY COUNSEL FOR THE PLAINTIFF
19 BY MR. LEBOWITZ:
20     Q  What is the quality monitoring
21 initiative?

COPY

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
(Southern Division)

- - - - - - - - - - - - - - -x

CARMEN GIBSON,

       Plaintiff,

  vs.                          Civil Action No.

ENCORE MARKETING          WDQ-02-CV-3827
INTERNATIONAL, INC.,

       Defendant.
- - - - - - - - - - - - - - - x

                     Silver Spring, Maryland

                     Tuesday, July 1, 2003

Deposition of:

              **DAVID A. GALLIMORE,**

a witness, called for examination by counsel for the Plaintiff, pursuant to notice, held in the Law Office of **Zipin, Melehy & Driscoll,** 8403 Colesville Road, Suite 610, Silver Spring, Maryland, beginning at 1:25 p.m., before Linda C. Marshall, Registered Professional Reporter and a Notary Public in and for the State of Maryland, when were present:

             O *precise JZeportirug Services*
   Oyu         (301) 210-SO92
             sm;,g 7VLT, T.C. & *vq*